UNITED STATES DISTRICT COURT
THE DISTRICT OF MASSACHUSETTS

PAULA O'DONNELL
            Plaintiff

v.                                              Civil Action No. 05-11257-NG

DONNA BOGGS*, BRENDAN HALL,
WILLIAM FRANCIS, MARY LOU MEGAN
and MARIAN DOUCETTE

            Defendants

## AFFIDAVIT OF HARVEY WEINER, ESQ.

I, Harvey Weiner, hereby depose under oath and state as follows:

1.      I am an attorney in good standing admitted to practice before the Bar of the

Commonwealth of Massachusetts and the United States District Court. I am counsel for

defendants Donna Boggs, J. Brendan Hall, William Francis, Mary Lou Meighan and Marion

Doucette. I submit this Affidavit in support the Defendants' Motion for Summary Judgment.

2.      A true and accurate copy of the Collective Bargaining Agreement ("CBA")

between the Boston Globe Employees Credit Union ("Credit Union") and the Office and

Professional Employees International Union, Local 6, AFL-CIO ("Local 6"), dated January 1,

2000 through December 31, 2002 is attached hereto as Exhibit 1.

3.      A true and accurate copy of the CBA between the Credit Union and Local 6 dated

January 1, 2003 through December 31, 2005 is attached hereto as Exhibit 2.

---

* Defendant Donna Boggs was incorrectly identified in defendants' Notice of Removal as Donna
Briggs.

4.     True and accurate copies of the following correspondence between Scott Adams, Esquire (attorney for Paula O'Donnell, hereinafter "Adams"), Harvey Weiner, Esquire (attorney for the Credit Union, hereinafter "Weiner"), the Credit Union and Local 6 related to Ms. O'Donnell's claims and grievance are attached hereto as indicated:

- Letter from Adams to Donna Boggs dated October 27, 2003 – Exhibit 3;

- Letter from Weiner to Adams dated November 19, 2003 – Exhibit 4;

- Letter from Adams to Weiner dated December 30, 2003 – Exhibit 5;

- Letter from Weiner to Adams dated January 13, 2004 – Exhibit 6;

- Letter from Adams to Weiner dated January 19, 2004 – Exhibit 7;

- Letter from Weiner to Adams dated February 2, 2004 – Exhibit 8;

- Letter from Adams to Weiner dated February 11, 2004 – Exhibit 9;

- Letter from Weiner to Adams dated February 13, 2004 – Exhibit 10;

- Letter from Lisa Lemieux, Business Agent for Local 6 ("Lemieux"), to Marion Doucette, dated February 25, 2004 and enclosing grievance – Exhibit 11;  Letter from J. Brendan Hall to Lemieux dated March 25, 2004 (unsigned) – Exhibit 11A;

- Letter from Lemieux to Peter Vinci, Manager/CEO of the Credit Union ("Vinci"), dated August 24, 2004 – Exhibit 12;

- Letter from Vinci to Lemieux dated August 27, 2004 – Exhibit 13;

- Letter from Lemieux to Vinci dated September 7, 2004 – Exhibit 14;

- Letter from Vinci to Lemieux dated September 13, 2004 – Exhibit 15;

- Letter from Lemieux to Vinci dated September 15, 2004 – Exhibit 16;

- Letter from Weiner to Vinci dated September 21, 2004 – Exhibit 17; and

- Letter from Robert Manning, General Counsel for Local 6, to Weiner dated June 14, 2005 – Exhibit 18.

5.      Paula O'Donnell ("O'Donnell") is a former employee of the Credit Union who alleges that over the course of several years she was harassed and ultimately constructively discharged.  Complaint at ¶¶ 7, 23.

6.      The Credit Union is a state-chartered financial institution incorporated in 1962 and located in Boston, Massachusetts.

7.      Defendant Donna Boggs was a member of Credit Union's Board of Directors at all times relevant until 2004 and served as Chairman during the relevant period.

8.      Defendant J. Brendan Hall was a member of the Credit Union's Board of Directors at all times relevant.

9.      Defendant William Francis has been a member of the Credit Union's Board of Directors since 2000.

10.      Defendant Mary Lou Meighan has been a member of the Credit Union's Board of Directors since 2001.

11.      Defendant Marion Doucette was an employee of the Credit Union for 30 years. She served on the Credit Union's Board of Directors at all times relevant, and served as Manager/CEO of the Credit Union from June 1998 until her retirement on July 2, 2004.

12.      O'Donnell was employed by the Credit Union from 1974 through February 13, 2004.  Complaint at ¶ 7; Letter from Weiner to Adams dated February 13, 2004 at Ex. 10.

13.      I was retained by the Credit Union in November, 2003 relative to Ms. O'Donnell's complaints and failure to return to work.

14.      Credit Union employees are covered by a CBA between the Credit Union and Local 6.  The text of the relevant portions of the CBA remained unchanged from the January 1, 2000 agreement through the January 1, 2003 agreement.  Compare Ex. 1, Ex. 2.

15.    O'Donnell was a signatory to the agreement as Shop Steward for Local 6 for the CBA in effect from January 1, 2000 through December 31, 2002, and was a member of Local 6 at all relevant times. Ex. 1 at 18.

16.    Defendants Marion Doucette and J. Brendan Hall were also signatories to the CBA during the same period. Id. Doucette signed as Manager/CEO and Hall signed as a Member of the Board of Directors. Id.

17.    Defendants Doucette, Hall and Marylou Meighan were signatories to the CBA in effect from January 1, 2003 through December 31, 2005. Ex. 2 at 18. Hall and Meighan signed as members of the Board of Directors and Doucette signed as Manager. Id.

18.    The CBA includes: Article VI, which vests all management rights in the Credit Union; Article XV, which addresses unpaid leaves of absence; Article XIX, which provides a grievance procedure; Article XX, which addresses discipline and discharge; and Article XXI, which provides for arbitration of grievances. Ex. 1 at 3, 8, 11, 13; Ex. 2 at 3, 8, 11, 13.

19.    Article VI of the CBA provides in part:

"All disciplinary action undertaken by Management against a member of the Bargaining Unit shall be for just cause and will be conducted in private and in such manner as to create respect for authority and preserve individual dignity. It is the responsibility of Management to inform individuals directly and in private of any alleged failure to perform their work properly so that the necessary changes and/or corrections can be made as speedily as possible."

Ex. 1 at 3-4; Ex. 2 at 3-4.

20.    Article XV of the CBA states as follows:

"Unpaid Leaves of Absence – Unpaid leaves of absence for good and sufficient reason in the opinion of the Employer shall be granted upon written request and shall not be unreasonably denied. Such leaves shall not be construed to be a termination of employment so long as they last no more than 6 months and the employee does not become employed by another employer. The employer will not be obligated to maintain benefits coverage during leaves covered by this article, but may do at its discretion considering each case."

4

Ex. 1 at 8-9; Ex. 2 at 8-9.

21.    Article XX of the CBA states in part:

"The Union and the Employer agree that discipline, including discharge, must be administered fairly and consistently for just cause. Discipline will typically be progressive. The offense facts and circumstances will determine the level of discipline to be applied regardless of prior discipline, if any...

...A minimum of two written warnings will be issued before an employee may be dismissed except in the case of gross neglect of duty or serious misconduct."

Ex. 1 at 13; Ex. 2 at 13.

22.    O'Donnell did not return to her job after August 14, 2003. Her sick leave and vacation time expired on or about November 30, 2003.

23.    Through her attorney, Adams, O'Donnell indicated that she would not return to work because of what she perceived to be a hostile working environment. Ex. 3: Letter from Adams to Boggs dated October 27, 2003.

24.    The letters from Attorney Adams acknowledged that O'Donnell's claims needed to be addressed through the grievance procedure provided for in the CBA. See, e.g., Ex. 3: Letter from Adams to Donna Boggs dated October 27, 2003; Ex. 5: Letter from Adams to Weiner dated December 30, 2003; Ex. 7: Letter from Adams to Weiner dated January 19, 2004.

25.    On or about January 19, 2004, Ms. O'Donnell requested an unpaid leave of absence. Ex. 7: Letter from Adams to Weiner dated January 19, 2004. The request was denied by the Board of Directors on the grounds that O'Donnell had not provided good and sufficient reason to grant the request as required by Article XV of the CBA. Ex. 8: Letter from Weiner to Adams dated February 2, 2004; Ex. 2 at 8.

26.    On February 2, 2004, the Board of Directors gave O'Donnell one final opportunity to end her unauthorized absence and return to work on February 17, 2004. Ex. 8: Letter from Weiner to Adams dated February 2, 2004.

27.    O'Donnell declined the opportunity to end her unauthorized absence from work. Ex. 9: Letter from Adams to Weiner dated February 11, 2004. As a result, the Board of Directors terminated O'Donnell for gross neglect of duty, as allowed for in Article XX of the CBA. Ex. 10: Letter from Weiner to Adams dated February 13, 2004; Ex. 2 at 13.

28.    Local 6 pursued a grievance on behalf of O'Donnell on February 25, 2004. Ex. 11: Letter from Lisa Lemieux to Marion Doucette dated February 25, 2004. The grievance alleged that O'Donnell's termination violated Articles I, VI, XV and XX of the CBA, and sought O'Donnell's reinstatement. Id.

29.    There is a multiple-step grievance process under the CBA. Ex. 2 at 11-12. A grievance hearing was held on March 19, 2004. Ex. 13: Letter from Lemieux to Vinci dated August 24, 2004. The Credit Union denied the grievance on March 25, 2004. Ex. 11A: Letter from Hall to Lemieux dated March 25, 2004 (unsigned).

30.    There was a dispute as to the subsequent steps in the grievance process between Local 6 and the Credit Union. See Ex. 14: Letter from Lemieux to Vinci dated September 7, 2004; Ex. 15: Letter from Vinci to Lemieux dated September 13, 2004; Ex. 16: Letter from Lemieux to Vinci dated September 15, 2004. Ultimately, the Credit Union agreed to arbitrate the grievance despite a dispute over the timing of the request for arbitration. Ex. 17: Letter from Weiner to Lemieux dated September 21, 2004.

31.     Local 6 abandoned the grievance just prior to a scheduled arbitration.  The grievance was formally withdrawn on June 14, 2005.  Ex. 18: Letter from Peter Manning to Weiner dated June 14, 2005.

32.     O'Donnell filed the instant complaint in Massachusetts Superior Court on or about April 28, 2005, alleging two counts of tortious interference with contractual relations, one against Doucette and the other against the other named Board members.

