UNITED STATES DISTRICT COURT
THE DISTRICT OF MASSACHUSETTS

PAULA O'DONNELL,
    Plaintiff

v.

DONNA BOGGS, BRENDAN HALL, WILLIAM FRANCIS, MARY LOU MEGAN and MARIAN DOUCETTE,
    Defendants

Civil Action No. 05-11257-NG

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Introduction

Defendants removed this matter to federal court rather than seek dismissal in state court on the basis of LMRA §301 preemption. Assuming (i) that Defendants are correct in their contention that adjudication will require interpretation and construction of the collective bargaining agreement and (ii) that the Defendants are deemed the employer, Plaintiff's cause of action against the individual defendants for tortious interference survives in federal court as pendant to a §301 action against the employer since Plaintiff has exhausted all of her collective bargaining agreement remedies.

Procedural Matter:

Rule 16 Conference Agreement That This Motion Delayed Discovery

At this time–by agreement– neither party has engaged in discovery. At the Rule 16 Pre-Trial Conference, it was agreed that discovery would be delayed pending resolution of Defendants' motion for judgment on LMRA §301 preemption issues. Defendants did not commit to (i) relying on the Complaint alone and moving under Rule 12(b)(6) or (ii) moving under Rule 56 with supplementary

materials and affidavits. Defendants submitted this motion relying on matters outside the Complaint, *i.e., an affidavit of Defendants' counsel* and exhibits. To the extent that Plaintiff cannot fully meet and oppose Defendants' affidavit and materials because the parties agreed to delay discovery, and to the extent such matters become relevant to resolution of the issue of summary judgment, Plaintiff reserves the right to submit a Rule 56(f) notice.

<u>Material Facts: Plaintiff's Employment and Defendants' Misconduct</u>

Plaintiff Paula O'Donnell, in 30 years of service to the Boston Globe Employees Credit Union, discovered and reported situations of fraud and embezzlement by two credit union employees. (Affidavit of Paula O'Donnell ¶1). In 1998 she discovered that Gene Farrell, the Manager/CEO, had fraudulently taken credit union funds. (Id.) Following her report of this to the security department and to the Board of Directors, and following a confirming investigation, he was terminated. (Id.) After this, Ms. O'Donnell experienced a degree of hostility and estrangement from certain Board members, including Bob Sylvester, who expressed sympathy and empathy for Mr. Farrell. (Id.) Defendant Board member Brendan Hall also distanced himself from and slighted Ms. O'Donnell, although they previously had close and friendly relations.(Id.)

In late 2000 Ms. O'Donnell, as Systems Manager, discovered an initial fraud by the new Manager/CEO, Defendant Marian Doucette, who misrepresented her daughter's qualifications and hired her as the Bookkeeper for greater compensation than practice and policy allowed. (Id. ¶2) Defendant Doucette's daughter was unqualified for the position of Bookkeeper, which was the same position previously held by Ms. O'Donnell. (Id.) Paying relatives more than scale was an objectionable practice previously engaged in by Mr. Farrell, the terminated Manager/CEO. (Id.) Ms.

O'Donnell complained of these matters to Defendant Doucette and to the Board of Directors, and raised the issue with her union steward. (Id.) The Board did nothing but Defendant Doucette began a course of retaliatory abuse and interference. (Id.)

Ms. O'Donnell next discovered and reported to Defendant Doucette, Board member Brendan Hall and to the union steward, that Defendant's Doucette's daughter, who had a credit union account, was bouncing an excessive number of checks (nearly 100) and that Defendant Doucette was violating practice and policy by approving their processing and payment. (Id. ¶3)  She also complained of ongoing retaliation by Defendant Doucette. Defendant Donna Boggs, the Chairperson of the Board, directed Ms. O'Donnell not to speak of this to any other Board members, and to drop the matter because it wasn't a policy violation. (Id.)  In fact, it was a violation of a policy implemented after the last instance of fraud by a credit union employee.  (Id.) Ms. O'Donnell insisted that the matter be dealt with or, since she was also a credit union shareholder, she would have to raise the issue as a shareholder action. (Id.) Defendant Boggs reacted adversely to this demand by Ms. O'Donnell. (Id.)

