UNITED STATES DISTRICT COURT
THE DISTRICT OF MASSACHUSETTS

PAULA O'DONNELL,
      Plaintiff                     Civil Action No. 05-11257-NG
v.

DONNA BOGGS , BRENDAN HALL,
WILLIAM FRANCIS, MARY LOU MEGAN
and MARIAN DOUCETTE,
      Defendants

PLAINTIFF'S OPPOSITION TO

DEFENDANTS' OBJECTIONS TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Procedural Note

      At the Rule 16 Pre-Trial Conference it was agreed that discovery would be delayed pending resolution of Defendants' motion for judgment on LMRA §301 preemption issues. Plaintiff here opposes *Defendants' Objections to Magistrate Judge's Report and Recommendation* ("Report"), in which Defendants' objections to the Report are made in order to obtain dismissal of all claims asserting individual liability. The Report should be sustained to the extent that Plaintiff's claims for individual liability are not dismissed. Furthermore, the Report should be sustained to the extent Plaintiff is allowed to amend her Complaint. The basis for this opposition is set forth below.

      It should be noted that this action has now been consolidated (i.e., fusion type of consolidation) with O'Donnell v. The Boston Globe Employees Credit Union (05-CV-12490 NG), the action in which Plaintiff is proceeding against the employer in a §301 claim.

Review of Material Facts

It is important that analysis of the issues raised recognizes that the conduct of the individual Defendants Doucette, Boggs, Megan and Francis differ, and may or should be analyzed differently. As the Report notes, Defendant Doucette verbally and physically intimidated and retaliated against Plaintiff for her efforts to disclose, prevent or rectify multiple instances of fraud and potentially criminal conduct by a fellow credit union employee and depositor who happened to be Defendant's daughter. [Report Factual Background, var. pp.]. "Board members Boggs, Megan and Francis all blamed plaintiff for notifying the [banking] commission" after the credit union was admonished by the commission regarding ATM fraud carried out by Defendant Doucette's daughter. [Report p.4-5]. Defendant "Boggs directed plaintiff to continue to approve payment of Doucette's daughter's overdrawn checks..." [Report p.4]. The conduct of Defendant Doucette causally resulted not only in Plaintiff's eventual termination but also, significantly, in adverse employment action and injuries prior to that termination, and in conditions that made Plaintiff's performance of her duties more onerous, if not impossible. Likewise for the retaliatory conduct of the board member Defendants.


Principal Issues

1.      *Independent, Non-Negotiable Rights and Duties:*     A Collective Bargaining Agreement ("CBA") is not always the sole source of rights and duties that an employee or employer have, and claims based on independent rights and duties are not preclusively preempted under §301. *See* Lividas v. Bradshaw, 512 U.S. 107, 123-124 (1994). Plaintiff worked in a federally regulated and state chartered credit union, in which there are required, independent and non-negotiable duties (and rights) external to the CBA to report even *suspected crimes* (eg., fraud, larceny, embezzlement, etc.).

See 12 CFR 748.0 and 748.1(c) [Exh. 1] and 209 CMR 4.03 [Exh. 2] (stating compliance with 12 CFR 748 deemed compliance with state regulations). In fact, an agent or employee failing to make such reports may be subject to civil penalties. 12 CFR 748.1(c)(3).

2.    *Non-Preclusion of Claims Under Acciavitti*: Judge Tauro, in Acciavatti v. Prof. Svcs. Group, Inc., 982 F.Supp 69, 78-79 (1977), even after dismissing a tortious interference claim as preempted,[1] sustained the count which alleged--for the same conduct by the same individuals–a violation of the Mass. Civil Rights Act for "whistleblowing" conduct. Judge Tauro noted that "cancellation of a contract securing future economic gain ... can constitute coercion," id. at 78, and that §301 preemption did not apply since while the "claim may refer to the [collective bargaining agreement] in some respects, it does not substantially depend upon an interpretation of the [same]," id. at 79. [Under this principle, amendment of the Complaint to add a count under the MCRA based on the conduct already set forth in the Complaint would independently sustain individual liability.]

