# UNITED STATES DISTRICT COURT
# THE DISTRICT OF MASSACHUSETTS

Paula O'Donnell,

      **Plaintiff**

**v.**                                      **Civil Action No. 05-CV-11257- NG**

Donna Boggs, et al.,

      **Defendants.**

## Plaintiff's Opposition to
## Defendants' Motion for Summary Judgment

### Request for Oral Argument

Plaintiff believes that the interests of efficient and just administration of justice
are best served by allowing the parties an opportunity for oral argument on the matters at issue.

**Table of Contents**

I.      Procedural Note . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      A.     Plaintiff's Service at the Credit Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      B.     Defendant Marion Doucett's Fraud and Retaliation . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      C.     Fraud, Retaliation and Willful Blindess . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      D.     Ms. O'Donnell's Deteriorating Circumstances and Lawsuit . . . . . . . . . . . . . . . . . . . . . 5

III.    Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
      A.     Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
      B.     Tortious Interference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
                Viability of the Cause of Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
                Ineffective Defense Based on Preemption . . . . . . . . . . . . . . . . . . . . . . . 9
      C.     Public Policy and Rights Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
      D.     Breach of Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
                Breach by Credit Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
                Breach by the Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
      E.     Statute of Limitations Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## I.    Procedural Note

A motion to strike elements of Defendants' supporting affidavits accompanies this opposition. Upon resolution of that motion, dependant elements of Defendants' Statement of Undisputed Material Facts and their Summary Judgment Motion that rely on those stricken portions of the affidavits must also be stricken. Without waiving Plaintiff's right to strike such matters, and the right to hold Defendants to their summary judgment burden, the Plaintiff responds and opposes as follows.

## II.    Background

Defendants' recitation of facts is a bloodless tale skirting the heart of the matter, which is what happened to Plaintiff Paula O'Donnell before the time she was advised by Defendant employer's own agent to leave work. By limiting discourse to later events and procedural details, Defendants avoid acknowledging the indisputable fraud, threats, intimidation, retaliation, incompetence, breach of duty and injury that are the heart of Plaintiff's complaint.

Defendants' preoccupations are meant to distract this Court from the fundamental question of justice in this case. At issue is not how the law can be twisted so that Defendants can avoid liability but to discern the legal and equitable jurisprudence that will allow them to be held accountable. The law does not, in fact, abide the intentional, harmful conduct that injured Plaintiff. To reach that end, more than what Defendants have set forth needs to be considered.

### A.    Plaintiff's Service at the Credit Union

Plaintiff Paula O'Donnell had over 30 exemplary years as an employee and shareholder of the Boston Globe Employees Credit Union ("Credit Union"). [SoMF 2-1]. She began work as a teller

in 1974 worked her way up to Head Teller in 1998, when she and another employee later discovered that Gene Farrell, the Manager or CEO of the Credit Union, had engaged in fraud and embezzlement of funds, which she reported to the Security department and the Board of Directors. [SoMF 2-1,2-2]. Investigations were conducted and Farrell was terminated, prosecuted and sentenced. [SoMF 2-2]. Strangely, a few board members, including Defendant Brendan Hall, openly expressed sympathy for Mr. Farrell and began shunning Ms. O'Donnell. [SoMF 2-3].

B.     Defendant Marion Doucett's Fraud and Retaliation

Defendant Marion Doucette replaced Farrell as Manager/CEO, and Ms. O'Donnell later became Systems Manager after serving as Bookkeeper. [SoMF 2-4]. In 2000, Marion Doucette hired her daughter, Linda Doucette, for the position of Bookkeeper, stating she had the necessary experience and qualifications. [SoMF 2-5]. Ms. O'Donnell soon discovered though, that Marion had misrepresented her daughter's qualifications. [Id.]. Since Ms. O'Donnell had been the Bookkeeper for nearly 2 years and, as Systems Manager, had to review Linda's work, she found that Linda lacked sufficient banking knowledge and even basic accounting skills. [Id.]. Linda could not competently balance ledgers and share draft accounts, she seemed unable to distinguish the difference between debits and credits, or how to designate them in the accounts. [Id.]. Ms. O'Donnell, who was also Union steward at the time, also learned that Marion had hired her daughter for more than Union scale provided. [SoMF 2-6]. The practice of hiring unqualified relatives and paying them more was a practice that Mr. Farrell had engaged in and which the Credit Union had taken steps to prevent. [Id.].