**Signed under the pains and penalties of perjury** this 6th day of September, 2005.

_____
Harvey Weiner

619736_1

# EXHIBIT 1

# COLLECTIVE BARGAINING AGREEMENT
between the

# BOSTON GLOBE EMPLOYEES CREDIT UNION
and the

# OFFICE AND PROFESSIONAL EMPLOYEES
# INTERNATIONAL UNION, LOCAL 6, AFL-CIO

# JANUARY 1, 2000 THROUGH DECEMBER 31, 2002

# TABLE OF CONTENTS

Anti-Discrimination .................................................... pg. 15
Applications ........................................................... pg. 11
Arbitration ............................................................ pg. 14
Bereavement Leave ..................................................... pg. 7
Coverage and Employment ............................................... pg. 1
Cross Training and Fill-Ins ........................................... pg. 11
Discharge and Discipline Action ....................................... pg. 13
Grievances ............................................................ pg. 11
Holidays .............................................................. pg. 4
Insurance ............................................................. pg. 6
Jury Duty ............................................................. pg. 5
Leaves of Absences .................................................... pg. 8
Length of Contract .................................................... pg. 18
Longevity ............................................................. pg. 16
Management Rights ..................................................... pg. 3
New Job Catergories ................................................... pg. 9
No Strike/Lockout ..................................................... pg. 15
Overtime .............................................................. pg. 3
Paid Sick Leave ....................................................... pg. 7
Parental Leave of Absence ............................................. pg. 8
Part-Time Employees ................................................... pg. 16
Payroll Deductions .................................................... pg. 4
Personnel Files ....................................................... pg. 15
Posting (of vacant positions) ......................................... pg. 10
Promotions/Transfers .................................................. pg. 9
Recognition Clause .................................................... pg. 1
Retirement Plan ....................................................... pg. 15
Seniority ............................................................. pg. 9
Service Letter ........................................................ pg. 17
Temporary Vacancies ................................................... pg. 9
Tuition Reimbursement ................................................. pg. 17
Vacation .............................................................. pg. 5
Wages ................................................................. pg. 2
Work Week ............................................................. pg. 2

**ARTICLE I**          **RECOGNITION  CLAUSE**

The Employer recognizes the OPEIU Local 6 AFL-CIO as the sole and exclusive Collective Bargaining Agent for all its full-time and regular part-time office clerical employees as listed in the *Certification of Representation from the National Labor Relations Board.*

The Union recognizes that the Employer is subject to the Massachusetts State Statutes and General Laws relating to financial institutions and credit unions as a state-chartered organization, and being insured by the *National Credit Union Share Insurance Fund and Massachusetts Credit Union Share Insurance Corporation,* subject to the regulations of the *Commonwealth of Massachusetts Office of Commissioner of Banks* both as amended or may be amended.  Therefore, no provision in this agreement shall prevent the management from carrying out their responsibilities under the regulations promulgated by the aforementioned regulatory agencies.

Successors and Assigns
Should the Employer sell, transfer, or assign its right, title, or interests or transfer by receivership or bankruptcy, its interest or ownership in any form or manner to a successor employer, the Employer will include in the transfer agreement a provision requiring the successor employer to recognize the Union and to be bound by the terms and conditions of this agreement and shall deliver a copy of this agreement to the successor employer.  In the event such a sale, transfer, or assignment occurs, the Employer shall also deliver to the Union a copy of that portion of the sale, transfer or assignment agreement that includes the provision that the successor employer recognize the Union and that it agrees to be bound by the terms and conditions of this agreement.

**ARTICLE II**         **COVERAGE AND EMPLOYMENT**

All employees presently in the bargaining unit and all probationary employees upon completion of their probationary periods shall become and remain members of the Union as a condition precedent to continued employment with the Credit Union and the Union agrees to receive into its membership all such employees who may be eligible therefore according to the laws of the Union.

All new employees hired to fill positions covered by the Bargaining Unit shall be probationary employees for the first 90

calendar days. The Credit Union may, during such 90 days, in its discretion, dismiss, lay off or transfer such employees whether with or without cause and no grievance shall be filed or claimed on behalf of such employees by the Union or on account of any action of the Credit Union during said 90 calendar days. However, all provisions of this Agreement, except where the contrary is indicated herein, shall apply to the probationary employees. Nothing herein, however, shall affect the termination of employment for just cause.

| | |
|---|---|
| **ARTICLE III** | **WORK WEEK** |

Employees current hours shall continue to be observed. The regular work week of 37.5 hours, shall consist of not more than five (5) days, of not more than 7.5 hours per day. Employees with regularly scheduled work days and hours will be given two weeks notice of any changes in schedule.

A.) Breaks:

1.) Part-time employees who work at least four (4) hours per day, but less than six (6) hours, shall receive a twenty (20) minute paid break, to be taken at the discretion of the immediate manager, based on the operational needs of the Credit Union. Part-time employees who work at least six (6) hours per day receive a one-half (1/2) hour paid break.

2.) Full-time employees shall receive two (2) fifteen (15) minute paid breaks; one (1) in the morning, one (1) in the afternoon. A thirty (30) minute unpaid break shall be given for lunch; however, one-hour lunch breaks may be required, combining the two (2) fifteen (15) minute paid breaks together with the one-half (1/2) hour unpaid break lunch period, at the discretion of the immediate manager, based on the operational needs of the Credit Union.

| | |
|---|---|
| **ARTICLE IV** | **WAGES** |

A.  All employees covered by this agreement shall receive a 3% increase for each year of this agreement.

B.  Base pay for new hires:

| | |
|---|---|
| Systems Manager: | $600/wk |
| Bookkeeper: | $575/wk |
| Sr. Loan Officer: | $525/wk |

2

| | |
|---|---|
| Loan Officer: | $385/wk |
| Head Teller: | $425/wk |
| Operations Clerk: | $400/wk |
| Member Rep: | $325/wk |
| Asst. Head Teller: | $375/wk |
| Full-time Teller: | $350/wk |
| Exper. P/T Teller: | $8.50/hr. |
| In-exp. P/T Teller: | $8.25/hr. |

The base pay schedule will become effective on October 1, 2000.

C.   Merit raises will be allowed, with the approval of
management, on an individual basis.

**ARTICLE V**        **OVERTIME**

Pay for work in excess of 7.5 hours per day or 37.5 hours per
week, scheduled Monday through Saturday, will be paid at the rate
of time and one-half of the employee's straight time rate. Pay for
Holidays and Sundays will be paid at the rate of double-time.

Mandatory training sessions scheduled outside of the normal 7.5
hour work day or 37.5 hour work week shall be compensated at
straight time, for all hours actually worked.

**ARTICLE VI**        **MANAGEMENT RIGHTS**

All management rights, powers, authority and functions, whether
heretofore or hereafter exercised, and regardless of frequency or
infrequency of their exercise, shall remain vested exclusively in the
Credit Union, and the Credit Union shall have the sole and
exclusive right to manage its business in every respect and to take
any other action which the Credit Union deems desirable to the
conduct of its business.

It is the intention of Credit Union and the Union that the
management rights, powers, authority and functions referred to
herein shall remain exclusively vested in the Credit Union except
insofar as specifically forbidden or abridged by an express
provision of this Agreement.

All disciplinary action undertaken by Management against a
member of the Bargaining Unit shall be for just cause and will be
conducted in private and in such manner as to create respect for
authority and preserve individual dignity.  It is the responsibility of

3

Management to inform individuals directly and in private of any alleged failure to perform their work properly so that the necessary changes and/or corrections can be made as speedily as possible.

Employees, at their request, may have a Union Representative during the interview, conference or hearing which may reasonably be expected to result in disciplinary action.

**ARTICLE VII**      **PAYROLL DEDUCTIONS**

The Credit Union agrees to make, at the request of the Union in writing, deductions of regular monthly Union dues from the employees who are members of the Union and who have submitted written authorizations to the Credit Union to make such deductions. The amount of such monthly Union dues and assessments is to be specified by the Union in writing to the Credit Union and such amounts shall be deducted from the earnings, if any, of each employee who shall have worked during the week when the deductions is to be made. Such deductions shall be made from the employee's earnings in each of the first four (4) payroll week each month. The deductions so made will be transmitted by the Credit Union to the Union. The Credit Union will make the voluntary deductions for *VOTE* (voice of the electorate) when so authorized.

A 401K Plan to be implemented by Credit Union management by November 1, 2000.

**ARTICLE VIII**      **HOLIDAYS**

Regular employees have the following nine (9) holidays, plus their birthday.

| | |
|---|---|
| New Year's Day | Martin Luther King Day |
| President's Day | Memorial Day |
| Independence Day | Labor Day |
| Columbus Day | Thanksgiving |
| Christmas | |

Unused holiday time must be used within an eight (8) week time-frame, seniority prevailing, allowing only one employee per department at a time. Situational circumstances to be allowed at the discretion of the immediate manager, based on the operational needs of the Credit Union. Requests will not be unreasonably denied.

4

Personal day (your birthday) must be used within one calendar year of your actual birthday.

**ARTICLE IX**          **VACATION**

Vacation for employees is based on service from the date of hire determined at December 31st of each year.

When a part-time employee is hired to a full-time position, all prior part-time service, on a pro-rata basis, shall be counted towards vacation provided there is not a break in service with the Credit Union.

| 0-3 months       | 0 weeks |
|------------------|---------|
| 3 months - 1 year | 1 week  |
| 1 year - 7 years | 3 weeks |
| 8 years - 17 years | 4 weeks |
| 18 years or more | 5 weeks |

Vacation selections, where possible shall be made on the basis of seniority.

Employees with excess vacation days as of January 1, 2000, will be banked.

Starting January 1, 2000, all accrued vacation time must be taken by December 31st of each year. One week of accrued vacation time will be allowed to be carried over to the following year.

Situational circumstances to be allowed at the discretion of the immediate manager, based on the operational needs of the Credit Union. Requests will not be unreasonably denied.

**ARTICLE X**          **JURY DUTY**

An employee covered by this Agreement who is required to perform Jury Duty during a regular work day will be granted leave of absence with pay, less the amount received for Jury Duty. An employee serving on jury duty will continue to receive their salary and shall forward any per diem allowance to the Credit Union. The Credit Union shall be notified promptly of an employee's receipt of a Summons of Jury Service.

**ARTICLE XI**          **INSURANCE**

Full-time employees will receive the following insurance that will be 100% paid by the employer, except as noted below:

A.   *Credit Union League Group Insurance and Benefits Program* or other family or individual coverage as applicable.

B.   Life Insurance (including supplemental insurance as currently provided)

C.   Long-Term Disability Insurance

Employees, upon signing of this contract, shall receive a detailed description of all insurance coverage and yearly therafter.

1.   Effective January 1, 2000 the following caps for insurance costs shall be in place. Any overage amounts in costs relating to the coverage plans shall be shared by the seven (7) employees currently enrolled in said plan.

Year 1: $4,750.00 per month *2 000*
Year 2: $5,250.00 per month *2001*
Year 3: $5,750.00 per month *2002*

2.   In the event the Employer shall hire any new employees, and those employees sign under BGECU coverage plan, the caps shall be increased as follows:

Family Insurance Plan: add $900.00 per employee
Single Insurance Plan: add $500.00 per employee

3.   In the event that current employees shall at any time change the status of their coverage from Family to Single, or vice versa, adjustments in the cap shall be made in accordance with #2 above.

If an employee has medical coverage from a source other than the BGECU, he or she may decline the BGECU medical insurance and receive a $1,000.00 cash payment on or before January 1 of each year, or after six (6) months from date of hire. To be eligible for such payment the employee must:

1.    Complete and sign a waiver of benefit form

2.    Provide documentation of coverage under another health plan

3.    Submit the waiver form and documentation to the Credit Union C.E.O. or his/her designee on or before the anniversary date of the insurance. You will then be ineligible to sign up for insurance coverage until the following year.

**ARTICLE XII**      **PAID SICK LEAVE**

Full-time employees shall not forfeit any part of his or her pay because of absence on account illness for up to fifteen (15) working days in any calendar year, or up to an additional fifteen (15) working days in any calendar year during the period of major illness. Accordingly, in cases of major illnesses, an employee will be entitled to up to (30) days sick leave consisting of a fifteen (15) day major illness allowance plus any unused portion of his/her fifteen (15) days sick leave.