Ms. O'Donnell later discovered and reported another instance of fraud, in which Defendant Doucette's daughter manipulated the accounting system and overrode security procedures to clear her personal checks when she had insufficient funds.  (Id. ¶4). Defendant Doucette's daughter was eventually  terminated only after Ms. O'Donnell reported a new instance of fraud in which she was manipulating ATM security procedures to wrongfully obtain funds. (Id.) Ms. Doucette's daughter was allowed to resign but her credit union account was to be closed. (Id.) Instead, Defendant Boggs ordered Ms. O'Donnell to keep the account open and clear checks even when there were insufficient funds. (Id.) The order that Ms. O'Donnell disobey the Board directive was reported by her to the union steward, who notified the Board of Defendant Boggs' conduct. (Id.)

Defendant Doucette's daughter's manipulation of the ATM system was reported to the state banking commission and the credit union received an "admonishment" as a result. (Id. ¶5) Notification of the commission was blamed on Ms. O'Donnell by Defendant Board members William Francis and Boggs. (Id.) Defendant Board member Mary Lou Megan also held Ms. O'Donnell accountable for this in subsequent grievance procedure during which Defendants Boggs and Megan questioned Ms. O'Donnell's performance of her duties. (Id.)

After each of these situations noted above was discovered, investigated and reported by Ms. O'Donnell in the course of her duties as the credit union's Systems Manager, Defendant Doucette's retaliation for disclosure of her own and her daughter's conduct and embarrassment intensified and expanded. (Id. ¶6) There were weekly incidents of physical and verbal intimidation and disparagement, verbal abuse, displays of physical violence, and interference with Ms. O'Donnell's duties. (Id.) This conduct was brought to the attention of Defendant Board members Boggs, Hall, Francis and Megan directly by Ms. O'Donnell and through union grievance procedures but no concrete or effective action was taken. (Id.¶7) In fact, Ms. O'Donnell began to be subject to adverse employment action and discipline undertaken by the various Defendants and various times. (Id.)

Eventually, the conduct of Defendant Doucette and the Defendants, and the failure of the Board generally to correct the situation, resulted in a work situation and environment that became intolerable and damaging. (Id. ¶8) It took such a physical and emotional toll on Ms. O'Donnell that the Boston Globe's own medical officer strongly advised that she leave work and take a leave of absence. (Id.) She did. (Id.) No action was taken by the credit union to remove or discipline Defendant Doucette, who continued in her position. (Id.) Ms. O'Donnell was eventually terminated when she refused to return to work under Defendant Doucette's supervision. (Id.).

Defendant Doucette's retaliation and interference with Ms. O'DOnnell's work at the credit union was motivated by actual malice for her complaining of and drawing attention to her misconduct and that of her daughter. (Id. ¶10) Defendant Board members Boggs, Hall, Francis and Megan's retaliation and interference with her work at the credit union was motivated by actual malice for her complaining and drawing attention to the malfeasance and misconduct of Defendant Doucette and her daughter while they were responsible for addressing such matters, for alleged contact with the banking commission that resulted in adverse action against the credit union, and for threatening shareholder action for failure to address matters. (Id. ¶11)

Ms. O'Donnell filed this action in state court against the named Defendants while her union continued to grieve the matter. (Id. ¶9) Against Ms. O'Donnell's wishes and instruction, her union abandoned the grievance just prior to scheduled arbitration. (Id.) The Defendants removed this matter to federal court. (Id.) Thereafter, Ms. O'Donnell filing a complaint against her union with the National Labor Relations Board. (Id.)

ARGUMENT:

LMRA §301 Jurisdictional Preemption May Be Appropriate

In moving for summary judgment on the issue of preemptive federal jurisdiction, and assuming– *for the sake of argument*– that Defendants are correct in their contention that Plaintiff's claims require interpretation of the collective bargaining agreement in a manner sufficient to establish §301 jurisdictional preemption, the result merely requires federal rather than state court adjudication of the claim. As the Supreme Court has held, "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract,

that claim must either be treated as a §301 claim . . . or dismissed as pre-empted by federal labor-contract law." Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 220 (1985). Although §301 preemption of such a claim is not always required and state law jurisdiction of tortious interference claims has been upheld,[1] in this instance– accepting the Defendants' contention that "substantial" interpretation is required–only means that a federal court has exclusive jurisdiction of this action.