3.    *Tortious Interference Variants:*  There are a number of variants of the tortious interference cause of action.  *See* Restatement Torts (2nd) §766, 766A.  There is the form in which (i) the tortfeasor induces or otherwise causes a party to cancel or not perform a contract with plaintiff (§766) and the form in which (ii) the tortfeasor interferes with the the plaintiff's performance, thereby causing the plaintiff's performance to be more onerous or even impossible (§766A). The cases cited

---

[1] Preemption was based on the acts by the supervisor in his capacity as such. *See id.* at 76, That is not the case at bar since the individual Defendants have acted contrary to independent rights and duties set forth explicilty and implicitly in banking regulations. *See* Legoff (Gertner, J.) *infra.*

Judge Tauro was also analyzing the case using the Restatement §766 form of the tort (citing United Truck Leasing), not the §766A form which is appropriate for the case at bar. *See infra.*

by the Report and in Defendants' objections almost universally analyze the issues in reference to the first form of the cause of action, which has different elements and injuries from the first and can lead to erroneous conclusions regarding the tort and its defenses.

This Court has also recognized the second form of the tort, along with the fact that even an employer's officer or the employee's supervisor may be liable for interference. *See* Boyle v. Boston, 788 F.Supp 627, 630 (D.Mass. 1992)(*citing* principles that (i) "intentional acts of a supervisor which caused an employee to resign would be sufficient to state a claim of intentional interference," Anzalone v. MBTA, 403 Mass, 119, 526 N.E.2d 246 (1988), and (ii) "an officer of a corporation may be liable for interfering with an employment contract between an employee and the corporation", Steranko v. Inforex, 5. Mass.App. 253, 272-73, 362 N.E.2d 222, 235-36 (1977)). *See also* Shafir v. Steele, et al., 431 Mass. 365, 368 n.7, 727 N.E.2d 1140, 1143 n.7 (2000)(recognizing Restatement of Torts §766A form of tortious interference). These principles have even been noted in this specific Court (Gertner, J.). Ruffino v. State Street Bank & Trust Co., 908 F.Supp. 1019, 1050-52 (D.Mass. 1995)(interference need not cause termination to sustain a claim of tortious interference); Legoff v. Trustees of Boston Univ., 23 F.Supp.2d 120, 129-30 (D. Mass. 2001)(unlawful acts such as threats and retaliation are not within scope of supervisor's duties and support a *prima facie* case of tortious interference). Under an analysis referring to the second form of the tort, whether or not the Plaintiff was terminated (for cause or not) is immaterial to the claim and not a dispositive defense.


## Conclusion

Upon the facts stated (setting aside for the moment the issue of §301 "preemption"), Plaintiff has clearly set forth viable claims for tortious interference on which she could prevail as a matter of

summary judgment. Plaintiff has set forth sufficient facts evidencing not only her need for a leave of absence and resulting termination but also the difficulties she encountered before that and the adverse affect they had on the performance of not only her contractual duties but also of her independent duties as prescribed by federal and state banking regulations. These adverse effects upon her ability to perform and to her employment interests were caused in various ways by acts undertaken by the individual Defendants. Since a tortfeasor in such circumstances may be a fellow employee, or even a supervisor or officer, or not acting with the scope of that employee's duties, and the interference need not induce the employer to terminate the contract in order to sustain liability for tortious interference, Defendants have set forth no dispositive defense to the tort. In fact, liability for the same conduct exists (without §301 preemption) for the closely related action alleging retaliation for protected whistle-blowing activity, which is–essentially–at the heart of this case. (For this reason alone, and in the interests of justice, amendment should be allowed in order to sustain liability.)