Ms. O'Donnell complained of these matters to Marion Doucette and to the Board of Directors, and raised the issue with the Union agent. [SoMF 2-7]. The Board appeared to do nothing

and Marion Doucette began a course of retaliatory abuse and interference. [SoMF 2-7,2-8]. This consisted of physical and verbal intimidation and disparagement, verbal abuse, displays of physical violence, and interference with Ms. O'Donnell's duties. [SoMF 2-8]. No other apparent explanation for Marion's behavior existed as she and Ms. O'Donnell had no problems outside of work. [Id.].

C.    Fraud, Retaliation and Willful Blindness

Ms. O'Donnell next discovered that Linda Doucette, who had a Credit Union account, was bouncing an excessive number of checks, and that Marion Doucette was violating practice and policy by approving their processing and payment. [SoMF 2-9]. Ms. O'Donnell reported and complained of this to Marion Doucette, who appeared to do nothing as the practice continued. [Id.]. As part of her duties, Ms. O'Donnell continued to review the situation and when she reported the matter to Board member Brendan Hall and to the new Union steward, Linda had bounced almost 100 checks. [Id.]. At the same time she complained to the Board and the Union steward of these issues, she also reported and complained of the ongoing retaliation by Marion Doucette. [SoMF 2-10].

Defendant Donna Boggs, the Chairperson of the Board, directed Ms. O'Donnell not to speak of these problems to any other Board members and to drop the matter because the Doucettes had not violated any Credit Union policy or practice. [SoMF 2-11]. In fact, the "kiting" of checks was a prohibited practice that predated Mr. Farrell's fraud. [Id.]. Ms. O'Donnell insisted, both to Marion Doucette and to Donna Boggs, that the problem be dealt with or, since she was a Credit Union shareholder, Ms. O'Donnell would raise the issue in a shareholder action. [SoMF 2-12].

Ms. O'Donnell later discovered a new fraud by Linda Doucette. [SoMF 2-13]. In this case, she had manipulated the accounting system and overrode security to clear her personal checks when

4

she had insufficient funds. [Id.]. This was also reported to Marion Doucette, to the Board and to the Union steward but nothing appeared to be done and Marion's retaliation continued. [Id.]. Ms. O'Donnell later discovered, and reported to Marion DOucette, yet another new fraud in which Linda manipulated ATM security procedures to wrongfully obtain funds. [SoMF 2-14].

It was only after this latest instance of fraud was reported that the Credit Union initiated an investigation but apparently took no action to inform authorities. [SoMF 2-15]. Linda was allowed to resign with a fraudulent resignation letter that had no reference to her misconduct. [Id.]. Linda's Credit Union account was, pursuant to Board order, to be closed but Donna Boggs ordered Ms. O'Donnell to keep the account open and clear checks even when there were insufficient funds. [SoMF 2-16]. This violated not only the Board order but also policy and procedure and Ms. O'Donnell reported this to the Union steward, who then notified the Board. [Id.].

At some point, Ms. O'Donnell learned from Board members that the Banking Commission hd been told by an unknown party of Linda's ATM fraud, and it had "admonished" the Credit Union as a result. [SoMF 2-17]. Although Ms. O'Donnell had not been the individual who notified the Banking Commission, she was blamed for doing so by Defendants Francis, Boggs and Meghan. [Id.].


D.    Ms. O'Donnell's Deteriorating Circumstances and Lawsuit

As Linda Doucette's misconduct was continually discovered, investigated and reported over time by Ms. O'Donnell, Marion Doucette's retaliation expanded and intensified. [SoMF 2-18]. There were weekly incidents of physical and verbal intimidation and disparagement, verbal abuse, displays of physical violence, and interference with Ms. O'Donnell's duties. [Id.]. The retaliation of Marion Doucette, the failure of the Board to correct the situation, and retaliation by the Defendant Board

members resulted in a work situation and environment that became increasingly intolerable to Ms. O'Donnell. [SoMF 2-19].    She suffered a physical and emotional toll, including sleepless nights, stress,  panic attacks, shortness of breath, spells of nausea, vomiting and crying, and general depression. [Id.]. There were no other situations in her life to which these conditions and symptoms could be attributed, and all were intimately related to her attendance or anticipation of work at the Credit Union and under Marion Doucette. [Id.].