In order to qualify for a major illness allowance, an employee must be absent for five (5) working days or more and produce certification from a hospital or medical doctor that the illness caused the employee to be absent for this period.

A full-time employee may use a total of three (3) sick days, from their accrued days, as personal days (example: doctor appointment, sick child, snow/hazardous weather).

Effective date of signing, part-time employees with a minimum of one (1) year of employment will be eligible for one (1) day of sick leave prorated. Effective January 1, 2001 part-time employees with a minimum of one (1) year of employment will be eligible for three (3) days of sick leave prorated.

**ARTICLE XIII**      **BEREAVEMENT LEAVE**

In the event an employee's spouse, mother, father, step-parent or step-child, son, daughter, brother, sister, grandmother, grandfather, grandchild, mother-in-law, father-in-law, sister-in-law, brother-in-law, daughter-in-law, or son-in-law dies, such employee shall be permitted to absent himself/herself from work without loss of pay

on any of his/her regularly scheduled working days following within four (4) consecutive days, one of which shall be the day of the funeral. This shall not apply when the funeral occurs at a time when the employee is on vacation or leave of absence.

If the deceased person is not a member of the immediate family as defined above, the employee may request a vacation day or unpaid day off to attend the funeral of the relative.

One day's absence, with pay, is allowable for the death of an employee's aunt or uncle.

**ARTICLE XIV**      **PARENTAL LEAVE OF ABSENCE**

A.   Parental leave shall be available upon reasonable notice to all employees who become parents of newborn or newly-adopted children.

B.   A female employee on the regular payroll shall be entitled to a maternity leave not to exceed six (6) months. During the leave the employee may first use the unused portion of her sick leave (30 working days maximum), and then may schedule remaining earned vacation days. This will end the paid portion of the leave and the remaining time shall be unpaid leave.

C.   A male employee shall be entitled to paternity leave not to exceed ten (10) working days. This leave is unpaid.

D.   The Employer agrees to maintain all life and health insurance coverage during parental leave subject to any regular participation required by the Employee.

E.   An employee returning from parental leave shall be restored to his/her former position at the salary he/she would have received had employment been continuous.

**ARTICLE XV**      **LEAVES OF ABSENCES**

*Unpaid Leaves of Absence* ~~Unpaid leaves of absence for good and sufficient reason in the opinion of the Employer shall be granted upon written request and shall not be unreasonably denied.~~ Such leaves shall not be construed to be a termination of employment so long as they last no more than 6 months and the employee does not become employed by another employer. The employer will ~~not~~ be obligated to maintain benefits coverage

8

during leaves covered by this article, but may do so at its discretion considering each case.

**ARTICLE XVI**         **SENIORITY**

*The Boston Globe Employees Credit Union* seniority begins from the date of hire as a regular employee in the bargaining unit. When a person who has worked as a part-time employee is hired as a regular employee, credit will be given for the hours worked as a part-time employee towards seniority.

**ARTICLE XVII**        **PROMOTION/TRANSFERS**

Promotion/Transfer - The Employer agrees to inform the Union of any major changes in employment procedures. Also, in the case of a permanent or semi-permanent change in an employee's basic function and responsibility, the Employer agrees to give sufficient Notice to the Union.

The Credit Union is to promote from within whenever practicable. When seeking to fill vacancies in existing staff positions falling under the provisions of this agreement, the Employer shall first consider employees. However, applicants who are from outside the bargaining unit may also be selected based on the needs of the Credit Union as determined by the Employer, job requirements and applicant qualifications.

**ARTICLE XVIII**       **TEMPORARY VACANCIES**

Temporary vacancies shall be filled by the Office Manager or his/her designee in his/her discretion. A temporary vacancy shall continue until such time as the Board of Directors shall declare permanent vacancy.

At the discretion of the Office Manager or his/her designee, temporary employees may be hired during temporary vacancies or peak periods for work up to and including six months or longer by mutual agreement. At the expiration of said six months, such employees must either be terminated or, if continued in the employ of the Credit Union, must become members of the Union.

**A.        NEW JOB CATEGORIES**

The Union shall be notified thirty (30) days prior to the creation of job categories or positions not otherwise listed under the Recognition clause or elsewhere in the collective bargaining

9

agreement. This thirty (30) day notice shall be observed unless otherwise agreed to in writing by the Union. Said notice shall include a posting in the form as set forth in this Agreement. The Union and the Employer shall then negotiate the appropriate job description and scale. The new job shall be posted according to section B posting. If agreement is not reached within the thirty (30) day period, either party may refer the unresolved issues to arbitration.

**B.    POSTING**

At least fourteen (14) calendar days prior to filling a vacancy the Employer shall send notices to the Union offices of all openings that occur within the bargaining unit, whether existing or newly created.

The Union shall post all notices of job openings promptly. If the Employer does not deliver the postings to the Union by noon, the posting will be dated the next calendar day.

If the Union objects to such posting, it may seek a meeting with the Employer to address its inquiries. Such meeting must be held within five (5) working days of said inquiry. The posting procedure will not be delayed; however, the posting will be revised to include a notice that the Union is objecting to the posting. Any changes in the posting that result from such inquiry will serve to restart the fourteen (14) day posting period. If the issue is unresolved, the matter may be taken to arbitration.

Notices shall be filled out by the Employer per the following sample posting form:

**POSTING FORM**

Date of Posting:                    Date to be taken down:

Dept:                               Number of jobs to be filled:

Department Head:                    Job Title:

Shift:

Qualification:

Basic Function and Responsibilities:

If the posted vacancy has not been filled within twenty (20) days after the posting has been taken down, the vacancy may not be filled unless it is re-posted. If the Employer does not intend to fill the vacancy the Employer will notify the Union as to the reason for not filling the vacancy.

## C.    APPLICATIONS

All bargaining unit employees will have the opportunity to submit an application to the CEO expressing interest in a posted position. Such application will include the name of the employee, current department, position applied for, resume and date of application. Only those employees, from within the bargaining unit, who have filed an application for a specific job posting will be considered for that posting. A list of such employees will be sent to the Union. At the end of the fourteen (14) day posting period, all Credit Union applicants will be interviewed. Personnel not receiving position will be notified in writing.

## D.    CROSS-TRAINING/FILL-INS

In order to provide increased efficiency for the Credit Union and its customers union personnel will be cross trained (example: a teller may be trained as a customer representative).

Should an employee be required to fill-in for higher level position and actually performs the work of the employee replaced for a full day or more shall receive the wage rate for the higher for all hours worked.

## ARTICLE XIX    GRIEVANCES

In the case of any different between the Credit Union and any employee within the bargaining unit out of the terms of this Agreement, the grievance procedure shall be as follows:

1.    The employee and/or the Shop Steward, within ten (10) working days after the Grievant or the Union has knowledge of it, whichever occurs first, will give written notice of the grievance to the Office Manager or his/her designee. The Office Manager or designee, within five (5)

working days, will respond and schedule a meeting to be held no later than ten (10) working days from the date of the response for the purpose of trying to resolve the grievance. The Office Manager or designee will issue his/her decision within three (3) working days of the meeting. If the employee disputes the decision of the Office Manager or designee fails to respond within the aforesaid time limit, then the grievance will be processed in the following manner:

2. Within five (5) working days of the decision of the Office Manager or designee, the Business Agent of the Union shall submit the grievance, in writing to the Office Manager or designee. The Office Manager or designee shall schedule or hold a meeting with the Business Agent of the Union and the Grievant for the purpose of resolving the grievance. The Office Manager or designee shall issue a written decision within five (5) working days of said meeting. If there is no settlement or if the Office Manager or designee fails to issue hi/her decision within the aforesaid time limit, the Business Agent shall forward the written grievance to the President of the Credit Union with five (5) working days of the written response.

3. Within ten (10) working days of the receipt of said notification, the President and Treasurer of the Credit Union shall schedule and hold a meeting with Business Agent of the Union for the purpose of trying to resolve the grievance. The President shall issue a decision within ten (10) working days of the meeting. If this matter is not settled or if the President fails to issue a decision within the agreed time limit, the Business Agent of the Union shall submit the grievance to arbitration, as herein provided, within ten (10) working days of the President's decision or failure to issue his/her response. Both parties agree fully to cooperate in an effort to resolve any grievance arising out of this Agreement.

Where there is no specific provision as set forth in this agreement, expectations to the above time limits shall be made only upon the mutual agreement of the Parties. In the absence of any such mutual agreement to extend the time limits, the failure of the Union to act within the above time limits shall constitute a waiver of that particular grievance and it shall be processed no further. Any such constructive waiver or acceptance shall be applicable to that particular grievance only and shall not serve as a precedent nor

a prejudice to the position of either the Union or the Credit Union in any future grievance.

**ARTICLE XX**      **DISCHARGE and DISCIPLINE ACTION**

The Union and Employer agree that discipline ~~including discharge must~~ be administered fairly and consistently for just cause. Discipline will ~~typically~~ progressive. The offense facts and circumstances will determine the level of discipline to be applied regardless of prior discipline, if any. There shall be the following forms of discipline:

A.  Verbal Warnings, which constitute the lease severe form of discipline, consist of verbal reprimands to the employee by the department head or manager. A written record of a verbal warning may be made.

B.  Written Warnings may be issued regarding an aspect of an employee's performance which could lead to suspension or dismissal, if uncorrected.

A minimum of two written warnings will be issued before an employee may be dismissed ~~except in the case of gross neglect of duty or serious misconduct.~~

An employee will be allowed a reasonable amount of time to correct the behavior or conduct which led to the first written warning. Reasonable amount of time shall be determined, by the Credit Union management and Union representative, depending upon the severity of the behavior, conduct, or infraction. If the same behavior or conduct continues after that period of time, a second written warning may be issued.

Any written warning older than two (2) years shall cease to exist for purposes of progressive discipline. However, those warnings may be considered by the Employer in determining the degree of discipline to issue in future cases involving probation,, suspension, or discharging action.

The Union may request that a written warning be reviewed by the Employer for possible removal after one (1) year if the employee has made substantial progress toward correcting the behavior or conduct which resulted in a written warning.

C.     Suspension and/or disciplinary probation decisions will be Made by the C.E.O. or President of the Board. The Union shall be notified when a final decision to suspend or place on probation is made, and the same rights of representation and appeal will apply as are applied to written warnings or dismissals.

If, in conference, a suspension without pay is found by mutual agreement not to have been based on just cause, the Employer will restore the employee to his/her position with full pay and all benefits for the period from the date of suspension to date of reinstatement, with service record unimpaired. A lesser form of discipline may be invoked.

**ARTICLE XXI**          **ARBITRATION**

If any grievance is submitted to arbitration under the provisions of *Article XIX*, the arbitration procedure shall be as follows:

- The decision to resort to arbitration must be in writing and given to the other party as provided in Step 3 of the Grievance Procedure.

- Within fifteen (15) working days from the original date of the grievance submission, the Credit Union and the Union shall designate their arbitrators. The two arbitrators so chosen shall, within (15) working days from the original date of the submission of the grievance to arbitration, select a third arbitrator.

- In the event that the arbitrators selected by the Credit Union and the Union should be unable to agree upon a third arbitrator, then the Parties may contact the American Arbitration Association for a list of five (5) arbitrators. Within ten (10) working days of the receipt of the list, the two arbitrators selected by the Parties shall meet and alternately strike the name of an arbitrator, the last name on the list, subject to his/her acceptance, shall serve as the third arbitrator.