### LMRA §301 Preemption Dismissal Is Not Sustainable

Subsequent to resolution of the jurisdictional aspect of §301 preemption, the issue of dismissal is a matter for subsequent analysis. *See* Magerer v. John Sexton & Co, et al., 912 F.2d 525, 531(1st Cir.1990)(dismissal analysis occurring only after §301 jurisdictional preemption established). Unless Defendants can set forth sufficient facts to support §301 preemptive dismissal, this case would proceed in federal court as a §301 claim. Defendants' argument for preemptive dismissal appears to rest solely on their contention that "[defendants] are the employer, since the employer is liable for [defendants'] conduct" (see Def Mtn p.12).

Assuming–*for the sake of argument*– that Defendants are also correct in this contention, Plaintiff's Complaint is still a viable, well-pleaded §301 claim against the employer for breach of the collective bargaining agreement. *See* Allis-Chalmers Corp, at 220 (1985) (stating that right Plaintiff sought to vindicate with state law tort claim "is rooted in contract, and the bad-faith claim he brings could have been pleaded as a contract claim under §301"); Vaca v. Sipes, 386 U.S. 171, 185-86

---

[1] Federal preemption of tortious interference claim did not exist where underlying tort liability was based on actual malice. *See* Tosti v. Ayik, 437 N.E.2d 1062, 386 Mass. 721, 726 (1982), appeal after remand 476 N.E.2d 928, 394 Mass. 482, 485-86 (1985), appeal after remand 508 N.E.2d 1368, 400 Mass. 224 (1987), certiorari denied United Auto Workers, Local 422 v. Tosti, 484 U.S. 964(198_)

(1966)(reviewing policy allowing employee to proceed against employer in a §301 action). Such claims involving counts against the employer or individuals in managerial or supervisory position are often adjudicated in federal court and there is nothing in their nature that requires dismissal. See Zimmerman v. Direct Federal Credit Union, 262 F.3d 70, 75-77 (C.A. 1 Mass. 2001)(case involving credit union where actual malice overcame qualified supervisory privilege); Legoff v. Trustees of Boston Univ., 23 F.Supp.2d 120, 129-30 (D. Mass. 2001)(unlawful acts such as threats and retaliation cannot be considered within scope of supervisor's duties and support *prima facie* case of tortious interference); Ruffino v. State Street Bank & Trust Co., 908 F.Supp. 1019, 1050-52 (D.Mass. 1995)(stating interference need not cause termination for recovery under claim of tortious interference); Boyle v. Boston Foundation, Inc., 788 F.Supp. 627, 630 (D.Mass. 1992)(stating discharge not necessary to sustain tortious interference claim when interference causes performance of contract to be more burdensome).

Defendants' sole defense to an action raising the employer's breach of the collective bargaining agreement is that of "failure to exhaust remedies", which is unavailing since, as Defendants concede, Plaintiff invoked the collective bargaining grievance procedures and it was her union that "abandoned" the grievance just prior to arbitration (Def SOMF ¶¶ 24-26). See. Allis-Chalmers Corp. at 219 (1985)(stating "failure to make use of the grievance procedure established in the collective-bargaining agreement" is basis for dismissal); Vaca v. Sipes, 386 U.S. 171, 184 (1967); *See also* O'Brien v. New England Telephone & Telegraph Co., 422 Mass. 686 , 688(1996)(tortioius interference claim sustainable in state court where tortious interference caused employee's misconduct that lead to eventual discharge; liability existed but defense arose because employee did not engage in grievance procedures). The union's abandonment of Plaintiff's grievance was against

her wishes and she subsequently filed a claim with the Labor Relations Board against her union, whcih would procede on the basis that her union's decision to abandon the grievance and arbitration was a breach of its duty of fair representation to Plaintiff.[2]