Defendants propose that, in consequence of §301, the mere existence of the CBA or the possibility that interpretation of the CBA will be required, precludes any claim against an individual. The existence of the CBA is not a *carte blanche* that irrevocably insulated individual defendants from liability for their wrongdoing. There must be, at least, a factual determination as to whether or not the rights and duties, and the injuries and causation at issue, arise independently of the CBA, since such independent rights and duties "are not to be preempted by the collective bargaining agreement." *See* Ralph v. Lucent Technologies, Inc., 135 F.3d 166, 171 (1st Cir. 1998). Significantly, the CBA at issue in this case sets forth no definitions, standards or even classifications regarding conduct or misconduct generally or in regard to the specific conduct at issue her and, therefore, it contains no explicit CBA derived rights or duties of the type at issue in this action.

5

This principle preserving independent rights is, of course, not only reasonable and just, but also consistent with legislative intent. While the Congressional intent for §301 was to provide for uniform application of federal labor law in the interpretation of a CBA, and to prevent state law interference with national labor law policy, there is no suggestion it was ever intended to absolve individuals of liability for wrongful conduct collateral to or merely incidental to federal labor law interests, especially where substanital independent state and federal interests such as the protection of depositor funds exists. *See* Lingle v. Norge Division of Magic Chef, Inc., 486 U.S. 399, 413 n.12 (1988)(claims requiring mere reference to terms of the CBA, or even interpretation of the CBA, are not of necessity preemptively precluded). This issue is addressed by Judge Tauro in Acciavatti.

Plaintiff clearly had independent rights and duties to disclose and prevent financial fraud in the credit union, and to be free from verbal and physical intimidation and retaliation for the protected activity of reporting or threatening to report such activities. Such rights exist both as a matter of state law and regulation and the CBA, in fact, explicitly recognizes the subservience of the CBA to such law and regulation.[2] For these reasons, Plaintiffs claims setting forth individual liability should survive, and allowing amendment to reconcile the consolidated actions, and to more clearly or fully set forth notice of the facts and claims at issue, is a reasonable exercise of discretion and in the interests of justice.

---

[2] The provisions of the CBA at articles 1 ¶2 and article 2 ¶2 specifically state that the "Union recognizes that the Employer is subject to the Massachusetts State Statutes and General Laws relating to financial institutions and credit unions as a state-chartered organization ... [and] subject to the regulations of the Commonwealth of Massachusetts Office of Commissioner of Banks .." Furthermore, it is stated that " .... no provision in this agreement shall prevent management from carrying out their responsibilities under the regulations promulgated by the aforementioned regulatory agencies" Id. These provisions, and their import, are mutually binding since the employer also cannot prevent employees from carrying out their regulated responsibilities.

WHEREFORE, Defendants' Objections to the Report should be denied to the extent that Defendants seek dismissal of all claims asserting individual rather than employer liability, amendment of the consolidated actions should be allowed, and that this matter should proceed as consolidated, with discovery to commence upon the schedule previously agreed.

Respectfully submitted for Plaintiff,
By her attorney,

dated: May 12, 2006                 __/s/ Scott Adams_____

Scott Adams (BBO# 639166)
92 State St., 9th Flr.
Boston, MA 02109
Tel: (617) 742-4554

**Exhibit 1**

[Code of Federal Regulations] [Title 12, Volume 6] [Revised as of January 1, 2006]
From the U.S. Government Printing Office via GPO Access
[CITE: 12CFR748.0]

[Page 670]
            TITLE 12--BANKS AND BANKING
        CHAPTER VII--NATIONAL CREDIT UNION ADMINISTRATION

PART 748_SECURITY PROGRAM, REPORT OF CRIME AND CATASTROPHIC ACT AND
BANK SECRECY ACT COMPLIANCE--Table of Contents

Sec. 748.0  Security program.

Sec.
748.0 Security program.
748.1 Filing of reports.
748.2 Procedures for monitoring Bank Secrecy Act (BSA) compliance.

* * * * * *

    Authority: 12 U.S.C. 1766(a), 1786(Q); 15 U.S.C. 6801 and 6805(b); 31 U.S.C. 5311 and 5318.