Eventually, Ms. O'Donnell's situation was so grave and debilitating that the Boston Globe's nurse referred her to the Employee Assistance Program, where she was advised to leave work and take a leave of absence. [SoMF 2-20]. Eventually she received treatment for her condition and symptoms, which could not be attributed to any situation in her life other than work, and was advised that she not return until able. [SoMF 2-21]. The Credit Union, the Union, and Defendants Doucette, Boggs, Hall and Meghan all knew of Ms. O'Donnell's leave and the reasons for it, and that she insisted she could not return to work with Marion Doucette as her supervisor. [SoMF 2-22].

The Credit Union apparently took no action to remove or discipline Marion Doucette, although they knew her conduct had been a problem in this and other circumstances. [SoMF 2-23]. Marion Doucette continued in her position and Ms. O'Donnell was eventually terminated when she was denied a leave of absence and refused to return to work under Marion Doucette's supervision. [SoMF 2-24]. Ms. O'Donnell filed an action in state court against the named individual Defendants while her Union grieved her situation. [SoMF 2-25]. That grievance covered a number of issues, including her termination and circumstances prior to her termination. [Id.]. The state court action was removed by Defendants to federal court. [SoMF 2-26]. Then, against Ms. O'Donnell's wishes and instruction, her Union officially abandoned the grievance on June 14, 2004. [SoMF 2-27].

### III.    Argument

A supervisor arrives at work with a bat and physically assaults and injures a worker, who must leave work due to the injury and is then terminated by the employer when she refuses to return to work under the same supervisor.  Mere common-sense can anticipate justice in that case.  For the case at hand, the only differences are that the assault was not with a bat and the employee was a union member.  Not only common sense, but facts and law sustain a similar justice in this case.

### A.    Standard of Review

A defendant seeking summary judgment must show (i) there is a complete absence of evidence or a failure of proof for an essential element of Plaintiff's cause of action or, (ii) Defendant prevails as a matter of law applied to undisputed material facts.

### B.    Tortious Interference

As Restatement Torts (2nd) notes, there are variants to this action: (i) the tortfeasor induces or otherwise causes a party to cancel or not perform a contract with plaintiff (§766) and (ii) the tortfeasor interferes with the the plaintiff's performance, causing it to be more onerous or even impossible (§766A). Cases previously noted have evaluated only the first form, which applies to Ms. O'Donnell's termination after her request for leave was granted.  The second form applies to matters prior to her temination, and this form has been recognized by this Court. *See* <u>Ruffino v. State Street Bank & Trust Co.</u>, 908 F.Supp. 1019, 1050-52 (D.Mass. 1995)(stating interference need not cause termination to sustain claim of tortious interference); <u>Boyle v. Boston Foundation, Inc.</u>, 788 F.Supp. 627, 630 (D.Mass. 1992)(stating discharge not necessary to sustain tortious interference claim when

interference causes contractual performance to be more burdensome). *See also* <u>Shafir v. Steele, et al.</u>, 431 Mass. 365, 368 n.7, (2000)(recognizing Restatement of Torts §766A form of tortious interference). Furthermore, not only strangers or co-workers may be liable; liability may also attach to the employer's officers and supervisors. *See* <u>Boyle v. Boston</u>, 788 F.Supp 627, 630 (D.Mass. 1992)(*citing* principles that (i) "intentional acts of a supervisor which caused an employee to resign would be sufficient to state a claim of intentional interference," <u>Anzalone v. MBTA</u>, 403 Mass, 119 (1988), and (ii) "an officer of a corporation may be liable for interfering with an employment contract between an employee and the corporation", <u>Steranko v. Inforex</u>, 5. Mass.App. 253, 272-73 (1977)).

*Viability of the Cause of Action*

Defendants do not assert that Plaintiff cannot prove an essential element of tortious interference, so Plaintiff is not burdened to produce proof for any element of her claim. Even so, the facts sustain a claim of tortious interference and it makes no difference whether Ms. Doucette's retaliation was motivated by a desire to protect herself or her daughter from embarrassment or the adverse consequences arising from her daughter's fraud, or whether her conduct was meant to punish Ms. O'Donnell for discovering and reporting their misconduct; Marion Doucette had no privilege to engage in threats, intimidation and interference that interfered with and prevented Ms. O'Donnell from carrying out her duties. <u>Legoff v. Trustees of Boston Univ.</u>, 23 F.Supp.2d 120, 129-30 (D. Mass. 2001)(unlawful acts such as threats and retaliation cannot be considered within scope of supervisor's duties and support *prima facie* case of tortious interference). Since malice is reasonably inferred from Ms. Doucette's conduct, there is no saving privilege upon which she can rely. <u>Zimmerman v. Direct Federal Credit Union</u>, 262 F.3d 70, 75-77 (C.A. 1 Mass. 2001)(involving credit

union, where interference motivated by malice overcame qualified supervisory privilege). A claim of tortious interference clearly lies, even though Marion Doucette was an officer and supervisor and even though her misconduct preceeded Ms. O'Donnell's termination; it was sufficient that her retaliation and interference prevented Ms. O'Donnell from completing her contractual obligations.