- The three arbitrators shall then endeavor to meet daily for the purpose of considering said grievance and the decision of the majority of said arbitrators,

14

submitted in writing to the Credit Union and the Union, shall be final and binding upon both Parties.

- Each Party shall bear the expenses of its arbitrator and the expense of the third arbitrator and any other expenses incurred in the conduct of the arbitration shall be borne equally by the Parties hereto.

**ARTICLE XXII**

## PERSONNEL FILES

Personnel files are confidential files. The employee is entitled to see his/her own file at reasonable times, excluding pre-employment material, upon written request. The employee may show his/her file to anyone upon written authorization to the C.E.O. The C.E.O. will provide the employee with a copy of any material that has been placed in his/her personnel file pertaining to his/her job performance that may result in disciplinary action. The employee shall be given the opportunity to respond in writing to such material, and such response shall be filed in his/her personnel file.

Every employee is entitled to see and reproduce his/her own personnel file as herein described at any reasonable time. The file shall remain in the custody of the C.E.O. at all times.

**ARTICLE XXIII**

## NO STRIKE - NO LOCKOUT

The Union agrees that there will be no strikes during the term of this Agreement and the Credit Union agrees there will be no lockouts during said period.

**ARTICLE XXIV**

## RETIREMENT PLAN

The Employer will continue the present retirement plan. The Employer will continue to contribute 15% of the base salary for each full time bargaining unit member.

**ARTICLE XV**

## ANTI-DISCRIMINATION

The Employer agrees that it will not discriminate against an employee or prospective employee by reason of race, color, creed, national origin, political or religious views, union position, sex, sexual orientation, age, physical or mental disability, marital status, physical appearance apart from

dress beyond bonafide occupational requirements of financial institutions, parenthood, or child bearing capacity.

**ARTICLE XXVI**      **LONGEVITY**

Each Union employee shall receive longevity compensation, minus applicable state and federal taxes as follows:

> Upon completion of ten years continuous service, a check in the amount of $150.00 shall be given to those employees once a year on the anniversary date of hire and once a year thereafter through the 14th year of service to the Credit Union;
>
> After 15 years through 19 years - $200.00
>
> After 20 years through 25 years - $300.00
>
> After 25 years and above - $400.00

Authorized leaves of absence shall not be deducted from an employee's length of service for purposes of this Article provided the employee does not engage in other employment during the authorized leave of absence.

An employee's longevity status will not be lost as a result of an interruption in service caused by a layoff.

**ARTICLE XXVII**      **PART - TIME EMPLOYEES**

For the purposes of this agreement, a part-time employee is defined as one who is scheduled for 25 hours a week or less.

No benefits specified in this agreement, other than pro-rata holidays, birthday holiday and vacation benefits shall accrue to part-time employees. Part-time employees shall receive jury and bereavement benefits but only when such absences occur during the employee's regularly scheduled work day.

**ARTICLE XXVIII**    **TUITION REIMBURSEMENT**

The employer will pay up to 50% of the cost of all tuition fees and books per year (up to $2,000 per employee). There will be a cap of total tuition reimbursement for the bargaining unit of $5,000 per year. This cap may be raised or lowered by the board from year to year but will not be below $5,000.

When the employer requires that a course or courses be taken by members of the bargaining unit, the employer will pay all tuition expenses in advance.

**ARTICLE XXIX**    **SERVICE LETTER**

If requested, an employee of the Credit Union leaving the Credit Union's service shall be given a letter stating the term of service and the type of service performed at the Credit Union.

**ARTICLE XXX**       **LENGTH OF CONTRACT**

This agreement shall expire on December 31, 2002 after its acceptance and signing of both parties.

For the UNION:          For the BOSTON GLOBE EMPLOYEES
                              CREDIT UNION:

Walter Allen, Jr.
Business Manager
OPEIU, Local 6

J. Brennan Hall
Member, Board of Director
Boston Globe Employees Credit Union

Ronda Tanguay
Business Agent
OPEIU, Local 6

Marion Doucette
Manger/CEO
Boston Globe Employees Credit Union

Paula O'Donnell
Shop Steward
Boston Globe Employees
Credit Union

William Cleary
Member, Board of Directors
Boston Globe Employees Credit Union

# EXHIBIT 2

# COLLECTIVE BARGAINING AGREEMENT
between the

# BOSTON GLOBE EMPLOYEES CREDIT UNION
and the

# OFFICE AND PROFESSIONAL EMPLOYEES
# INTERNATIONAL UNION, LOCAL 6, AFL-CIO

# JANUARY 1, 2003 THROUGH DECEMBER 31, 2005

# TABLE OF CONTENTS

Anti-Discrimination ................................................. pg. 15
Applications ................................................. pg. 11
Arbitration ................................................. pg. 14
Bereavement Leave ................................................. pg. 7
Coverage and Employment ................................................. pg. 1
Cross Training and Fill-Ins ................................................. pg. 11
Discharge and Discipline Action ................................................. pg. 12
Grievances ................................................. pg. 11
Holidays ................................................. pg. 4
Insurance ................................................. pg. 5
Jury Duty ................................................. pg. 5
Leaves of Absences ................................................. pg. 8
Length of Contract ................................................. pg. 18
Longevity ................................................. pg. 15
Management Rights ................................................. pg. 3
New Job Catergories ................................................. pg. 9
No Strike/Lockout ................................................. pg. 15
Overtime ................................................. pg. 3
Paid Sick Leave ................................................. pg. 7
Parental Leave of Absence ................................................. pg. 8
Part-Time Employees ................................................. pg. 16
Payroll Deductions ................................................. pg. 4
Personnel Files ................................................. pg. 15
Posting (of vacant positions) ................................................. pg. 10
Promotions/Transfers ................................................. pg. 9
Recognition Clause ................................................. pg. 1
Retirement Plan ................................................. pg. 15
Seniority ................................................. pg. 9
Service Letter ................................................. pg. 17
Temporary Vacancies ................................................. pg. 9
Tuition Reimbursement ................................................. pg. 16
Vacation ................................................. pg. 5
Wages ................................................. pg. 2
Workplace Relations Committee ................................................. pg. 17
Work Week ................................................. pg. 2

discretion, dismiss, lay off or transfer such employees whether with or without cause and no grievance shall be filed or claimed on behalf of such employees by the Union or on account of any action of the Credit Union during said 90 calendar days. However, all provisions of this Agreement, except where the contrary is indicated herein, shall apply to the probationary employees. Nothing herein, however, shall affect the termination of employment for just cause.

**ARTICLE III**          **WORK WEEK**

Employees current hours shall continue to be observed. The regular work week of 37.5 hours, shall consist of not more than five (5) days, of not more than 7.5 hours per day. Employees with regularly scheduled work days and hours will be given two weeks notice of any changes in schedule.

A.) Breaks:

1.) Part-time employees who work at least four (4) hours per day, but less than six (6) hours, shall receive a twenty (20) minute paid break, to be taken at the discretion of the immediate manager, based on the operational needs of the Credit Union. Part-time employees who work at least six (6) hours per day receive a one-half (1/2) hour paid break.

2.) Full-time employees shall receive two (2) fifteen (15) minute paid breaks; one (1) in the morning, one (1) in the afternoon. A thirty (30) minute unpaid break shall be given for lunch; however, one-hour lunch breaks may be required, combining the two (2) fifteen (15) minute paid breaks together with the one-half (1/2) hour unpaid break lunch period, at the discretion of the immediate manager, based on the operational needs of the Credit Union.

**ARTICLE IV**          **WAGES**

A.    All employees covered by this agreement shall receive a 2% increase for each year of this agreement.

B.    Base pay for new hires:

| | |
|---|---|
| Systems Manager: | $600/wk |
| Bookkeeper: | $575/wk |
| Sr. Loan Officer: | $525/wk |
| Loan Officer: | $385/wk |
| Head Teller: | $425/wk |

2

authority and preserve individual dignity.  It is the responsibility of Management to inform individuals directly and in private of any alleged failure to perform their work properly so that the necessary changes and/or corrections can be made as speedily as possible.

Employees, at their request, may have a Union Representative during the interview, conference or hearing which may reasonably be expected to result in disciplinary action.

**ARTICLE VII**       **PAYROLL DEDUCTIONS**

The Credit Union agrees to make, at the request of the Union in writing, deductions of regular monthly Union dues from the employees who are members of the Union and who have submitted written authorizations to the Credit Union to make such deductions.  The amount of such monthly Union dues and assessments is to be specified by the Union in writing to the Credit Union and such amounts shall be deducted from the earnings, if any, of each employee who shall have worked during the week when the deductions is to be made.  Such deductions shall be made from the employee's earnings in each of the first four (4) payroll weeks each month.  The deduction so made will be transmitted by the Credit Union to the Union.  The Credit Union will make the voluntary deductions for VOTE (voice of the electorate) when so authorized.

A 401K Plan to be implemented by Credit Union management by November 1, 2000.

**ARTICLE  VIII**       **HOLIDAYS**

Regular employees have the following nine (9) holidays, plus their birthday.

| | |
|---|---|
| New Year's Day | Martin Luther King Day |
| President's Day | Memorial Day |
| Independence Day | Labor Day |
| Columbus Day | Thanksgiving |
| Christmas | |

Unused holiday time must be used within an eight (8) week time-frame, seniority prevailing, allowing only one employee per department at a time.  Situational circumstances to be allowed at the discretion of the immediate manager, based on the operational needs of the Credit Union.  Requests will not be unreasonably denied.

4

A.    Credit Union League Group Insurance and Benefits Program or other family or individual coverage as applicable.

B.    Life Insurance, AD&D, Vision and Dental.

C.    Short-Term Disability Insurance

D.    Long-Term Disability Insurance

Employees, upon signing of this contract, shall receive a detailed description of all insurance coverage and yearly therafter.

1.    Effective January 1, 2003 the following caps for insurance costs shall be in place for up to seven employees. Any overage amounts in costs relating to the coverage plans shall be shared by the seven (7) employees enrolled in said plan.

Year 1:  $5,750.00 per month
Year 2:  $6,000.00 per month
Year 3:  $6,250.00 per month

2.    In the event the Employer shall hire any new employees, bringing the total number of employees to eight (8) or more, and those employees sign under BGECU coverage plan, the caps shall be increased as follows:

Family Insurance Plan:  add $900.00 per employee
Single Insurance Plan:   add $500.00 per employee

3.    In the event that employees shall at any time change the status of their coverage from Family to Single, or vice versa, adjustments in the cap shall be made in accordance with #2 above.

If an employee has medical coverage from a source other than the BGECU, he or she may decline the BGECU medical insurance and receive a $1,000.00 cash payment on or before January 1 of each year, or after six (6) months from date of hire. To be eligible for such payment the employee must:

1.    Complete and sign a waiver of benefit form

6

If the deceased person is not a member of the immediate family as defined above, the employee may request a vacation day or unpaid day off to attend the funeral of the relative.

One day's absence, with pay, is allowable for the death of an employee's aunt or uncle.

| | | |
|---|---|---|
| **ARTICLE XIV** | **PARENTAL LEAVE OF ABSENCE** | |

A.    Parental leave shall be available upon reasonable notice to all employees who become parents of newborn or newly-adopted children.