When the Complaint is read in the manner that Defendants argue is appropriate, i.e., as a claim requiring not only interpretation of a collective bargaining agreement but also one made against the employer for breach of the collective bargaining agreement, Plaintiff concedes that it is preempted jurisdictionally and must be resolved in federal court.[3] Furthermore, it should and must proceed as a §301 claim subject only to Defendants' ability to set forth other facts necessary and sufficient to require dismissal. Since Defendants do not attack the sufficiency of Plaintiff's Complaint to set forth a cause of action[4] or dispute the facts alleged in her Complaint, or set forth other sufficient grounds for dismissal, there is no basis for granting summary judgment adverse to Plaintiff.

---

[2] When the Complaint is understood, as Defendants contend, to allege a claim against the employer for breach of the collective bargaining agreement, Plaintiff would be allowed the option of supplementing her Complaint to in order to join her union as party. This is an acceptable–but not necessary–practice. See Vaca at 187 (stating 'it is obvious that the courts will be compelled to pass upon whether there has been a breech of the duty of fair representation in the context of many §301 breach-of-contract actions.")

[3] Even if all or only some of the individual Defendants are not deemed the employer, federal jurisdiction would still be appropriate as a matter of (i) exclusive jurisdiction because interpretation of the collective bargaining agreement is necessary, see Allis-Chalmers at 220, or (ii) pendant jurisdiction due to the close relationship of the claims to issues raised in a §301 action against the employer, see Young v. Anthony's Fish Grottos, Inc., 830 F.2d 993, 999 (9th Cir. 1987)(stating court "could properly exercise pendant jurisdiction over the tort claims based on their close relation with the section 301 claim ..."); see also Johnson v. Anheuser Busch, Inc. 876 F.2d 620, 625 (8th Cir. 1989)(stating remanding or retaining ancillary tort claims as pendant to §301 claim is discretionary).

[4] Defendants concede as much in their Memorandum: "Setting aside whether Plaintiff states a claim for tortious interference with contractual relations in the case at bar, it is clear the case is preempted" (p. 10).

WHEREFORE, Defendants' Motion for Summary Judgment should be denied to the extent that Plaintiff's claims are dismissed, and the matter should proceed and discovery commence.

                                                    Respectfully submitted for Plaintiff,
                                                    By her attorney,

dated: September 27, 2005        __/s/ Scott Adams_____

                                                    Scott Adams (BBO# 639166)
                                                    92 State St., 9th Flr.
                                                    Boston, MA 02109
                                                    Tel: (617) 742-4554

UNITED STATES DISTRICT COURT
THE DISTRICT OF MASSACHUSETTS

PAULA O'DONNELL,
    Plaintiff
v.

DONNA BOGGS , BRENDAN HALL, WILLIAM FRANCIS, MARY LOU MEGAN and MARIAN DOUCETTE,
    Defendants

Civil Action No. 05-11257-NG

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS, AND FURTHER MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION

Pursuant to Rule 56.1, Plaintiff Paula O'Donnell submits the following response to Defendants' Statement of undisputed material facts in support of their motion for summary judgment:

Note:   Defendants' Motion for Summary Judgment was submitted under circumstances in which the parties, at the Rule 16 Pre-Trial Conference, agreed that discovery would be delayed pending resolution of Defendants' motion for judgment on LMRA §301 preemption issues. Defendants did not commits to moving under Rule 12(b)(6) and rely on the Complaint alone, or under Rule 56 with supplementary materials and affidavits. Defendant submitted a motion supported by affidavit of Defendants' counsel only–no affidavits of the Defendants or other witnesses have been submitted. To the extent that Defendants submitted their Statement of Material Facts under circumstances in which discovery was waived for the purposes of Defendants' proposed motion, Plaintiff cannot fully meet and oppose Defendants' affidavits and other materials because the parties delayed discovery, Plaintiff will submit a Rule 56(f) Motion and Affidavit.