    (a) Each federally insured credit union will develop a written security program within 90 days of the
effective date of insurance.
    (b) The security program will be designed to:
    (1) Protect each credit union office from robberies, burglaries, larcenies, and embezzlement;
    (2) Ensure the security and confidentiality of member records, protect against the anticipated threats or
hazards to the security or integrity of such records, and protect against unauthorized access to or use of
such records that could result in substantial harm or serious inconvenience to a member;
    (3) Respond to incidents of unauthorized access to or use of member information that could result in
substantial harm or serious inconvenience to a member;
    (4) Assist in the identification of persons who commit or attempt such actions and crimes, and

    * * * * * *

[50 FR 53295, Dec. 31, 1985, as amended at 53 FR 4845, Feb. 18, 1988; 66 FR 8161, Jan. 30, 2001; 69
FR 69274, Nov. 29, 2004; 70 FR 22778, May 2, 2005]

[Code of Federal Regulations] [Title 12, Volume 6] [Revised as of January 1, 2006]
From the U.S. Government Printing Office via GPO Access
[CITE: 12CFR748.1]

[Page 670-671]
                    TITLE 12--BANKS AND BANKING
            CHAPTER VII--NATIONAL CREDIT UNION ADMINISTRATION

PART 748_SECURITY PROGRAM, REPORT OF CRIME AND CATASTROPHIC ACT AND
BANK SECRECY ACT COMPLIANCE--Table of Contents

Sec. 748.1  Filing of reports.
    (a) Compliance report. Each federally insured credit union shall file with the regional director an annual
statement certifying its compliance with the requirements of this part. The statement shall be dated and
signed by the president or other managing officer of the credit union. The statement is contained on the
Report of Officials which is submitted annually by federally insured credit unions after the election of
officials. In the case of federally insured state-chartered credit unions, this statement can be mailed to the
regional director via the state supervisory authority, if desired. In any event, a copy of the statement shall
always be sent to the appropriate state supervisory authority.

    * * * * * *
[[Page 671]]

    * * * * * *
    (c) Suspicious Activity Report.
    (1) Each federally-insured credit union will report any crime or suspected crime that occurs at its
office(s), utilizing NCUA Form 2362, Suspicious Activity Report (SAR), within thirty calendar days after
discovery. Each federally-insured credit union must follow the instructions and reporting requirements
accompanying the SAR. Copies of the SAR may be obtained from the appropriate NCUA Regional Office.
    (2) Each federally-insured credit union shall maintain a copy of any SAR that it files and the original of
all attachments to the report for a period of five years from the date of the report, unless the credit union is
informed in writing by the National Credit Union Administration that the materials may be discarded
sooner.
    (3) Failure to file a SAR in accordance with the instructions accompanying the report may subject the
federally-insured credit union, its officers, directors, agents or other institution-affiliated parties to the
assessment of civil money penalties or other administrative actions.
    (4) Filing of Suspicious Activity Reports will ensure that law enforcement agencies and NCUA are
promptly notified of actual or suspected crimes. Information contained on SARs' will be entered into an
interagency database and will assist the federal government in taking appropriate action.


[50 FR 53295, Dec. 31, 1985, as amended at 53 FR 26232, July 12, 1988; 58 FR 17492, Apr. 5, 1993; 61
FR 11527, Mar. 21, 1996]

**Exhibit 2**

CODE OF MASSACHUSETTS REGULATIONS
TITLE 209: DIVISION OF BANKS AND LOAN AGENCIES
CHAPTER 4.00: COMPLIANCE WITH FEDERAL LAW AND REGULATION
Current with May 5, 2006, Register #1051

4.03: Security and Protection of Banks

A bank which complies with the provisions of 12 CFR Part 216 (Regulation P, Minimum Security Devices and Procedures) or 12 CFR Part 748 (Report of Crime or Catastrophic Act) or other applicable regulations of a federal banking agency, which regulations govern substantially the same subject matter as is governed by this provision, shall be deemed to be in compliance with M.G.L. c. 167, § 1A and 209 CMR 4.00.