Tortious and retaliatory interference by Defendants Boggs, Hall and Meghan, which contributed to her physical and emotional breakdown also prevented Ms. O'Donnel from completing her contractual obligations. These individuals may have been motivated by different reasons, such as (i) Ms. O'Donnell's threat to initiate a shareholder action if complaints about Marion and Linda Doucette were not addressed, (ii) an incorrect belief that she reported the Credit Union to the Banking Commission, or (iii) annoyance or ill-will directed at Ms. O'Donnell for continually reporting problems concerning Marion and Linda Doucette, but that was also outside the safe harbor of justifiable or privileged action. Individual liability would be conferred upon any individual who maliciously (e.g., in retaliation) made Ms. O'Donnell's performance more burdensome either indirectly (e.g., failing to address or correct the work environment) or directly (e.g., ordering Ms. O'Donnell not to perform contractual duties, denying leave, termination).

*Ineffective Defense Based on Preemption and Law of Case*

Since Defendants' settle no attack on the merit of the tortious interference claims, they resort to the purported affirmative legal defense that §301 preemption underlines the claims. Notably, even §301 federal jurisdictional preemption of tortious interference claims does not exist where underlying tort liability is based on actual malice, as is alleged and reasonably inferable here. *See* Tosti v. Ayik, 437 N.E.2d 1062, 386 Mass. 721, 726 (1982), appeal after remand 394 Mass. 482, 485-86

(1985), appeal after remand 400 Mass. 224 (1987), *certiorari denied* United Auto Workers, Local 422 v. Tosti, 484 U.S. 964(1987). Notable also is International Union, UAW v. Russell, 356 U.S. 634, 78 S.Ct. 932 (1958), in which the U.S. Supreme Court sustained a claim of tortious interference with employment based on unprivileged misconduct by the tortfeasor. As noted in Legoff and Zimmerman, retaliatory conduct is not privileged and rights under the CBA are not at issue because the right to be protected from such conduct is clearly collateral to and independant of any CBA.[1]

When jurisdictional preemption brings a case into federal court with ancillary state law claims, they are not extinguished but may be heard as an exercise in discretionary pendant jurisdiction. *See* Young v. Anthony's Fish Grottos, Inc., 830 F.2d 993, 999 (9th Cir. 1987)(stating court "could properly exercise pendant jurisdiction over the tort claims based on their close relation with the section 301 claim ..."); Johnson v. Anheuser Busch, Inc. 876 F.2d 620, 625 (8th Cir. 1989)(stating remanding or retaining ancillary tort claims as pendant to §301 claim is discretionary). There is no basis for extinguishing the tort claims set forth here merely because the tort victim is a union member.

Defendants also assert that law of the case doctrine requires extinguishing the tortious interference claims, and rely on the Court's statement that liability will be determined by "whether

---

[1] Reliance on Magerer v John Sexton & Co., 912 F.2d 525 (1st Cir. 1990) and Acciavatti v. Professional Services Group, Inc., 982 F.Supp 69 (D.Mass. 1997) are unavailing. Both involved a claim against a supervisor ostensibly acting to terminate an employee under a supervisory privilege, In this action, much of the claims that lie against the individual defendants relate to their conduct prior to Ms. O'Donnell's termination and conduct clearly outside any viable privilege, and the refusal to extend a leave of absence for good cause, which only consequentially resulted in termination. Specifically in regard to Marion Doucette, her conduct made it impossible for Ms. O'Donnell to perform her duties. This is a far different claim than those set forth in Magere, Acciavatti, Troconis v. Lucent Technologies, Inc., 160 F.Supp. 2d 150 (D. Mass. 2001) and Rocheleau v. Brockway-Smith Co., 1999 WL 172813 (D. Mass. March 25, 1999) that have been referred to for the principle that, in this Circuit, claims of intentional interference with contractual relations are uniformly subject to section 301 preemption.