B.    A female employee on the regular payroll shall be entitled to a maternity leave not to exceed six (6) months. During the leave the employee may first use the unused portion of her sick leave (30 working days maximum), and then may schedule remaining earned vacation days. This will end the paid portion of the leave and the remaining time shall be unpaid leave.

C.    A male employee shall be entitled to paternity leave not to exceed ten (10) working days. A male employee may utilize sick days and, if no accrued sick time is available, vacation time at the employee's request.

D.    An employee may elect to substitute paid vacation or paid sick leave as otherwise provided for in this Agreement, as part or all of the Parental Leave period.

E.    The Employer agrees to maintain all life and health insurance coverage during parental leave subject to any regular participation required by the Employee.

F.    An employee returning from parental leave shall be restored to his/her former position at the salary he/she would have received had employment been continuous.

**ARTICLE XV**       **LEAVES OF ABSENCES**

**Unpaid Leaves of Absence** - Unpaid leaves of absence for good and sufficient reason in the opinion of the Employer shall be granted upon written request and shall not be unreasonably denied. Such leaves shall not be construed to be a termination of employment so long as they last no more than 6 months and the employee does not become employed by another employer. The

~~Recognition clause or elsewhere in the~~ collective bargaining agreement. This thirty (30) day notice shall be observed unless otherwise agreed to in writing by the Union. Said notice shall include a posting in the form as set forth in this Agreement. The Union and the Employer shall then negotiate the appropriate job description and scale. The new job shall be posted according to section B posting. If agreement is not reached within the thirty (30) day period, either party may refer the unresolved issues to arbitration.

## B.    <u>POSTING</u>

At least fourteen (14) calendar days prior to filling a vacancy the Employer shall send notices to the Union offices of all openings that occur within the bargaining unit, whether existing or newly created.

The Union shall post all notices of job openings promptly. If the Employer does not deliver the postings to the Union by noon, the posting will be dated the next calendar day.

If the Union objects to such posting, it may seek a meeting with the Employer to address its inquiries. Such meeting must be held within five (5) working days of said inquiry. The posting procedure will not be delayed; however, the posting will be revised to include a notice that the Union is objecting to the posting. Any changes in the posting that result from such inquiry will serve to restart the fourteen (14) day posting period. If the issue is unresolved, the matter may be taken to arbitration.

Notices shall be filled out by the Employer per the following sample posting form:

## POSTING FORM

Date of Posting:                         Date to be taken down:

Dept:                                    Number of jobs to be filled:

Department Head:                         Job Title:

Shift:

Qualification:
Basic Function and Responsibilities:

~~meeting. If the employee~~ disputes the decision of the Office Manager or designee fails to respond within the aforesaid time limit, then the grievance will be processed in the following manner:

2. Within five (5) working days of the decision of the Office Manager or designee, the Business Agent of the Union shall submit the grievance, in writing to the Office Manager or designee. The Office Manager or designee shall schedule or hold a meeting with the Business Agent of the Union and the Grievant for the purpose of resolving the grievance. The Office Manager or designee shall issue a written decision within five (5) working days of said meeting. If there is no settlement or if the Office Manager or designee fails to issue his/her decision within the aforesaid time limit, the Business Agent shall forward the written grievance to the President of the Credit Union with five (5) working days of the written response.

3. Within ten (10) working days of the receipt of said notification, the President and Treasurer of the Credit Union shall schedule and hold a meeting with Business Agent of the Union for the purpose of trying to resolve the grievance. The President shall issue a decision within ten (10) working days of the meeting. If this matter is not settled or if the President fails to issue a decision within the agreed time limit, the Business Agent of the Union shall submit the grievance to arbitration, as herein provided, within ten (10) working days of the President's decision or failure to issue his/her response. Both parties agree fully to cooperate in an effort to resolve any grievance arising out of this Agreement.

Where there is no specific provisions set forth in this agreement, expectations to the above time limits shall be only upon the mutual agreement of the Parties. In the absence of any such mutual agreement to extend the time limits, the failure of the Union to act within the above time limits shall constitute a waiver of that particular grievance and it shall be processed no further. Any such constructive waiver or acceptance shall be applicable to that particular grievance only and shall not serve as a precedent nor a prejudice to the position of either the Union or the Credit Union in any future grievance.

**ARTICLE XX**     **DISCHARGE and DISCIPLINE ACTION**

and appeal will apply as are applied to written warnings or dismissals.

If, in conference, a suspension without pay is found by mutual agreement not to have been based on just cause, the Employer will restore the employee to his/her position with full pay and all benefits for the period from the date of suspension to date of reinstatement, with service record unimpaired. A lesser form of discipline may be invoked.

**ARTICLE XXI**          **ARBITRATION**

If any grievance is submitted to arbitration under the provisions of Article XIX, the arbitration procedure shall be as follows:

- The decision to resort to arbitration must be in writing and given to the other party as provided in Step 3 of the Grievance Procedure.

- Within fifteen (15) working days from the original date of the grievance submission, the Credit Union and the Union shall designate their arbitrators. The two arbitrators so chosen shall, within (15) working days from the original date of the submission of the grievance to arbitration, select a third arbitrator.

- In the event that the arbitrators selected by the Credit Union and the Union should be unable to agree upon a third arbitrator, then the Parties may contact the American Arbitration Association for a list of five (5) arbitrators. Within ten (10) working days of the receipt of the list, the two arbitrators selected by the Parties shall meet and alternately strike the name of an arbitrator, the last name on the list, subject to his/her acceptance, shall serve as the third arbitrator.

- The three arbitrators shall then endeavor to meet daily for the purpose of considering said grievance and the decision of the majority of said arbitrators, submitted in writing to the Credit Union and the Union, shall be final and binding upon both Parties.

- Each Party shall bear the expenses of its arbitrator and the expense of the third arbitrator and any other

14

Each Union employee shall receive longevity compensation, minus applicable state and federal taxes as follows:

> Upon completion of ten years continuous service, a check in the amount of $150.00 shall be given to those employees once a year on the anniversary date of hire and once a year thereafter through the 14th year of service to the Credit Union.
>
> After 15 years through 19 years - $200.00
>
> After 20 years through 25 years - $300.00
>
> After 25 years and above - $400.00

Authorized leaves of absence shall not be deducted from an employee's length of service for purposes of this Article provided the employee does not engage in other employment during the authorized leave of absence.

An employee's longevity status will not be lost as a result of an interruption in service caused by a layoff.

**ARTICLE XXVII**          **PART - TIME EMPLOYEES**

For the purposes of this agreement, a part-time employee is defined as one who is scheduled for 25 hours a week or less.

No benefits specified in this agreement, other than pro-rata holidays, birthday holiday and vacation benefits shall accrue to part-time employees. Part-time employees shall receive jury and bereavement benefits but only when such absences occur during the employee's regularly scheduled work day.

**ARTICLE XXVIII**         **TUITION REIMBURSEMENT**

The employer will pay up to 50% of the cost of all tuition fees and books per year (up to $2,000 per employee). There will be a cap of total tuition reimbursement for the bargaining unit of $5,000 per year. This cap may be raised or lowered by the board from year to year but will not be below $5,000.

**ARTICLE XXXI**     **LENGTH OF CONTRACT**

This agreement shall expire on December 31, 2005 after its acceptance and signing of both parties.

For the UNION:                    **For the BOSTON GLOBE EMPLOYEES CREDIT UNION:**


_Mary Mahoney_

Mary Mahoney
Business Manager
OPEIU, Local 6

_Marion Doucette_

Marion Doucette
Manager
Boston Globe Employees Credit Union


_Lisa M. Lemieux_

Lisa M. Lemieux
Business Agent
OPEIU, Local 6

_J. Brendan Hall_

J. Brendan Hall
Member, Board of Directors
Boston Globe Employees Credit Union


_Kay Toland_

Kay Toland
Committee Member
Boston Globe Employees
Credit Union

_Marylou Meighan_

Marylou Meighan
Member, Board of Directors
Boston Globe Employees Credit Union


_John J. Quinn_

John J. Quinn
Chairman, Board of Directors
Boston Globe Employees Credit Union

# EXHIBIT 3



## Scott Adams

**Attorney at Law**

92 State St., 9th Flr. • Boston, MA 02109

Tel: (617) 742-4554 • Fax: 742-8599

October 27, 2003

Donna Boggs
Chairman and Board of Directors
Boston Globe Employees Credit Union
c/o Schultz & Boggs
616 Main St.
Woburn, MA 01801

Dear Ms. Boggs:

I have been retained by Paula O'Donnell to address issues related to her employment at the Boston Globe Employees Credit Union. I am aware that Mrs. O'Donnell's employment is covered under the Collective Bargain Agreement with Local 6—and they are receiving a copy of this communication—but I feel that a direct approach to you may help in resolving matters.

To begin with, I believe the board is well aware that there are problematic issues in the credit union arising from the management and administration of Marion Doucette as CEO of the credit union. Many of the issues regarding Ms. Doucette's management involve unprofessional and abusive conduct towards employees. Other issues involve what might be fairly and generously described as problematic conduct for an officer of a financial institution.

What I would like to address first is Ms. Doucette's behavior towards other employees, and to Mrs. O'Donnell in particular. As you were made aware through Mrs. O'Donnell's communications to certain board members, and in her union grievance, Ms. Doucette has consistently and unreasonably acted in a demeaning, spiteful manner towards employees generally and towards Mrs. O'Donnell in particular. Some of this misconduct involves verbal abuse and other misconduct relates to actions that placed Mrs. O'Donnell in reasonable fear that Ms. Doucette would engage in inappropriate or unlawful physical action.. Instances of these behaviors have already been brought to your attention so I will not go into a litany of particular incidents. As the board is fully aware, such conduct is not only unprofessional it is damaging to those who must suffer through it.

It is such conduct, which is totally unnecessary, unreasonable and unjustifiable that has caused injury to my client Mrs. O'Donnell. The abuse and resultant stress has resulted in both physical and emotional injury and harm to Mrs. O'Donnell. It is on this basis that she has, at times, had to avail herself of the Globe's medical facilities, and has had to seek outside diagnosis and treatment for various conditions that have been directly caused by Ms. Doucette's behavior. At this time, her treating specialists have recommended that she not subject herself to the abusive and stressful environment that exists while Ms. Doucette is in place and unrestrained in her conduct. Furthermore, it appears that the actual conditions under which Mrs. O'Donnell would have to work would be so harmful and injurious to her physical and emotional welfare that she could not actually return to that work environment. From what Mrs. O'Donnell has described to me, it would appear that she is not the only one to report such conditions and effects.

As the board is fully aware that Ms. Doucette's conduct is problematic and injurious, I am surprised that the board has allowed such conduct to continue. It has, in fact, come to my attention that at one point the board may have initiated actions to possibly replace Ms. Doucette but, for some reason, that action has been forestalled. I can imagine the circumstances in which the board would have acted to resolve the problem but decided not to take such action but I would have hoped, in view of Ms. Doucette's uncontested misconduct and its wide-ranging effect on employees, that the board would have followed through with its desire to rectify the situation and replace Ms. Doucette. The failure to do so in light of obvious problems is particularly damning evidence of the board's failure to assert proper priorities and recognize appropriate loyalties.