Defendants' Statements:

1. through 27: Not disputed by Plaintiff for the purposes submitted, i.e., Defendants current Motion for Summary Judgment. laintiff reserves the right to dispute the stated facts in consequence of information obtained when discovery is commenced in this case.

Plaintiff's Further Statements of Material Fact:

28. Plaintiff Paula O'Donnell, in 30 years of service to the Boston Globe Employees Credit Union, discovered and reported situations of fraud and embezzlement by two credit union employees. (Affidavit of Paula O'Donnell ¶1)

29. In 1998 she discovered that Gene Farrell, the Manager/CEO, had fraudulently taken credit union funds. Following her report of this to the security department and to the Board of Directors, and following a confirming investigation, he was terminated. (Id.)

30. After this, Ms. O'Donnell experienced a degree of hostility and estrangement from certain Board members, including Bob Sylvester, who expressed sympathy and empathy for Mr. Farrell. (Id.) Defendant Board member Brendan Hall also distanced himself from and slighted Ms. O'Donnell, although they previously had close and friendly relations. (Id.)

31. In late 2000 Ms. O'Donnell, as Systems Manager, discovered an initial fraud by the new Manager/CEO, Defendant Marian Doucette, who misrepresented her daughter's qualifications and hired her as the Bookkeeper for greater compensation than practice and policy allowed. (Id. ¶2) Defendant Doucette's daughter was unqualified for the position of Bookkeeper, which was the same position previously held by Ms. O'Donnell. Paying relatives more than scale was an objectionable practice previously engaged in by Mr. Farrell, the terminated Manager/CEO. (Id.)

32. Ms. O'Donnell complained of these matters to Defendant Doucette and to the Board of Directors, and raised the issue with her union steward. The Board did nothing but Defendant Doucette began a course of retaliatory abuse and interference. (Id.)

33. Ms. O'Donnell next discovered and reported to Defendant Doucette, Board member Brendan Hall and the union steward, that Defendant's Doucette's daughter, who had a credit union account, was bouncing an excessive number of checks (nearly 100) and that Defendant Doucette was violating practice and policy by approving their processing and payment. (Id. ¶3)

34. Ms. O'DOnnell also complained of ongoing retaliation by Defendant Doucette. (Id.)

35. Defendant Donna Boggs, the Chairperson of the Board, directed Ms. O'Donnell not to speak of this to any other Board members, and to drop the matter because it wasn't a policy violation. (Id.) In fact, it was a violation of a policy implemented after the last instance of fraud by a credit union employee. (Id.)

36. Ms. O'Donnell insisted that the matter be dealt with or, since she was also a credit union shareholder, she would have to raise the issue as a shareholder action. (Id.) Defendant Boggs reacted adversely to this demand by Ms. O'Donnell. (Id.)

37. Ms. O'Donnell later discovered and reported another instance of fraud, in which Defendant Doucette's daughter manipulated the accounting system and overrode security procedures to clear her personal checks when she had insufficient funds. (Id. ¶4)

38. Defendant Doucette's daughter was eventually terminated only after Ms. O'Donnell confirmed and reported a new instance of fraud in which she was manipulating ATM security procedures to fraudulently obtain funds. (Id.)

39. Defendant Doucette's daughter was allowed to resign but her credit union account was directed to be closed. (Id.) Instead, Defendant Boggs ordered Ms. O'Donnell to keep the

account open and to clear checks even when there were insufficient funds. (Id.) The order that Ms. O'Donnell disobey the Board directive was reported by her to the union steward, who notified the Board of Defendant Boggs' conduct. (Id.)

40. Defendant Doucette's daughter's manipulation of the ATM system was reported to the state banking commission and the credit union received an "admonishment" as a result. (Id. ¶5) Notification of the commission was blamed on Ms. O'Donnell by Defendant Board members William Francis and Boggs. (Id.) Defendant Board member Mary Lou Megan also held Ms. O'Donnell accountable for this in a subsequent grievance procedure during which Defendants Boggs and Megan questioned Ms. O'Donnell's performance of her duties. (Id.)