[Defendants] breached the terms of the CBA." Report at 14. The Court's statement cannot be referring to tortious interference claims because the tortfeasor's breach of the subject contract is not a necessary element of the cause of action where the tortfeasor acts to make the plaintiff's performance more onerous or impossible. The Court appears to be referring to claims against the employer based upon the conduct of the individual defendants acting as agents of the employer. This was the Defendants' argument in an earlier motion, that Ms. O'Donnell's claims against them were actually claims against the "employer."[2]

In any event, law of the case doctrine is "amorphous," unlike the doctrine of *res judicata*, and merely directs the Court's discretion; it does not limit its power to adapt, clarify and correct interlocutory decisions and holdings. Arizona v. California, 460 U.S. 605, 618-19 (1983). In this case, the Court's reading of claims against the individual Defendants as claims against the employer was dealt with in the consolidation and amendment procedures executed in this action.

For all of the reasons stated above, Plaintiff's tortious interference claims survive. This includes claims against Marion Doucette, Francis, Boggs, Hall and Meghan for their retaliatory conduct prior to Ms. O'Donnell's termination, and against rancis, Boggs, Hall and Meghan for their retaliatory conduct related to her termination.

C.    Public Policy and Rights Violations

In regard to Plaintiff's allegations that she engaged in protected activities and suffered

---

[2] "The allegedly tortious conduct also involves the Defendants acting in their official capacities" September 2005 Memorandum of Law in Support of Defendants' Motion for Summary Judgment at 12. In that same memo, Defendants also argued that, "[f]or purposes of §301 claims (and state law claims preempted by §301), [supervisory employees] are the employer, since the employer is liable for their conduct." *Id.*

retaliation as a result, these allegations are not intended to establish substantive claims but to prove rights independent of the CBA[3] and the wrongful nature of Defendants' conduct. As noted, Plaintiff worked in a federally regulated and state chartered credit union [SoMF 2-28], in which there are independent and non-negotiable duties external to the CBA to report even *suspected crimes* (eg., fraud, larceny, embezzlement, etc.). See 12 CFR 748.0 and 748.1(c) and 209 CMR 4.03 (stating compliance with 12 CFR 748 deemed compliance with state regulations). In fact, an agent or employee failing to make such reports may be subject to civil penalties. 12 CFR 748.1(c)(3).

The retaliation experienced by Ms. O'Donnell at the hands of the Defendants implicates such rights, and measures the wrongfulness of their conduct. And while Ms. O'Donnell did not inform the Banking Commission about the ATM fraud of Linda Doucette, it is material that Defendants Francis, Boggs and Meghan believed that she had and acted upon that belief. To the extent necessary to clarify this point, such substantive claims that may be inferred are waived and Plaintiff elects her tort and contract causes and remedies.

D.    Breach of Contract

Plaintiffs claims against the Credit Union allege allege breach of contract. Not all terms and conditions of employment are expressed in the CBA. Massachusetts employment incorporates certain implied and collateral covenants and duties (e.g., good faith and fair dealing), and fills in for on those matters not covered by express or implied terms of the CBA, or federal labor law.

---

[3] A Collective Bargaining Agreement ("CBA") is not always the sole source of rights and duties that an employee or employer have, and claims based on independent rights and duties are not preclusively preempted under §301. *See* Lividas v. Bradshaw, 512 U.S. 107, 123-124 (1994).

*Breach by Credit Union*

The Credit Union relies on a single theory to attack Ms. O'Donnell's contractual claim. Stating, "no genuine issue of material fact exists regarding the appropriateness of the Credit Union's actions under the CBA," reliance is placed on the conclusion that, "[t]here is nothing unreasonable about the Union's determination that the Credit Union did not breach the CBA." (Defendants' Memoorandum Document #29 at 11).   Reliance on hearsay or speculative opinion of another is insufficient evidence to sustain summary judgment. Facts must be set forth.