Furthermore, in Mrs. O'Donnell's case, her efforts to resolve the problem and associated matters through the grievance procedure do not seem to have been effective. In fact, it appears that the board has now decided to condone or support Ms. Doucette in spite of her misconduct. I refer specifically to the August meeting in which the union raised a number of compensations issues regarding credit union employees, one of those Mrs. O'Donnell. Rather than support her in her requests, the board seems to have sided with Ms. Doucette and slighted Mrs. O'Donnell, despite her long and valuable contributions to the credit union and its members.

I do not need to remind the board that it was Mrs. O'Donnell who was not only instrumental in discovering and blowing the whistle in regards to damaging, ongoing fraud. Unfortunately it appears that Mrs. O'Donnell is now suffering from various incidents of retaliation as a result. Perhaps

2

some major portion of Ms. Doucette's misconduct that is directed at Mrs. O'Donnell can be attributed to this particular situation. It is more disconcerting to infer, reasonably from the evidence, that too some degree the board's failure to support Mrs. O'Donnell might be attributed to some resentment of Mrs. O'Donnell for bringing such matters to light during the board's term of office. In the end, the board's actions slighting Mrs. O'Donnell rather than supporting her have contributed to the distress, both physical and emotional, that has placed her in diminished state and capacity.

As it is Ms. Doucette's actions and the board's failures that have caused the distress, both physical and emotional, that have resulted in the diminished state and capacity in which Mrs. O'Donnell now finds herself, it is incumbent upon the board to take actions to rectify the situation. As it also appears that the board has not and will not take actions to remove Ms. Doucette but, rather, intends to leave her in place, it is imperative that the board fully realize the consequences of such a decision. One such consequence is to deal with the issue of Mrs. O'Donnell's involuntary absence from employment and her obvious inability to return to such a dysfunctional work environment.  Obviously I would demand, on behalf of Mrs. O'Donnell, various forms of compensation to place her in a position she would have been but for the misconduct of Ms. Doucette and the failures of the board to deal with such misconduct appropriately and thoroughly. Such compensation must address not only her salary and benefits, including retirement benefits, but also address whatever disability and/or diminished opportunities are a consequence of the problematic situation at the credit union.

Before setting forth any offers and initiating discussion and negotiation on this matter, I would first like to hear a response from the board. I believe that our discussion of the matter could include the option of a severance agreement, leaves of absence, transitional assistance and other components of settlement. I believe any agreement that we can reach can be structured such that it remains within the bounds allowed under relevant statutory and union constraints.  On this particular issue I anxiously anticipate your response.

As a final matter in this communication I would also like to address some concerns that have arisen in regards to certain financial and managerial matters involving Ms. Doucette.. These issues are raised on behalf of Mrs. O'Donnell in the context of her fiduciary duty to her employer, the credit union, and to its members—of which she is one.  It is unclear as to whether or not the board has

3

properly investigated, resolved and reported all of the problematic financial matters that Mrs. O'Donnell has brought to the board's attention. In particular the I would draw the board's attention to Ms. Doucette's personal financial transactions in addition to the misconduct of her daughter, Linda Doucette. I would stress that Mrs. O'Donnell has an exemplary history in regards to putting the interests of the credit union and its members foremost, and any concerns brought to your attention now are in that same vein. Certainly these matters do impinge on the board's own conduct and duties. I will refrain from going into my concerns too deeply at this point in order that you might have a representative contact me on the matter.

Regards,

Scott Adams

cc: Mary Mahoney, Business Manager OPEIU, Local 6

4

# EXHIBIT 4

**PEABODY & ARNOLD** LLP
COUNSELLORS AT LAW

30 ROWES WHARF, BOSTON, MA 02110
[617] 951.2100  FAX [617] 951.2125

BOSTON, MA    PROVIDENCE, RI

HARVEY WEINER
[617] 951.2014
hweiner@peabodyarnold.com

November 19, 2003

**VIA FACSIMILE AND REGULAR MAIL**
**(617) 742-8599**

Scott Adams
Attorney at Law
92 State Street, 9th Floor
Boston, MA 02109

Re:    Paula O'Donnell

Dear Mr. Adams:

Please be advised that I represent the Boston Globe Employees Credit Union ("Credit Union") in response to your October 27, 2003 letter to Donna Boggs. I called you on Friday, November 14, 2003, and left you a voice mail message asking you to call me. Since I have not heard from you, I am responding as best I can to your letter.

In the first instance, it is my understanding that your client left the firm on August 14, 2003, and has been using up accrued sick time, vacation time and one personal day. This will end next week. Will your client be applying for long-term disability? What is she going to do relative to her employment? It is my understanding that there is a doctor's report, and I would appreciate it if you would send me a copy thereof.

You have made a series of general allegations against Ms. Doucette, but before I can respond thereto, I need to know the specifics. Can you explain in detail what you mean relative to the following:

On page 1      a) Ms. Doucette acting in a demeaning spiteful
                    manner toward Mrs. O'Donnell.

                b) the verbal abuse and other misconduct that
                    placed Mrs. O'Donnell in fear that Ms.
                    Doucette would engage in inappropriate or
                    unlawful physical action.

On page 2      c) What are the physical and emotional injuries
                    that your client has suffered?

**PEABODY & ARNOLD** LLP
Scott Adams
November 19, 2003
Page 2

        that your client has suffered?

d) What do you mean by the statement that "the board has now decided to condone or support Ms. Doucette?"

e) Is the "fraud" you are referring to relative to Ms. Doucette's daughter?

Page 3      f) How has the Board "slighted" Mrs. O'Donnell?

Before I can advise the Board, I need a thorough grounding from you respective to the particulars of Mrs. O'Donnell's complaint. Please give me a call, so that we can discuss this further.

Very truly yours,

Harvey Weiner

PABOS2:HWEINER:577531_1

**PEABODY & ARNOLD** LLP
Scott Adams
November 19, 2003
Page 3


bcc: Donna Boggs, Esquire

# EXHIBIT 5



# Scott Adams

92 State St., 9th Flr. • Boston, MA 02109

Tel: (617) 742-4554 • Fax: 742-8599

**Attorney at Law**

December 30, 2003                          Via Mail & Fax (617) 951-2125

Harvey Weiner
Peabody & Arnold
30 Rowes Wharf
Boston, MA 02110

Dear Mr. Weiner:

Please excuse this extended delay in responding to your request for more information but my client has not yet resolved how she will handle the matter. She is conferring with others on both worker's comp and disability insurance issues and does not have an answer yet. Perhaps it would be best for the Board to offer my client an extended leave of obsence or sabbatical in the interim to sustain the status quo?

As to your request for details of Ms. Doucette's behavior, I would prefer to present my client's case either through some initial mediation or truly meaningful investigative procedure. Much of the information and details of Ms. Doucette's behavior is known to the board, the union, managment and other employees and, if I am correct in this, the Board has already actually considered the issue of replacing her–probably on this basis. Perhaps investigating these issues would be best with–and might require--union involvement so that other grievences may be brought forward and corrobaration obtained? It would seem incumbant upon the Board, in fulfillment of their duties, to take this step. I also believe that, in preserving my client's rights, we must invoke or delineate the scope of union involvment in order to comply with the CBA.

While we can address these issues for my client as victimized employee, I would also stress that my client is a credit union member and has apprised the Board of financial improprieties and questionable practices by Ms. Doucette herself, in addition to those regarding her daughter. As to his matter, I believe the board may have both common-law and statutory duties but I am not fully cognizant of all regulations and procedures that might be applicable. The Board's duties in that regard are best set forth to them by you and we will be happy to comply with any investigative activies you undertake.


Regards,


Scott Adams

# EXHIBIT 6

**PEABODY & ARNOLD** LLP
COUNSELLORS AT LAW

30 ROWES WHARF, BOSTON, MA 02110
[617] 951.2100 FAX [617] 951.2125

BOSTON, MA   PROVIDENCE, RI

HARVEY WEINER
[617] 951.2014
hweiner@peabodyarnold.com

January 13, 2004

**VIA FACSIMILE AND REGULAR MAIL**
**(617) 742-8599**

Scott Adams
Attorney at Law
92 State Street, 9th Floor
Boston, MA 02109

Re:    Paula O'Donnell v. Boston Globe Employees Credit Union

Dear Mr. Adams:

Thank you for your December 30, 2003 letter, which I have now presented to the Board.

It is unclear to us from your letter if your client is actually seeking either an unpaid absence or a sabbatical. The Board does not give sabbaticals. An unpaid leave of absence may be granted by the Board upon good and sufficient reason upon written request. Are you formally requesting a leave of absence for her? If so, you must give good and sufficient reason. Since your client has applied for neither disability nor worker's compensation, I am assuming it is for another reason. If it is for a medical reason, you should submit a current doctor's report explaining the medical reason and why it prevents your client from working. If a request for a leave of absence is granted, it cannot be longer than 6 months retroactive to December 1, 2003, which was the next working day after your client's official last day at work.

It has been six weeks since your client's last official day at work without a word from her. Unless I hear from you within ten (10) days of the date of this letter with a formal and documented written request for an unpaid leave of absence based on good and sufficient reason, the Credit Union must take action for her gross neglect of duty, including considering the possibility of termination.

I look forward to hearing from you as soon as possible.

Very truly yours,

Harvey Weiner

HW/jac
cc: Marion Doucette
    Donna Boggs, Esquire

# EXHIBIT 7



**Scott Adams**

Attorney at Law

92 State St., 9th Flr. • Boston, MA 02109

Tel: (617) 742-4554 • Fax: 742-8599

January 19, 2004

Via Mail & Fax (617) 951-2125

Harvey Weiner
Peabody & Arnold
30 Rowes Wharf
Boston, MA 02110

Dear Mr. Weiner:

In response to your January 13 letter my client, Paula O'Donnell, is submitting this written request for a leave of absence. We make this request for good and sufficient reason: (i) improper, demeaning and abusive behavior by a Credit Union manager and supervisor, Marion Doucette, (ii) the failure of the Credit Union Board and management to take steps to rectify the wrongful conduct of Ms. Doucette,, and (iii) the physical and emotional injury that has been caused by the wrongful conduct of Ms. Doucette. On this last issue, my client has sought and has been treated for both physical and emotional injuries that she has suffered both in consequence of Ms. Docuette's behavior and the failure of the Board to rectify that situation. My client is currently investigating the potential for filing various insurance, disability and worker's compensation claims and will, as necessary or required, keep the Credit Union informed in a timely manner.

I would urge the Board, in the interests of both the Credit Union and my client, to grant this requested leave of absence and to actively investigate and rectify Ms. Doucette's conduct. My client is not the only employee who has suffered at her hands and can give the Board relevant information on the matter. It is also likely that Ms. Doucette's conduct will give rise to additional complaints and claims against the Credit Union and its Board. My client has long been an exemplary employee and has personally, and at risk, taken necessary actions to forestall two separate instances of ongoing fraud by managers and employees of the Credit Union. If my client has complaints about the conduct of Ms. Doucette, they should be taken seriously. As I suggested before, an serious, good faith investigation into these matters would be appreciated and my client stands ready to be interviewed, with or without Union involvement as all parties, including the Union, deem appropriate.

Please let me know of the Board's decision regarding an investigation and the request for leave at the earliest convenience.