41. After each of these situations noted above was discovered, investigated and reported by Ms. O'Donnell in the course of her duties as the credit union's Systems Manager, Defendant Doucette's retaliation for disclosure of her own and her daughter's conduct and embarrassment intensified and expanded. (Id. ¶6) It included weekly incidents of physical and verbal intimidation and disparagement, verbal abuse, displays of physical violence, and interference with Ms. O'Donnell's duties at the credit union. (Id.)

42. This conduct was brought to the attention of Defendant Board members Boggs, Hall, Francis and Megan directly by Ms. O'Donnell and separately through union grievance procedures but no concrete or effective action was taken. (Id. ¶7)

43. In fact, Ms. O'Donnell began to be subject to adverse employment action and discipline undertaken by the various Defendants and various times. (Id.)

44. Eventually, the conduct of Defendant Doucette and the conduct of the Defendant Board members, and the failure of the Board generally to correct the situation, resulted in a work situation and environment that became intolerable and damaging. (Id. ¶8) It took such a

physical and emotional toll on Ms. O'Donnell that the Boston Globe's own medical officer strongly advised that she leave work and take a leave of absence. (Id.) She did. (Id.)

45. No action was taken by the credit union to remove or discipline Defendant Doucette, who continued in her position. (Id.) Ms. O'Donnell was eventually terminated when she refused to return to work under Defendant Doucette's supervision. (Id.)

46. Ms. O'Donnel filed this action in state court against the named Defendants while her union continued to grieve the matter.(Id. ¶9). Against Ms. O'Donnell's wishes and instruction, her union abandoned the grievance just prior to scheduled arbitration. (Id.)

47. The Defendants removed this matter to federal court. (Id.)

48. Thereafter, Ms. O'Donnell filed a complaint against her union with the National Labor Relations Board. (Id.)

49. Defendant Doucette's retaliation and interference with Ms. O'Donnell's work at the credit union was motivated by actual malice for her complaining of and drawing attention to her misconduct and that of her daughter. (Id. ¶10)

50. Defendant Board members Boggs, Hall, Francis and Megan's retaliation and interference with Ms. O'Donnell's work at the credit union was motivated by actual malice for her complaining and drawing attention to the malfeasance and misconduct of Defendant Doucette and her daughter while they were responsible for addressing such matters, and for alleged contact with the banking commission that resulted in adverse action against the credit union, and for threatening shareholder action for failure to address matters. (Id. ¶11)

                                                Respectfully submitted for Plaintiff,
                                                By her attorney,

dated: September 27, 2005        __/s/ Scott Adams_____

                                                Scott Adams (BBO# 639166)
                                                92 State St., 9th Flr.
                                                Boston, MA 02109
                                                Tel: (617) 742-4554

UNITED STATES DISTRICT COURT
THE DISTRICT OF MASSACHUSETTS

PAULA O'DONNELL,
    Plaintiff
v.                                                                                 Civil Action No. 05-11257-NG

DONNA BOGGS , BRENDAN HALL,
WILLIAM FRANCIS, MARY LOU MEGAN
and MARIAN DOUCETTE,
    Defendants

AFFIDAVIT OF PAULA O'DONNELL

I, Paula O'Donnell, state under oath of my personal knowledge:

1. In my 30 years of service to the Boston Globe Employees Credit Union, I discovered and reported situations of fraud and embezzlement by two credit union employees. In 1998 I discovered that Gene Farrell, the Manager/CEO, had fraudulently taken credit union funds. Following my report of this to the security department and to the Board of Directors, and following a confirming investigation, he was terminated. After this, I experienced a degree of hostility and estrangement from certain Board members, including Bob Sylvester, who expressed sympathy and empathy for Mr. Farrell. Defendant Board member Brendan Hall also distanced himself from and slighted me, although we previously had close and friendly relations.