Notably, the Credit Union and the Union only touch on Ms. O'Donnell's request for leave of absence and the Credit Union's denial.  They never address the undisputed retaliatory conduct of the Defendants prior to that termination.  Nothing in the Credit Union's presentation even hints at Marion Doucette's retaliation, and the weekly incidents of physical and verbal intimidation and disparagement, verbal abuse, displays of physical violence, and interference with Ms. O'Donnell's duties that resulted in physical and emotional injury and Ms. O'Donnell's need to leave work due to a constructive discharge, *see* GTE Prods. Corp. v. Stewart, 421 Mass. 22, 33-34 (1995), resulting in a breach of contract.  Obviously, employer liability for officers, agents and employees, especially those engaged in tortious conduct, allows liability for breach of Ms. O'Donnell's employment agreement to reach the Credit Union. See e.g., Dias v. Brigham Medical Assoc., Inc., 438 Mass. 317, 322-23 (2002)(respondeat superior).  This is especially true since the Credit Union, through its officers and agents had actual knowledge of these problems with its CEO Marion Doucette, who was Ms. O'Donnell's superior, and failed to take action sufficient to cure the problem.

In any event, since Defendants bear the burden for summary judgment of showing a failure of proof on an essential element of Plaintiff's claim, or that it fails as a matter of law applied to

undisputed facts, Plaintiff bears no responsive burden where Defendants have not set the issue in play. On this basis alone, all of Ms. O'Donnell's breach of contract claims attributable to supervisory retaliation and interference prior to her termination are sustained and survive.

In avoiding the issue of Marion Doucette's conduct, Defendants avoid dealing with how such conduct and retaliation plays under the CBA and how it changes the calculus applied to her request for leave of absence. This brings us to the only issue raised by Defendants, which is Ms. O'Donnell's request for leave and their rejection of it, and the resultant termination. Defendants state the CBA terms are: "Unpaid leaves of absence for good and sufficient reason in the opinion of the employer shall be granted upon written request and shall not be unreasonably denied." To resolve this contract claim, the issue is whether or not denial of leave was "unreasonable." This is an obvious factual dispute since, under these circumstances, the refusal cannot be deemed reasonable as a matter of law.

Certainly Ms. O'Donnell's request for leave was for a "good and sufficient reason." No reasonable or intelligent person would or should subject themselves to what she went through. Even the law recognizes the reasonableness of Ms. O'Donnell's position in the principles and law applied to constructive discharge. *See e.g.*, Boyle, Anzalone. The Credit Union, and the Union, knew the request for leave was made because Marion Doucette's constant retaliation, attacks and interference made work unbearable and made her ill. They knew this both directly from Ms. O'Donnell in her reports and complaints prior to leaving work, and her request for leave of absence. [SoMF 2-29]

Addressing the issue of medical documentation upon which the Credit Union and the Union rely, first, there is no condition precedent in the CBA that required "medical documentation" for a leave of absence, in contrast to that requirement for paid sick leave. [SoMF 2-30]. The issue of medical documentation arose in a communication from attorney Weiner as an informal request for

14

a doctor's report [see Weiner Aff Exh. #4]. A later note merely said that if a written request leave "is for a medical reason, you should submit a current docutor's report ..." [see Weiner aff. Exh. #6]. The actual request for leave rested on the wrongful conduct of Marion Doucette and Board's failure to rectify the situation. [See Weiner aff Exh #7]. The medical issue was noted and the Board advised they would be kept "informed in a timely manner"–there was no refusal to provide medical information. Id. Ms' O'Donnell request was denied because the Credit Union declared Ms. Doucette did nothing wrong. [See Weiner aff Exh. #8].[4]  Reliance on Ms. O'Donnell's alleged failure to provide "required" medical documentation as the reason for not granting leave is not supported by the facts and, under the totality of circumstances, hardly credible. A more reasonable, likely inference is retaliation and missing medicals merely pretext. At the very least, a factual dispute as to the reason for refusal of leave and termination requires jury determination of this disputed fact.

*Breach by the Union*

A §301 will succeed if the Union has also breached its duty of fair representation. It would be a breach of the duty (i.e., arbitrary, capricious or in bad faith) to fail or refuse to take a valid grievance to arbitration absent countervailing interests. *See eg.* Miller v. U.S. Postal Service, 985 F.2d 9 (C.A. 1 1993). The Union's mere statement that it abandoned the grievance after good faith review and because Ms. O'Donnell refused to provide medical documentation, or refused either reinstatement or a negotiated settlement is conclusory and insufficient to sustain summary judgment.