Regards,

Scott Adams

# EXHIBIT 8

**PEABODY & ARNOLD** LLP
COUNSELLORS AT LAW

30 ROWES WHARF, BOSTON, MA 02110
[617] 951.2100 FAX [617] 951.2125

BOSTON, MA    PROVIDENCE, RI

# FILE COPY

HARVEY WEINER
[617] 951.2014
hweiner@peabodyarnold.com

February 2, 2004

**VIA FACSIMILE AND REGULAR MAIL**
**(617) 742-8599**

Scott Adams
Attorney at Law
92 State Street, 9th Floor
Boston, MA 02109

      Re:    Paula O'Donnell/Boston Globe Employees Credit Union ("Credit Union")

Dear Mr. Adams:

      Thank you for your January 19, 2004 letter requesting an unpaid leave of absence for your client, Paula O'Donnell, which I have presented to the Credit Union's Board of Directors.

      After a Board meeting (in which Marion Doucette did not either participate or vote), the Board voted unanimously to deny your client's request for an unpaid leave of absence. It concluded that there was not good and sufficient reason to grant this request. It concluded that Ms. Doucette, your client's supervisor, did not act in an improper, demeaning or abrasive manner towards your client, nor, if true, was that an adequate reason for granting a leave of absence to your client. It also concluded that Ms. Doucette has engaged in no wrongful conduct that would warrant a leave of absence for your client nor have you provided any medical basis, as requested in my January 13, 2004 letter to you, for a leave of absence. You have provided no doctor's report explaining your client's medical condition and why this prevents her from working at the Credit Union at this time.

      As your client is aware, the Board has in the recent past not only investigated all matters brought to its attention or required by law, but also had outside investigators review the activities of the Credit Union. Problematic situations have been rectified to its satisfaction, but it need not make changes solely to please your client. Because your client does not like Ms. Doucette is no reason for the Board to terminate Ms. Doucette's employment.

      The Board has also reached the following decision in the light of your client's gross neglect of duty of not showing up for work for over eight weeks after all her vacation time and sick leave had expired without a word from her. Your client must either resign or return to work by Tuesday, February 17, 2004 at 8:30 a.m. She must give written notice of her intentions either to resign or to return to work on said time and date to the Board, with a copy to me, by the end of business on Thursday, February 12, 2004.

**PEABODY & ARNOLD** LLP
Scott Adams
February 2, 2004
Page 2

If said notice is not given as indicated, or if your client states she will return to work in said notice but does not show up for work at 8:30 a.m. on February 17, 2004, your client is terminated from employment at the Credit Union. The Board is mindful of your client's almost thirty years of employment at the Credit Union and her prior good employment history and therefore offers her this final chance. However, her present gross neglect of duty can no longer be tolerated and must be resolved one way or the other as soon as possible.

I look forward to your response by February 12, 2004.

Very truly yours,

Harvey Weiner

HW/jac
cc: Donna Boggs, Esquire (by facsimile)

# EXHIBIT 9



# Scott Adams

**Attorney at Law**

92 State St., 9ᵗʰ Flr. • Boston, MA 02109

Tel: (617) 742-4554 • Fax: 742-8599

February 11, 2004                                    Via Mail & Fax (617) 951-2125

Harvey Weiner
Peabody & Arnold
30 Rowes Wharf
Boston, MA 02110

Dear Mr. Weiner:

In response to your February 2 letter and notice, we believe that the Credit Union's decision not to grant a leave of absence is short-sighted. My client knows that the situation with Ms. Doucette has not changed or improved, and that she continues to engage in abusive behavior that has not been addressed or rectified by the Credit Union's management and Board of Directors. That behavior will, eventually, give rise to considerable difficulties for the Credit Union and to liabilities beyond those that my client may assert. Under the circumstances, and due to the fact that my client is medically unable to return to work and has been advised not to do so in view of the certainty of continued harassment, she will not be reporting to work as requested. We will, if you take the step of terminating her, engage such union and private rights as may be available. I would again encourage the Credit Union, with the involvement of union representation, to engage in a good faith investigation and resolution of the matters previously addressed.

Regards,

Scott Adams

# EXHIBIT 10

**PEABODY & ARNOLD** LLP
COUNSELLORS AT LAW

30 ROWES WHARF, BOSTON, MA 02110
[617] 951.2100 FAX [617] 951.2125

BOSTON, MA   PROVIDENCE, RI

HARVEY WEINER
[617] 951.2014
hweiner@peabodyarnold.com

February 13, 2004

**VIA FACSIMILE AND REGULAR MAIL**
**(617) 742-8599**

Scott Adams
Attorney at Law
92 State Street, 9th Floor
Boston, MA 02109

Re:    Paula O'Donnell/Boston Globe Employees Credit Union ("Credit Union")

Dear Mr. Adams:

I have received your February 11, 2004 letter in response to my February 2, 2004 letter to you and have forwarded it to the Board of Directors of the Credit Union. In your letter, you state that your client will not return to work at the Credit Union on February 17, 2004. You also indicate that your "client is medically unable to return to work, and has been advised not to do so in view of the certainty of [alleged] continued harassment." As indicated to you earlier, such unsupported allegations from you are insufficient to justify a leave of absence without a doctor's report explaining your client's present medical condition and why that prevents her from working at the Credit Union at this time, all as indicated in my February 2, 2004 letter to you.

Since you did not affirm by the end of business on Thursday, February 12, 2004 that your client intended to return to work on February 17, 2004, the Board hereby terminates your client's employment at the Credit Union for gross neglect of duty, as indicated in my February 2, 2004 letter to you.

Very truly yours,

Harvey Weiner

HW/jac
cc: Donna Boggs, Esquire
(via facsimile and regular mail)

# EXHIBIT 11



**Office & Professional Employees
International Union, AFL-CIO, Local 6**

One Billings Road, Suite 200 • Quincy, MA 02171 • 617-984-0006 • 1-800-882-1462 • FAX 617-984-5882

**Mary Mahoney**
President

**AFFILIATIONS**
American Federation of Labor and Congress of Industrial Organizations
Massachusetts State Labor Council (AFL-CIO)

February 25, 2004


Boston Globe Employees Credit Union
Ms. Marion Doucette
P. O. Box 2378
135 Morrissey Blvd.
Dorchester, MA    02107

RE: Step I Grievance Hearing Request for Paula O'Donnell – Termination

Ms. Marion Doucette;

Enclosed please find a grievance for the above named grievant. Please contact me at your earliest convenience so we can schedule a Step I hearing at a mutually agreed upon time.

Thank you for your anticipated cooperation.


Sincerely,

Lisa M. Lemieux
Business Agent
OPEIU Local 6


cc:  Paula O'Donnell
     File
     Mary Mahoney


opeiu:6
afl-cio

# GRIEVANCE FORM
## OPEIU Local 6

*I hereby elect to process the grievance described below in accordance with the Collective Bargaining Agreement between OPEIU Local 6 and the Employer.*

**Aggrieved employee:**

**Name:**  Paula O'Donnell

**Position/Title:**  Systems Manager

**Employer Name:** Boston Globe Employees Credit Union

**Location:**  135 Morrissey Blvd.
Boston, MA 02125

**Immed. Mgr's Name:**  Marion Doucette

**Position/Title:**  Manager

**Describe grievance, including date of the incident and Article(s) of Agreement alleged to have been violated:**

On or about February 17, 2004, the grievant was unjustly terminated. The union contends this violates Articles I, VI, XV, XX and any other relevant articles of the collective bargaining agreement.

**Describe remedy sought:**  Reinstatement and to be made whole.

**Aggrieved employee:**  Paula O'Donnell

**Date:**  February 25, 2004

**Home Address:**  18 Hillview Lane
Plymouth, MA 02360

**Home #:**  508-746-8506

**Union Official:**  Lisa M. Lemieux

**Date:**  February 25, 2004

STEP 1:     Date Submitted _____

Disposition: _____

_____

_____

_____

_____

_____

                                        (Manager's Signature)        (Date)

STEP 2:     Date Submitted _____

Disposition: _____

_____

_____

_____

_____

                                        (Manager's Signature)        (Date)

STEP 3:     Date Submitted _____

Disposition: _____

_____

_____

_____

_____

                                        (Manager's Signature)        (Date)

# EXHIBIT 11A

March 25, 2004

Lisa M. Lemieux, BA
Office & Professional Employees
International Union, AFL-CIO, Local 6
One Billings Road, Suite 200
Quincy, MA 021711

Dear Lisa,

We have decided to let our decision concerning Paula stand as is.

Sincerely,

J. Brendan Hall

# EXHIBIT 12



# Office & Professional Employees
## International Union, AFL-CIO, Local 6
One Billings Road, Suite 200 • Quincy, MA 02171 • 617-984-0006 • 1-800-882-1462 • FAX 617-984-5882

**Mary Mahoney**
President

**AFFILIATIONS**
American Federation of Labor and Congress of Industrial Organizations
Massachusetts State Labor Council (AFL-CIO)

August 24, 2004

Boston Globe Employees Credit Union
Peter Vinci, Manager/ CEO
P. O. Box 2378
135 Morrissey Blvd.
Dorchester, MA 02107

**RE: Paula O'Donnel**

Dear Mr. Vinci;

As per your request, the Union has put our request in writing along with a summary of events. The Union is hereby requesting that Paula O'Donnells' employment be reinstated. In order to avoid mutual arbitration costs and/or civil charges, the Union stands by ready to negotiate the terms of Paula's reinstatement.

February 17, 2004 termination

February 25, 2004 grievance submitted

March 19, 2004 grievance hearing

March 24, 2004 letter from Brendan with questions, I called with response

March 25, 2004 letter from Brendan denying grievance

March 29, 2004 Brendan & I (B.A., Lisa M. Lemieux) spoke re: next step. We verbally agreed to keep grievance in abeyance while the Union researched the merits of the grievance further to determine if the Union would be moving forward.

During this time of abeyance the Union gathered more information from the Globe Nurse, had discussions with Paula and her attorney, Marion Doucette retired and new CEO Peter Vinci came on board at the BGECU. Paula through out this entire period has remained under doctors care and has worked diligently to get improve her health and has had much improvement. Both Paula and her doctor feel Paula is able to come back to work.

August 11, 2004 termination grievance reconvened with Mr. Vinci, CEO, Kay Toland, Steward, and Lisa M. Lemieux, B.A. The Union explained that we were making a last

request from the company to reinstate Paula back for the reasons listed below in order to avoid arbitration costs and/or civil charges.

➢  Paula's health has improved and is able to come back to work

➢  The Union believes that one of the root causes for Paula's absences was on the job stress from a relationship between Paula and Marion Doucette, who is no longer employed at the BGECU.

➢  New CEO and Manager, Peter Vinci had identified the need for an experienced Systems Manager.

➢  Mr. Vinci also identified that it was clear to him that Paula knew her job and did it well. As the books were kept balanced up until Paula left and that he would be willing to work with her knowing she could do the job if the Board agreed.

➢  Paula is a 30 year employee, that should mean something to the BGECU, an employee like Paula should not loose her job and or earned benefits because she had an illness.

Please contact me at 671-984-0006 to see if we can work this out.

Sincerely,

Lisa M. Lemieux
Business Agent


cc: Paula O'donnel
    Kay Toland
    File


opeiu:6
afl-cio

# EXHIBIT 13



**Boston Globe
Employees
Credit Union**

August 27, 2004

Lisa M. Lemieux, Business Agent
Office of Professional Employees
International Union, AFL-CIO, Local 6
One Billings Road, Suite 200
Quincy, Massachusetts 02171

Dear Ms. Lemieux,

I am in receipt of your letter dated August 24, 2004 concerning the reinstatement of Paula O'Donnell. There appears to be some misinterpretations made within your letter concerning some verbal meetings held with either Mr. J. Brendan Hall or myself on two separate occasions.