2. In late 2000, as Systems Manager, I discovered an initial fraud by the new Manager/CEO, Defendant Marian Doucette, who misrepresented her daughter's qualifications and hired her as the Bookkeeper for greater compensation than practice and policy allowed. Defendant

Doucette's daughter was unqualified for the position of Bookkeeper, which was the same position previously held by me. Paying relatives more than scale was an objectionable practice previously engaged in by Mr. Farrell, the terminated Manager/CEO. I complained of these matters to Defendant Doucette and to the Board of Directors, and raised the issue with her union steward. The Board did nothing but Defendant Doucette began a course of retaliatory abuse and interference.

3. I next discovered and reported to Defendant Doucette, Board member Brendan Hall. and to the union steward, that Defendant's Doucette's daughter, who had a credit union account, was bouncing an excessive number of checks (nearly 100) and that Defendant Doucette was violating practice and policy by approving their processing and payment. I also complained of ongoing retaliation by Defendant Doucette. Defendant Donna Boggs, the Chairperson of the Board, directed me not to speak of this to any other Board members, and to drop the matter because it wasn't a policy violation. In fact, it was a violation of a policy implemented after the last instance of fraud by a credit union employee. I insisted that the matter be dealt with or, since I was also a credit union shareholder, I would have to raise the issue as a shareholder action. Defendant Boggs reacted adversely to this demand by me.

4. I later discovered and reported another instance of fraud, in which Defendant Doucette's daughter manipulated the accounting system and overrode security procedures to clear her personal checks when she had insufficient funds. Defendant Doucette's daughter was eventually terminated only after I confirmed and reported a new instance of fraud in which she was manipulating ATM security procedures to fraudulently obtain funds. Defendant Doucette's daughter was allowed to resign but her credit union account was directed to be closed. Instead, Defendant Boggs ordered me to keep the account open and to clear checks

even when there were insufficient funds. The order that I disobey the Board directive was reported by me to the union steward, who notified the Board of Defendant Boggs' conduct.

5. Defendant Doucette's daughter's manipulation of the ATM system was reported to the state banking commission and the credit union received an "admonishment" as a result. Notification of the commission was blamed on me by Defendant Board members William Francis and Boggs. Defendant Board member Mary Lou Megan also held me accountable for this in a subsequent grievance procedure during which Defendants Boggs and Megan questioned my performance of my duties.

6. After each of these situations noted above was discovered, investigated and reported by me in the course of my duties as the credit union's Systems Manager, Defendant Doucette's retaliation for disclosure of her own and her daughter's conduct and embarrassment intensified and expanded. It included weekly incidents of physical and verbal intimidation and disparagement, verbal abuse, displays of physical violence, and interference with my duties at the credit union.

7. This conduct was brought to the attention of Defendant Board members Boggs, Hall, Francis and Megan directly by me and separately through union grievance procedures but no concrete or effective action was taken. In fact, I began to be subject to adverse employment action and discipline undertaken by the various Defendants at various times.

8. Eventually, the conduct of Defendant Doucette and the conduct of the Defendant Board members, and the failure of the Board generally to correct the situation, resulted in a work situation and environment that became intolerable and damaging. It took such a physical and emotional toll on Me that the Boston Globe's own medical officer strongly advised that she leave work and take a leave of absence. She did. No action was taken by the credit union to

       remove or discipline Defendant Doucette, who continued in her position. I was eventually terminated when she refused to return to work under Defendant Doucette's supervision.

9. I filed this action in state court against the named Defendants while her union continued to grieve the matter. Against my wishes and instruction, my union abandoned the grievance just prior to scheduled arbitration. The Defendants removed this matter to federal court. Thereafter, I filed a complaint against my union with the National Labor Relations Board.

10. Defendant Doucette's retaliation and interference with my work at the credit union was motivated by actual malice for my complaining of and drawing attention to her misconduct and that of ther daughter.

11. Defendant Board members' Boggs, Hall, Francis and Megan's retaliation and interference with my work at the rcredit union was motivated by actual malice for my complaining and drawing attention to the malfeasance and misconduct of Defendant Doucette and her daughter while they were responsible for addressing such matters, for alleged contact with the banking commission that resulted in adverse action against the credit union, and for threatening shareholder action for failure to address matters.

Signed under penalty of perjury,

September 27, 2005                  ____ /s/ Paula O'Donnell _____