In the first instance, there is no competent or admissible undisputed evidence that (i) as noted

---

[4] That contention is belied by the fact that Marion Doucette was eventually forced to retire because of the problematic nature of her tenur, which included relatiatory actions against loan officers who refused to sign off on a loan to her daughter. [SoMF 2-31].

above, Ms. O'Donnell was required to or refused to provide medical information, and (ii) that she was offered and/or refused return to her position under conditions that were not a breach of the CBA or her independent rights. She was, offered only the opportunity to return to her prior circumstance, supervised by Marion Doucette, [see Weiner aff Exh. #8], clearly an unacceptable alternative. Both Ms. O'Donnell and the Union could reasonably foresee only a continuing course of retaliatory and damaging conduct from Marion Doucette, without any assurance of safety or oversight because the Credit Union refused to recognize, let alone deal with, the problem. If Ms. O'Donnell had been offered a "safe" return, it is mere speculation she would have refused that offer.

Reference to settlement negotiations, used in the manner set forth, are inadmissible in any event to prove the merit (or lack thereof) of her claim. There is no evidentiary proffer to establish an admissible basis for such evidence or even for the conclusion that any offered settlement was reasonable, if such evidence could be admitted for summary judgment.

Furthermore, there is no question that up to the 11th hour the Union actually believed Ms. O'Donnell's grievance had merit and she could prevail and obtain relief. The fact that the Union sought strenuously to have the grievance heard [Mahoney Aff ¶14] belies the belated lament that it had no merit. There is no assertion that Ms. Doucette did not do what she was accused of.

The facts at issue in the grievance were established at the time of Ms. O'Donnell's termination in February 2004. No new facts, evidence or argument arose between February 2004 and the June 14, 2006 notice to the Credit Union that the Union was withdrawing the grievance. There was no new no evidence or legal analysis that altered the nature of Ms. O'Donnell's claims or relief. It is, therefore, unreasonable to credit the Union's "sudden" change in attitude as anything more than a late, arbitrary, capricious or bad faith change in position.

16

The belated and sudden position (i.e., mere opinion and speculation) that a failure to provide medical documentation was a failure to perform a condition precedent which justified the Credit Union's refusal to grant leave, is not sufficient to sustain summary judgment. Neither are the inadmissible conclusions or opinion that Ms. O'Donnell could not prevail at arbitration or that no remedy was possible. An arbitrator could have awarded back wages, or ordered compliance with the contractual right to leave of absence, or some other remedy might have been fashioned. Under these circumstances, a factual dispute exists and a jury could reasonably conclude that the evidence set forth, including (i) long term knowledge of the facts, (ii) lack of any subsequent investigation, (iii) lack of newly discovered contervailing evidence, (iv) late abandonment of the claim, (v) immaterial nature of medical documentation, (vi) etc, indicates an arbitrary and capricious decision by the Union to abandon Ms. O'Donnell.  Summary judgment should not issue.

E.    <u>Statute of Limitations Issue</u>

The final matter is the statute of limitations.  Defendants assert that the Dec. 12, 2005 filing of the second action runs afoul of the limitation period..[5] The first response to this is that this Court previously found that the Union had abandoned its grievance on June 14, 2005, a finding made in reliance upon the affidavit of Defendants' attorney Harvey Weiner (see Magistrate Report Doc #11 at 6).  This affidavit has been resubmitted with the current motion, along with a contradictory affidavit of Mary Mahoney, which asserts that the grievance was abandoned earlier on June 6, 2005. At best, this creates a factual dispute precluding summary judgment on this issue.

_____

[5] <u>Scaglione v. Commuications Workers of America, Local 1395, et al.,</u> 586 F.Supp. 1018, 1021 (D. Mass. 1983) (Zobel, J.) (in regard to 6-month statute of limitations, stating cause of action arises from date plaintiff had notice that union breached its duty by failing to proceed with grievance)

Turning to these dueling affidavits in detail:

| Mahoney:<br>(1/2007) | 15. | Local 6 withdrew the grievance just prior to the scheduled arbitration. **The grievance was formally withdrawn on June 6, 2005.** ~~This was communicated to Plaintiffs counsel by telephone on June 6, 2005 and by facsimile letter received by Plaintiff's counsel on June 6, 2005. Ex. 10:~~... |
|---|---|---|
| Weiner:<br>(9/2005) | 31. | Local 6 abandoned the grievance just prior to a scheduled arbitration. **The grievance was formally withdrawn on June 14, 2005**. Ex. 18: Letter from Peter Manning to Weiner dated June 14, 2005. |

Mahoney may testify as to the Union's withdrawal of the grievance but not as to a communication she was not privy to[6] and the date of receipt of a document by Ms. O'Donnell's counsel (portions of the representation that should be stricken as inadmissible hearsay or speculation not complying with Rule 56(e) are noted.)   <u>There is a direct contradiction as to the date of the withdrawal.</u>

Weiner:    The grievance was formally withdrawn on June 14, 2005.