As you stated within your letter, on March 29, 2004 you received a letter from Mr. J. Brendan Hall denying the grievance. I cannot speak for Mr. Hall but, from various written communications, which I have at my disposal, Mr. Hall would have received the formal instructions for denial of the grievance, which was placed in writing, directly from the Board of Directors. He would not have made this decision at his own discretion nor would he have had the authority to make that decision on his own without the full approval of the Board of Directors.

On August 11, 2004 it was not my understanding that our meeting was anything more than you, Lisa M. Lemieux, informing me, Peter M. Vinci, of your meeting with Ms. O'Donnell, her attorney, and the union the previous day or days before August 11, 2004. We, in my own opinion, did not reconvene any termination grievance meeting, hearing or any other such renegotiation of Ms. O'Donnell's termination or reinstatement. If this meeting was for that purpose I was not aware of its intent. At that meeting on August 11, 2004 we did discuss that I would bring to the Board of Directors at their next regularly scheduled meeting your verbal request to have Paula O'Donnell reinstated to her former position so as to possibly avoid arbitration and/or civil charges. As I was not aware of all the circumstances surrounding Ms. O'Donnell's termination or her absence from employment I did agree to submit this request to the Board of Directors. **In response to that request I must inform you that the Board of Directors has made it quite clear to me that this situation had been settled by the full Board of Directors back in February 2004 and that they, the present Board of Directors, would not entertain or reconsider Ms O'Donnell's termination or job reinstatement request.**

In your letter, you say that I had identified the need for an experienced Systems Manager (Senior Accounting Position). That is absolutely true. I also had identified other personnel needs, changes, and improvements that I felt were required in order for the Credit Union to fully respond to the needs of our membership and to the needs and

P.O. Box 2378
Boston, MA 02107-2378

(617) 929-2741
FAX (617) 929-3386

fulfillment of our employees to perform their duties in a such a manner as to protect the deposits of our membership and the assets of the Credit Union.

In addition to the above identified need for an experienced Systems Manager (Senior Accounting Position), I believe that there is a misunderstanding of my comments concerning Ms. O'Donnell's performance. I was not here in August 2003 or prior to the time when Ms. O'Donnell removed herself from her position at the Credit Union and did not return of her own accord. Therefore, I cannot, nor will I, evaluate her performance, work habits, or knowledge and ability without visually observing her performance first hand. I can only state that the books and records of the Credit Union were in balance and appear to have been well managed from the end of August 2003 and prior to that.

Any further requests concerning Ms. O'Donnell's termination, reinstatement, request for arbitration, or other such requests directly concerning this matter or other matters as it pertains to Ms. O'Donnell's prior employment or the absence thereof should be directed in writing to the following:

Board of Directors
Attention: Peter M. Vinci, Manager/CEO
Boston Globe Employees Credit Union
P.O. Box 55819
Boston, Massachusetts 02205-5819

Respectfully,

Peter M. Vinci
Manager/Chief Executive Officer

# EXHIBIT 14



**Office & Professional Employees**
**International Union, AFL-CIO, Local 6**
One Billings Road, Suite 200 • Quincy, MA 02171 • 617-984-0006 • 1-800-882-1462 • FAX 617-984-5882

**Mary Mahoney**
President

**AFFILIATIONS**
American Federation of Labor and Congress of Industrial Organizations
Massachusetts State Labor Council (AFL-CIO)



September 7, 2004

Peter M. Vinci, Manager/CEO
Board of Directors
Boston Globe Employees Credit Union
P. O. Box 55819
Boston, MA 02205-5819

Dear Mr. Vinci,

      RE:   Paula O'Donnell termination grievance

      I am writing in response of your letter dated August 27, 2004. The Union is submitting the termination grievance of Paula O'Donnell to arbitration under the provisions of Article XIX of the collective bargaining agreement. The Union hereby designates Mary Mahoney as the Union Arbitrator.

      Please have the Boston Globe Employee Credit Union's designated arbitrator contact Mary Mahoney to select a mutual third arbitrator. She can be reached at 617-684-0006.

      Thank you for your attention to this matter.

Sincerely,

Lisa M. Lemieux
Business Agent

cc:    Paula O'Donnell
       Mary Mahoney
       Robert S. Manning, Esq.

opeiu:6
afl-cio

# EXHIBIT 15



**Boston Globe**
**Employees**
**Credit Union**

September 13, 2004

Lisa M. Lemieux
Business Agent
Office of Professional Employees
International Union, AFL-CIO Local 6
One Billings Road, Suite 200
Quincy, Massachusetts 02171

Dear Ms. Lemieux,

I am in receipt of your letter dated September 7, 2004 whereas you have requested that the termination of Paula O'Donnell on February 17, 2004, the submission of said grievance dated February 25, 2004, and the denial of said grievance by the Board of Directors of the Boston Globe Employees Credit Union on March 25, 2004, that was forwarded to you and/or Local 6 in writing, under the signature of J. Brendan Hall be appealed to arbitration for consideration and merit.

This request was forwarded for review, and for the determination of the validity of this request, as it pertains to the provisions of Article XIX of the Collective Bargaining Agreement to the Credit Union's attorney. I unfortunately regret to inform you that this request has been denied. It is our interpretation of Article XIX that the request for arbitration concerning this grievance and/or the termination of Paula O'Donnell does not qualify for arbitration due to the tardiness of the request, more than (10) ten days after the denial of the grievance. As it clearly states within the agreement under Article XIX:

**"Where there is no specific provisions set forth in this agreement, expectations to the above time limits shall be only upon the mutual agreement of the Parties. In the absence of any such mutual agreement to extend the time limits, the failure of the Union to act within the above time limits shall constitute a waiver of that particular grievance and it shall be applicable to that particular grievance only and shall not serve as a precedent nor a prejudice to the position of either the Union of the Credit Union in any future grievance."**

Whereas there is no written mutual agreement of both parties to extend the time frame of the grievance, it is the Credit Union's position that such time limitations had expired at midnight on April 4, 2004, (10) ten days after denial of such grievance in writing by Mr. J. Brendan Hall on March 25, 2004, and that no further action is required at this time.

Respectfully,


Peter M. Vinci
Manager & CEO


P.O. Box 2378
Boston, MA 02107-2378

(617) 929-2741
FAX (617) 929-3386

# EXHIBIT 16



# Office & Professional Employees
## International Union, AFL-CIO, Local 6

One Billings Road, Suite 200 • Quincy, MA 02171 • 617-984-0006 • 1-800-882-1482 • FAX 617-984-5882

**Mary Mahoney**
President

**AFFILIATIONS**
American Federation of Labor and Congress of Industrial Organizations
Massachusetts State Labor Council (AFL-CIO)



September 15, 2004

Board of Directors
Mr. Peter M. Vinci, Manager/CEO
Boston Globe Employees Credit Union
P.O. Box 55819
Boston, MA 02205-5819

     Re:    Paula O'Donnell – Discharge

Dear Mr. Vinci:

     I have spoken with our attorney about your September 13, 2004 letter in which you declined to participate in the arbitration procedure outlined in our collective bargaining agreement because, you claim, that there was "no written mutual agreement of both parties to extend the time frame of the grievance . . ."

     It is the Union's position that, in fact, both parties did agree to extend the time frames of the grievance procedure; Brendan Hall and I had agreed orally on March 29 to hold this matter in abeyance until we further investigated the merits of the grievance to determine if we would go forward to arbitration. On August 11, 2004, you and I met and you agreed to take a settlement offer we made back to the board of directors for consideration. When you informed me, by letter dated August 27, that the board of directors "would not entertain or reconsider Ms. O'Donnell's termination or job-reinstatement request," we timely filed for arbitration.

     It is our position that the Credit must designate its arbitrator, in accordance with Article XXI of the labor agreement, even if management is raising an issue over arbitrability. It is ultimately up to the arbitrator to determine that issue. In the meantime, as the labor agreement states: "Both parties agree fully to cooperate in an effort to resolve any grievance arising out of this Agreement." This includes the obligation to participate in the arbitration procedure.

     Therefore, if management refuses to designate its arbitrator, we will file a demand to arbitrate with the American Arbitration Association and take the position that management has forfeited its right to have a company-designated arbitrator participate in the hearing. In addition, we will consider filing an unfair labor practice against the Credit Union for refusing to participate in good faith in the grievance/arbitration procedure.

We would like to avoid those actions if necessary. So, I suggest that you at least inform us who the Credit Union arbitrator will be and that we let a third, neutral arbitrator determine the issue of arbitrability. Please speak to the Credit Union's labor counsel about this matter and let me know, promptly, what you intend to do. In addition, if it would be of assistance, your attorney could speak to our general counsel, Robert S. Manning, to go over this issue. He can be reached at our office.

Thank you for your cooperation and attention to this matter.

Sincerely yours,

Lisa M. Lemieux
Business Agent

cc: Paula O'Donnell
Robert S. Manning, Esq.

# EXHIBIT 17

**PEABODY & ARNOLD** LLP
COUNSELLORS AT LAW

30 ROWES WHARF, BOSTON, MA 02110
[617] 951.2100 FAX [617] 951.2125

BOSTON, MA    PROVIDENCE, RI

HARVEY WEINER
[617] 951.2014
hweiner@peabodyarnold.com

September 21, 2004

Lisa M. Lemieux
Business Agent
Office & Professional Employees
International Union, AFL-CIO, Local 6
One Billings Road, Suite 200
Quincy, MA 02171

Re:    Paula O'Donnell v. Boston Globe Employees Credit Union

Dear Ms. Lemieux:

I have been asked to respond to your September 15, 2004 letter on behalf of the Boston Globe Employees Credit Union ("Credit Union"). While maintaining and specifically not waiving its position that the time for arbitration of this matter has expired and that the alleged claim is not arbitratable, the Credit Union hereby designated Maria Walsh as its arbitrator. She can be reached at (617) 228-0200. Once again, Brendan Hall has indicated that he did not agree with you orally or in any other manner on March 29, 2004 to "hold the matter in abeyance."

Sincerely yours,

Harvey Weiner

HW/jac
cc: Peter Vinci (personal and confidential)
    Robert S. Manning, Esquire
PABOS2:HWEINER:597755_1
193-90324

# EXHIBIT 18

# Office and Professional Employees International Union, AFL-CIO, Local 6

One Billings Road, Suite 200 • North Quincy, MA 02171 • 617-984-0006 • 800-882-1462
E-MAIL: opeiulocal6@aol.com • WEBSITE: www.opeiulocal6.org  FAX: 617-984-5882

**Mary Mahoney**
*President*
*Business Manager*

**AFFILIATIONS**
American Federation of Labor and Congress of Industrial Organizations • Massachusetts State Labor Council (AFL-CIO)

June 14, 2005

Harvey Weiner, Esq.
Peabody & Arnold
30 Rowe's Wharf
Boston, MA 02108

Re:    Boston Globe Employees Credit Union and OPEIU, Local 6
Gr.:   Paula O'Donnell – Discharge

Dear Mr. Weiner:

This letter is to confirm that the union has withdrawn the grievance in the above-referenced matter.

If you have any question, please do not hesitate to call. Thank you.

Very truly yours,

Robert S. Manning
General Counsel