Mahoney:    The grievance was formally withdrawn on June 6, 2005.

It appears that the Mahoney affidavit has been tailored to counteract the effect of attorney Weiner's earlier affidavit, in regards to the date on which the grievance was "formally withdrawn," in order to meet the needs of Defendants' current statute of limitations argument. The affidavits present a factual dispute that precludes summary judgment.

---

[6] See Adams affidavit ¶ 2, recalling no phone conversation in which Mary Mahoney was a participant.

The next problem with Defendants' argument is that Massachusetts does not recognize the principle of "anticipatory breach" and mere repudiation of an obligation is insufficient to trigger a right of action  *See* <u>Petrangelo v. Pollard</u>, 356 Mass 696, 702 (1970)(noting that recovery for anticipatory breach would be denied under the rule of <u>Daniels v. Newton</u>, 114 Mass. 530.").  In this case, the Union's duty to fairly represent Ms. O'Donnell was not breached by mere notice of an intention not to perform. As a mere third party beneficiary to the CBA, she was not privy to the contractual duties between the Union and Credit Union and had no standing to compel performance by either.  Whatever she was told, at any time, by the Union regarding its purported intentions, the only effective repudiation of the Union's grievance or settlement rights occurred no earlier than June 14, 2005, as evidenced in the official, written notice sent to the Credit Union that effectively abandoned its rights under the CBA.[7]

 June 14, 2005 is the earliest date upon which the statute of limitations could be triggered, but only if the Plaintiff actually learned of the Union's communication and irrevocable renunciation on that date.  In fact, it was only later when nothing more occurred that Ms. O'Donnell could validly conclude that a breach had occurred and that her CBA-based remedies were lost. [SoMF 2-27]. Yet, even then, her attempt to have the NLRB enforce her remedies would preclude an irrevocable determination of breach since she had not yet exhausted all of her remedies.

A last argument against Defendants' contention as to the statute of limitations involves estoppel and law of the case principles. Plaintiff's first action was filed in state court and removed to federal court by Defendants at a time when the Union was still pursuing the grievance.  Defendants

---

[7] The existence of this communication was not discovered by Plaintiff until it was submitted by the Credit Union's counsel Harvey Weiner as an exhibit to his affidavit. [Adams aff ¶3].

19

argued for dismissal in federal court on the basis that Plaintiff's claims against the individual Defendants were, in actuality, claims against the employer preempted by §301.  (See n. 2 supra). When, it became clear that the Union had abandoned the grievance, the means of reconciling the claims against the individual defendants and the employer in a single action could have been accomplished by amending or supplementing the original complaint, or by filing a second action and seeking consolidation.  Those alternatives were proposed to Defendants counsel and the Court and in the end, following a conference with Judge Gertner in chambers and pursuant to agreements reached there, the parties agreed to and filed a pleading providing for "fusion" consolidation.[8]  Later, this Court allowed amendment to restate and reconcile all claims. The effect of fusion consolidation, which effectively combines all claims into a single action, and of the amendment (or supplementation), allowed all of Plaintiff's claims to relate back to the original state court filing date which, as Defendants have asserted, did raise claims against the employer.


## IV.    Conclusion

For the reasons stated above, Defendants Motion for Summary Judgment must be denied.

---

[8] Of the three types of consolidation available, see generally  9 Mass. Practice §533 (1992), two were possible in this instance: (i) 'fusion' consolidation,  where because of the identity of parties or causes of action, the actions might have been commenced as a single case, or (ii) trial consolidation, where cases present questions similar enough so that time and expense will be saved if the cases are tried at the same time because the proof in each case is similar or the issues arise out of the same transaction or occurrence. See Lumiansky v. Tessier 214 Mass 182, 188 (1912).

Respectfully submitted for Plaintiff,
By her attorney,

dated: February 20, 2007        __/s/ Scott Adams_____

Scott Adams (BBO# 639166)
92 State St., 9th Flr.
Boston, MA 02109
Tel: (617) 742-4554

---

*Certificate of Service*

*I hereby certify that a true copy of this document and any attachments was served upon all parties pro se or parties' attorneys by ~~hand / mail / fax~~ / ECF on _____2/20____, 2007.*

_____/s/ Scott Adams_____ __2__/_20__/07

---