# UNITED STATES DISTRICT COURT
# THE DISTRICT OF MASSACHUSETTS

Paula O'Donnell,
        Plaintiff
v.                                          Civil Action No. 05-CV-11257- NG

Donna Boggs, et al.,
        Defendants.

### Plaintiff's Response to Defendants' Statement of Undisputed Material Facts

**Table of Contents:**

I.  Defendants' Statements and Responses ............................................................................ 2

II.  Plaintiff's Additional Statements ..................................................................................... 11

## I.   Defendants' Statements and Responses

1.     Plaintiff Paula O'Donnell ("O'Donnell") is a former employee of the Boston Globe Employees Credit Union (the "Credit Union") who alleges that over the course of several years she was harassed and ultimately constructively discharged. First Amended (Consolidated) Complaint. ("AC"), at ¶¶5, 23.

>      Response: Not disputed.

For the following matters, the subject of the Motion to Strike is set forth as underlined text.

2.     The Credit Union is a state-chartered financial institution incorporated in 1962 and located in Boston, Massachusetts. _Affidavit of Harvey Weiner ("Weiner Aff."), at ¶6_

>      Response: Deferred pending resolution of Motion to Strike.

3.     Defendant Donna Boggs was a member of Credit Union's Board of Directors at all times relevant through 2004 and served as Chairman during the relevant period. _Id._ at ¶7.

>      Response: Deferred pending resolution of Motion to Strike.

4.     Defendant Brendan Hall was a member of the Credit Union's Board of Directors at all times relevant. _Id._ at ¶8.

>      Response: Deferred pending resolution of Motion to Strike.

5.     Defendant William Francis has been a member of the Credit Union's Board of Directors since 2000. _Id._ at ¶9.

>      Response: Deferred pending resolution of Motion to Strike.

6.     Defendant Mary Lou Meighan has been a member of the Credit Union 's Board of Directors since 2001. _Id._ at ¶10.

>      Response: Deferred pending resolution of Motion to Strike.

7.    Defendant Marion Doucette was an employee of the Credit Union for 30 years. She served on the Credit Union's Board of Directors at all times relevant, and served as Manager/CEO of the Credit Union from June 1998 until her retirement on July 2, 2004. *Id.* at ¶11.

      Response: Deferred pending resolution of Motion to Strike.

8.    O'Donnell was employed by the Credit Union from 1974 through February 13, 2004. AC at ¶5; Weiner *Aff.* Ex. 10: Letter from Weiner to Adams dated February 13, 2004.

      Response: Subject to pending resolution of Motion to Strike, but without waiving rights fact stated is not disputed

9.    Credit Union non-managerial employees are covered by a CBA between the Credit Union and Local 6. The text of the relevant portions of the CBA remained unchanged from the January 1, 2000 agreement through the January 1,2003 agreement. Weiner Aff. at ¶14.

      Response: Deferred pending resolution of Motion to Strike.

10.   O'Donnell was a signatory to the CBA as Shop Steward for Local 6 for the CBA in effect from January 1, 2000 through December 31, 2002, and was a member of Local 6 at all relevant times. *Id.* at ¶15;Weiner Aff. Ex. 1 at 18.

      Response: Deferred pending resolution of Motion to Strike.

11.   Defendants Marion Doucette and J. Brendan Hall were also signatories to the CBA during the same period. Weiner Aff. at ¶16; Weiner Aff. Ex. 1 at 18. Doucette signed as Manager/CEO and Hall signed as a Member of the Board of Directors. *Id.*

      Response: Deferred pending resolution of Motion to Strike.

12.   Defendants Doucette, Hall and Meighan were signatories to the CBA in effect from January 1, 2003 through December 31, 2005. Weiner Aff. at ¶17; Weiner Aff. Ex. 2 at 18. Hall and Meighan signed as members of the Board of Directors and Doucette signed as Manager. *Id.*

      Response: Deferred pending resolution of Motion to Strike.

13.    The CBA includes: Article VI, which vests all management rights in the Credit Union; Article XV , which addresses unpaid leaves of absence; Article XIX, which provides a grievance procedure; Article XX, which addresses discipline and discharge; and Article XXI, which provides for arbitration of grievances. Weiner Aff. at ¶18; Weiner Aff. Ex. 1 at 3,8, 11, 14; Weiner Aff. Ex. 2 at 3, 8, 11, 14.

       Response: Deferred pending resolution of Motion to Strike.

14.    Article VI of the CBA provides in part:

" All disciplinary action undertaken by Management against a member of the Bargaining Unit shall be for just cause and will be conducted in private and in such manner as to create respect for authority and preserve individual dignity. It is the responsibility of Management to inform individuals directly and in private of any alleged failure to perform their work properly so that the necessary changes and/or corrections can be made as speedily as possible."

Weiner Aff. at ¶19; Weiner Aff. Ex. 1 at 3-4; Weiner Aff. Ex. 2 at 3-4.

       Response: Deferred pending resolution of Motion to Strike.

15.    Article XV of the CBA states as follows:

"Unpaid Leaves of Absence -Unpaid leaves of absence for good and sufficient reason in the opinion of the Employer shall be granted upon written request and shall not be unreasonably denied. Such leaves shall not be construed to be a termination of employment so long as they last no more than 6 months and the employee does not become employed by another employer. The employer will not be obligated to maintain benefits coverage during leaves covered by this article, but may do at its discretion considering each case."

Weiner Aff. at ¶20; Weiner Aff. Ex.1 at 8-9; Weiner Aff. Ex. 2 at 8-9.

       Response: Deferred pending resolution of Motion to Strike.

16.    Article XX of the CBA states in part:

"The Union and the Employer agree that discipline, including discharge, must be administered fairly and consistently for just cause. Discipline will typically be progressive.

The offense facts and circumstances will determine the level of discipline to be applied regardless of prior discipline, if any. ..

...A minimum of two written warnings will be issued before an employee may be dismissed except in the case of *gross neglect of duty* or serious misconduct." [Emphasis added.] Weiner Aff. at ¶21; Weiner Aff. Ex. 1 at 13; Weiner Aff. Ex. 2 at 13.

> Response: Deferred pending resolution of Motion to Strike.

17. O'Donnell did not return to her job after August 14, 2003. Her sick leave and vacation time expired on or about November 30, 2003. Weiner Aff. at ¶22.

> Response: Deferred pending resolution of Motion to Strike.

18. Through her attorney, Scott Adams, O'Donnell indicated that she would not return to work because of what she perceived to be a hostile working environment. Weiner Aff. at ¶23; Weiner Aff. Ex. 3: Letter from Adams to Boggs dated October 27, 2003.

> Response: Deferred pending resolution of Motion to Strike.

19. The letters from Attorney Adams acknowledged that O'Donnell's claims needed to be addressed through the grievance procedure provided for in the CBA. Weiner Aff. at ¶24; *See, e.g.,* Weiner Aff. Ex. 3: Letter from Adams to Boggs dated October 27, 2003; Weiner Aff. Ex. 5: Letter from Adams to Weiner dated December 30, 2003; Weiner Aff. Ex. 7: Letter from Adams to Weiner dated January 19, 2004.

> Response: Subject to resolution of Motion to Strike but, without waiving right to strike, facts stated are not disputed..

20. On or about January 19, 2004, O'Donnell requested an unpaid leave of absence. Weiner Aff. at ¶25; Weiner Aff. Ex. 7: Letter from Adams to Weiner dated January 19, 2004. The request was denied by the Board of Directors on the grounds that O'Donnell had not provided good and sufficient reason to grant the request as required by Article XV of the CBA. Weiner Aff. at ¶25; Weiner Aff. Ex. 8: Letter from Weiner to Adams dated February 2, 2004; Weiner Aff. Ex. 1 at 8; Weiner Aff. Ex. 2 at 8.

5

Response: Objection as to the characterization and synopsis of communications as being full and complete representations of the contents of the documents, which speak for themselves.

21.    On February 2, 2004, the Board of Directors gave O'Donnell one final opportunity to end her unauthorized absence and return to work on February 17, 2004. Weiner Aff. at ¶26; Weiner Aff. Ex. 8: Letter from Weiner to Adams, dated February 2, 2004.

Response: Objection as to the characterization and synopsis of communications as being full and complete representations of the contents of the documents, which speak for themselves.

22.    O'Donnell did not provide any medical documentation to support her request for the leave of absence, and declined the opportunity to end her unauthorized absence from work. Weiner Aff. at ¶27; Weiner Aff. Ex. 9: Letter from Adams to Weiner dated February 11, 2004. As a result, the Board of Directors terminated O'Donnell for gross neglect of duty, as allowed for in Article: XX of the CBA. Weiner Aff. at ¶27; Weiner Aff. Ex. 10: Letter from Weiner to Adams dated February 13, 2004; Weiner Aff. Ex. 2 at 13.

Response: Objection as to the characterization and synopsis of communications as being full and complete representations of the contents of the documents, which speak for themselves..

23.    Local6 filed a grievance on behalf of O'Donnell on February 25, 2004. Affidavit of Mary Mahoney ("Mahoney Aff."), filed herewith, at ¶12; Mahoney Aff. Ex. 3: Letter from Lemieux to Doucette dated February 25, 2004. The grievance alleged that O'Donnell's termination violated Articles I, VI, XV and :XX of the CBA, and sought O'Donnell's reinstatement. *Id.*

Response: Not disputed.

24.    There is a multiple-step grievance process under the CBA. Mahoney Aff. at ¶13; Mahoney Aff. Ex. 2 at 11-12. A grievance hearing was held on March 19, 2004. Mahoney Aff. at ¶13;

Mahoney Aff. Ex. 4: Letter from Lemieux to Vinci dated August 24, 2004. The Credit Union denied the grievance on March 25, 2004. Mahoney Aff.¶13; Mahoney Aff. Ex. 5: Letter from Hall to Lemieux dated March 25, 2004 (unsigned).

      Response: Not disputed.

25.    There was a dispute as to the subsequent steps in the grievance process between Local 6 and the Credit Union. Mahoney Aff. at ¶14; Mahoney Aff. Ex. 6: Letter from Lemieux to Vinci dated September 7, 2004; Mahoney Aff. Ex. 7: Letter from Vinci to Lemieux dated September 13, 2004; Mahoney Aff. Ex. 8: Letter from Lemieux to Vinci dated September 15, 2004. Ultimately, the Credit Union agreed to arbitrate the grievance despite a dispute over the timing of the request for arbitration. Mahoney Aff. at ¶14; Mahoney Aff. Ex. 9: Letter from Weiner to Lemieux dated September 21, 2004.

      Response: Not disputed.

26.    Local 6 withdrew the grievance just prior to a scheduled arbitration. Mahoney Aff. at ¶15. The grievance was formally withdrawn in writing on June 6, 2005. *Id.;* Mahoney Aff. Ex. 10: Letter from Manning to Adams dated June 6, 2005.

      Response: Generally deferred pending resolution of Motion to Strike, but note that the prior affidavit of attorney Weiner states that the grievance was formally withdrawn on June 14, 2005. See Weiner Affidavit ¶31. Disputed that grievance was withdrawn on June 6, 2005.

27.    After review of the grievance, Local 6 determined that the case did not have sufficient merit to win at arbitration and that the Credit Union did not violate the CBA in dealing with Ms. O'Donnell's request for a leave of absence. Mahoney Aff. at ¶¶ 16-21.

      Response: Deferred pending resolution of Motion to Strike.

28.    Plaintiff filed a Charge against Local 6 with the National Labor Relations Board ("NLRB") alleging violation of its duty of fair representation on or about August 22, 2005. Mahoney Aff. at ¶22; Mahoney Aff. Ex. 12.

Response: Deferred pending resolution of Motion to Strike.

29.    In its response to the Charge, Local 6 set forth the reasons for its decision not to proceed with the arbitration of Ms. O'Donnell's grievance and stated, in part, as follows:

"[O'Donnell] was denied a 6-month unpaid leave of absence when she was unable and/or unwilling to provide medical documentation justifying her remaining on leave. When she still refused to return to work her employment was terminated in February 2004. ( ...) The Union ultimately concluded, however, that the employer was within its rights to deny the leave of absence, and that [O'Donnell] was required to obey and grieve. In addition, the Union learned from Ms. O'Donnell that she did not want to return to work for the credit union."

Mahoney Aff. at ¶23; Mahoney Aff. Ex. 13.

Response: Deferred pending resolution of Motion to Strike.

30.    The NLRB's Regional Director dismissed the Charge on October 19, 2005, and found that: The Union's decision not to take the case to arbitration was made after analysis of the grievance showed that it would not be possible for an arbitrator to remedy the grievance, thereby rendering the arbitration process moot. There is no evidence that the Union processed your grievance in an unfair or discriminatory manner.

Mahoney Aff. at ¶24; Mahoney Aff. Ex. 14.

The Regional Director refused to issue a Complaint in this matter, and advised O'Donnell of her right to appeal. *Id.*

Response: Deferred pending resolution of Motion to Strike.

31.    Plaintiff filed an appeal, which the NLRB's Office of Appeals denied for substantially the reasons set forth in the Regional Director's October 19, 2005 letter, stating that "the evidence shows that the Union did not pursue [the] grievance to arbitration after a good faith review of the dispute, because [Ms. O'Donnell] refused either reinstatement or a negotiated monetary settlement. Inasmuch as the Union's decision was not based on unlawful considerations, further proceedings herein were deemed unwarranted." Mahoney Aff. at ¶25;

<u>Mahoney Aff. Ex. 15</u>.

Response: Deferred pending resolution of Motion to Strike.

32.    O'Donnell filed a complaint in Massachusetts Superior Court on or about April 28, 2005, alleging two counts of tortious interference with contractual relations, one against Doucette and the other against the other named Board members (Brendan Hall, William Francis, Mary Lou Megan, Bob Sylvester).

Response: Not disputed.

33.    The defendants removed the case to federal district court. (Docket Entry # 1.)

Response: Not disputed.

34.    On December 12, 2005, the Plaintiff filed a separate civil action against the Credit Union alleging breach of contract by the Credit Union. Civ. A. No. 05-CV-12490-NG) (the "Second Civil Action").

Response: Not disputed.

35.    The Defendants moved for summary judgment in the original action on September 6, 2005 on the grounds that Plaintiff's state law claims of tortious interference with contractual relations were subject to preemption by Section 301 of the Labor Management Relations Act. The Court denied the summary judgment motion on May 18, 2006, allowed the Plaintiff leave to amend her complaint, and ordered Plaintiff to include all of her claims from both this action and the Second Civil Action into an amended complaint in this action. (Electronic Order dated May 18, 2006. )

Response: Disputed as to the legal characterization and recitation of procedural matters in that the statements are not fully accurate or descriptive and omits notable events such as conferences, agreements, consolidation agreements and other matters. See Order referenced.

36.     The Plaintiff filed a "First Amended (Consolidated) Complaint" (the "Amended Complaint") against Donna Boggs, Marion Doucette, Brendan Hall, William Francis, Mary Lou Meighan, and the Boston Globe Employees Credit Union on May 31, 2006. (Docket Entry # 14.) The Amended Complaint is in four counts: "Tortious Interference with Contractual Relations by Marian Doucette" (Count I); "Tortious Interference with Contractual Relations by Board Member Defendants" (Count II); "Breach of Contract by Boston Globe Credit Union" (Count III); and "Various Public Policy and Rights Violations" (Count IV). *Id.*

        Response: Not disputed.

## II. Plaintiff's Additional Statements

### A. Plaintiff's Service at the Credit Union

2-1    Plaintiff Paula O'Donnell had over 30 exemplary years as an employee and shareholder of the Boston Globe Employees Credit Union ("Credit Union"). [Paula O'Donnell Affidavit ¶1: hereinafter O'Dnl Aff ¶1].

2-2    She began work as a teller in 1974 worked her way up to Head Teller in 1998, when she and another employee later discovered that Gene Farrell, the Manager or CEO of the Credit Union, had engaged in fraud and embezzlement of funds, which she reported to the Security department and the Board of Directors. [O'Dnl Aff ¶1,2]. Investigations were conducted and Farrell was terminated , prosecuted and sentenced. [O'Dnl Aff ¶2]

2-3    Strangely, a few board members, including Defendant Brendan Hall, openly expressed sympathy for Mr. Farrell and began shunning Ms. O'Donnell. [O'Dnl Aff ¶3].

### B. Defendant Marion Doucette's Fraud and Retaliation

2-4    Defendant Marion Doucette replaced Farrell as Manager/CEO, and Ms. O'Donnell later became Systems Manager. [O'Dnl Aff ¶4].

2-5    In 2000, Marion Doucette hired her daughter, Linda Doucette, for the position of Bookkeeper, stating she had the necessary experience and qualifications. [O'Dnl Aff ¶5]. Ms. O'Donnell soon discovered though, that Marion had misrepresented her daughter's qualifications. [Id.]. Since Ms. O'Donnell had been the Bookkeeper for nearly 2 years and, as Systems Manager, had to review Linda's work, she found that Linda lacked sufficient banking knowledge and even basic accounting skills. [Id.]. Linda could not competently balance ledgers and share draft accounts, she seemed unable to distinguish the difference between debits and credits, or how to designate them in the accounts. [Id.].

2-6    Ms. O'Donnell, who was also Union steward at the time, also learned that Marion had hired her daughter for more than Union scale provided. [O'Dnl Aff ¶6]. The practice of hiring unqualified relatives and paying them more than others was a practice that Mr. Farrell had engaged in and which the Credit Union had taken steps to prevent. [Id.].

2-7    Ms. O'Donnell complained of these matters to Marion Doucette and to the Board of Directors, and raised the issue with the Union agent. [O'Dnl Aff ¶7].

2-8    The Board appeared to do nothing and Marion Doucette began a course of retaliatory abuse and interference. [O'Dnl Aff ¶7,8]. This consisted of physical and verbal intimidation and disparagement, verbal abuse, displays of physical violence, and interference with Ms. O'Donnell's duties. [O'Dnl Aff ¶8]. No other apparent explanation for Marion's behavior existed as she and Ms. O'Donnell had no problems outside of work. [Id.].

C.    Fraud, Retaliation and Willful Blindess

2-9    Ms. O'Donnell next discovered that Linda Doucette, who had a Credit Union account, was bouncing an excessive number of checks, and that Marion Doucette was violating practice and policy by approving their processing and payment. [O'Dnl Aff ¶9]. Ms. O'Donnell reported and complained of this to Marion Doucette, who appeared to do nothing as the practice continued. [Id.]. As part of her duties. Ms. O'Donnell continued to review the situation and when she reported the matter to Board member Brendan Hall and to the new Union steward, Linda had bounced almost 100 checks. [Id.].

2-10    At the same time she complained to the Board and the steward of these issues, she also reported and complained of the ongoing retaliation by Marion Doucette. [O'Dnl Aff ¶10].

2-11    Defendant Donna Boggs, the Chairperson of the Board, directed Ms. O'Donnell not to speak of these problems to any other Board members and to drop the matter because the Doucettes had not violated any Credit Union policy or practice. [O'Dnl Aff ¶11]. In fact, the "kiting" of checks was a prohibited practice that predated Mr. Farrell's fraud. [Id.].

2-12   Ms. O'Donnell insisted, both to Marion Doucette and to Donna Boggs, that the problem be dealt with or, since she was a Credit Union shareholder, Ms. O'Donnell would raise the issue in a shareholder action. [O'Dnl Aff ¶12].

2-13   Ms. O'Donnell later discovered a new fraud by Linda Doucette. [O'Dnl Aff ¶13]. In this case, she had manipulated the accounting system and overrode security to clear her personal checks when she had insufficient funds. [Id.]. This was also reported to Marion Doucette, to the Board and to the Union steward but nothing appeared to be done and Marion's retaliation continued. [Id.].

2-14   Ms. O'Donnell later discovered, and reported to Marion Doucette, another new fraud in which Linda manipulated ATM security procedures to obtain funds. [O'Dnl Aff ¶14].

2-15   It was only after this last fraud was reported that the Credit Union initiated an investigation but apparently took no action to inform authorities. [O'Dnl Aff ¶15]. Linda was allowed to resign with a fraudulent resignation letter that had no reference to her misconduct. [Id.].

2-16   Linda's Credit Union account was, by Board order, to be closed but Donna Boggs ordered Ms. O'Donnell to keep it open and clear checks even when there was insufficient funds. [O'Dnl Aff ¶16]. This violated not only the Board order but also policy and procedure and Ms. O'Donnell reported this to the Union steward, who notified the Board. [Id.].

2-17   At some point, Ms. O'Donnell learned from Board members that the Banking Commission hd been told by an unknown party of Linda's ATM fraud,  and it had "admonished" the Credit Union as a result. [O'Dnl Aff ¶17]. Although Ms. O'Donnell had not been the individual who notified the Banking Commission, she was blamed for doing so by Defendants Francis, Boggs and Meghan. [Id.].

D.    Ms. O'Donnell's Deteriorating Circumstances and Lawsuit

2-18    As Linda Doucette's misconduct was continually discovered, investigated and reported by
        Ms. O'Donnell, Marion Doucette's retaliation expanded and intensified. [O'Dnl Aff ¶18].
        There were weekly incidents of physical and verbal intimidation and disparagement, verbal
        abuse, displays of physical violence, and interference with Ms. O'Donnell's duties. [Id.].

2-19    The retaliation of Marion Doucette, the failure of the Board to correct the situation, and
        retaliation by the Defendant Board members resulted in a work situation and environment
        that became increasingly intolerable to Ms. O'Donnell. [O'Dnl Aff ¶19].    She suffered a
        physical and emotional toll, including sleepless nights, stress,  panic attacks, shortness of
        breath, spells of nausea, vomiting and crying, and general depression. [Id.].  There were no
        other situations in her life to which these conditions and symptoms could be attributed, and
        all were intimately related to her attendance or anticipation of work at the Credit Union and
        under Marion Doucette. [Id.].

2-20    Eventually, Ms. O'Donnell's situation was so grave and debilitating that the Boston Globe's
        nurse referred her to the Employee Assistance Program, where she was advised to leave
        work and take a leave of absence. [O'Dnl Aff ¶20].

2-21    Eventually she received treatment for her condition and symptoms, which could not be
        attributed to any situation in her life other than work, and was advised that she not return
        until able. [O'Dnl Aff ¶21].

2-22    The Credit Union, the Union, and Defendants Doucette, Boggs, Hall and Meghan all knew
        of Ms. O'Donnell's leave and the reasons for it, and that she insisted she could not return to
        work with Marion Doucette as her supervisor. [O'Dnl Aff ¶22].

2-23    The Credit Union apparently took no immediate action to remove or discipline Marion
        Doucette, although they knew that her conduct had been a problem in this and other
        circumstances. [O'Dnl Aff ¶23].

2-24    Marion Doucette continued in her position and Ms. O'Donnell was eventually terminated when she was denied a requested leave of absence and refused to return to work under Marion Doucette's supervision. [O'Dnl Aff ¶24].

2-25    Ms. O'Donnell filed an action in state court against the named individual Defendants while her Union grieved her situation. [O'Dnl Aff ¶25]. That grievance covered a number of issues, including her termination and circumstances prior to her termination. [Id.].

2-26    The state court action was removed by Defendants to federal court. [O'Dnl Aff ¶26].

2-27    Then, against Ms. O'Donnell's wishes and instruction, her Union officially abandoned the grievance on June 14, 2005 in a communication to the Credit Union. [O'Dnl Aff ¶27]. She did not learn of this action until later. [Id.] See also Weiner aff ¶31].

E.      Miscellaneous Matters

2-28    The Credit Union is federally and state regulated, and NCUA insured. [O'Dnl Aff ¶28]

2-29    The Credit Union, and the Union, knew that Ms. O'Donnell's request for leave was made because Marion Doucette's constant retaliation, attacks and interference made work unbearable and made her ill. [O'Dnl Aff ¶29] They knew this both directly from Ms. O'Donnell in her reports and complaints prior to leaving work, and her request for leave of absence. Id.    See also Weiner Aff Exhs: #3 - Letter from Adams to Donna Boggs dated Oct. 27, 2003; #4 - Letter from Weiner to Adams dated Nov. 19, 2003; #5 - Letter from Adams to Weiner dated Dec. 30, 2003; #7 - Letter from Adams to Weiner dated January 19, 2004; # 8 - Letter from Weiner to Adams dated Feb. 2, 2004; #9 - Letter from Adams to Weiner dated Feb. 11, 2004.

2-30    There is no CBA condition precedent that required "medical documentation" in order to obtain leave of absence, such as there is for paid sick leave. [O'Dnl Aff ¶30]. See also

Mahoney Aff Exh. ##1, 2. Compare Article XII - Paid Sick Leave to Article XV - Leave of Absence.

2-31    Marion Doucette was eventually replaced, in part because of the problematic nature of her tenure, which included abuse of employees relatiatory actions against loan officers who refused to sign off on a loan to her daughter. [Hall Depstn p.18-ln.5 to p.19-ln.14; p.52-ln.24 to p.57-ln.24; p.78-ln.5 to p.81-ln.20]

2-32    In the proceedings of this action, when it became clear that the Union had abandoned the grievance, the means of reconciling the claims against the individual defendants and the employer in a single action could have been accomplished by amending or supplementing the original complaint, or by filing a second action and seeking consolidation.   Those alternatives were proposed to Defendants counsel and the Court and in the end, following a conference with Judge Gertner in chambers and pursuant to agreements reached there, the parties agreed to and filed a pleading providing for "fusion" consolidation and this Court then allowed amendment to restate and reconcile all claims. [Adams aff ¶4].

                           Respectfully submitted for Plaintiff,
                           By her attorney,

dated: February 20, 2007          __/s/ Scott Adams_____

                           Scott Adams (BBO# 639166)
                           92 State St., 9th Flr.
                           Boston, MA 02109
                           Tel: (617) 742-4554

*Certificate of Service*

*I hereby certify that a true copy of this document and any attachments was served upon all parties pro se or parties' attorneys by ~~hand / mail / fax~~ / ECF on ___2/20_____, 2007.*

                   ____/s/ Scott Adams_____ __2__/_20_/07

# UNITED STATES DISTRICT COURT
# THE DISTRICT OF MASSACHUSETTS

**Paula O'Donnell,**
        **Plaintiff**
**v.**                                    **Civil Action No. 05-CV-11257- NG**

**Donna Boggs, et al.,**
        **Defendants.**


## Plaintiff's Exhibits
## In Support of Opposition to Summary Judgment


1.      Affidavit of Scott Adams

2.      Affidavit of Paula O'Donnell

3.      Deposition John Hall (excerpts)

**EXHIBIT 1**

AFFIDAVIT OF SCOTT ADAMS

I, Scott Adams, state of personal knowldege:

1.      I am the attorney for Plaintiff Paula O'Donnell.

2.      In the course of discussions with the Union regarding my client's situation, I can recall no phone conversation on or about June 6, 2005 with Bob Manning, counsel for the Union, in which Mary Mahoney was a participant. In fact I cannot recall any phone conversation with Bob Manning or anyone else in which Mary Mahoney was a participant.

3.      The letter from the Union to the Credit Union dated June 14, 2006 in which the grievance was officially withdrawn was first discovered as a Exhibit 18 to the Affidavit of Harvey Weiner submitted in this action on or about September 6, 2006.

4.      In the proceedings of this action, when it became clear that the Union had abandoned the grievance, the means of reconciling the claims against the individual defendants and the employer in a single action could have been accomplished by amending or supplementing the original complaint, or by filing a second action and seeking consolidation.  Those alternatives were proposed to Defendants counsel and the Court and in the end, following a conference with Judge Gertner in chambers and pursuant to agreements reached there, the parties agreed to and filed a pleading providing for "fusion" consolidation and this Court then allowed amendment to restate and reconcile all claims.

5.      The attached Exhibit 2 is a true and accurate copy of Ms. O'Donnell's subscribed and approved affidvait, copies of original signature shall be filed separately.

6.      The attached Exhibit 3 is a true and accurate copy of the Deposition of John Hall.


Signed under penalty of perjury,

2/20/2007        ___/s/ Scott Adams _____

**EXHIBIT 2**

AFFIDAVIT OF PAULA O'DONNELL

I, Paula O'Donnell State of personal knowledge:

1.      I have worked for and been a shareholder of the Boston Globe Employees Credit Union ("Credit Union") for over 30 years.  I began work as a teller in 1974 worked my way up to Head Teller in 1998.

2.      While working as the Head Teller, I and another employee later discovered that Gene Farrell, the Manager or CEO of the Credit Union, had engaged in fraud and embezzlement of funds, which I reported to the Security department and the Board of Directors. Various investigations were conducted, and I provided information to Credit Union, NCUA and state auditors and the FBI.  Mr. Farrell was terminated and I learned from one or more Board members, and from the newspapers the he was being prosecuted for his actions.  I also attended Court the day he was sentenced.

3.      After this, a few board members (including Brendan Hall, Bob Sylvester and Dick Serrano) openly expressed sympathy for Mr. Farrell and began shunning me.  When I confronted Mr. Sylvester about how his treatment of me had changed, he only said that he could understand how Farrell might have gotten himself into trouble.  In the case of Brendan Hall, we had previously had close and friendly relations, but after this he distanced himself from me.

4.      Marion Doucette became Manager/CEO after Mr. Farrell was terminated and I later became Systems Manager after serving as Bookkeeper for a few years.

5.      In 2000, Marion Doucette hired her daughter, Linda Doucette, for the position of Bookkeeper, stating she had the necessary experience and qualifications.  I soon discovered though, that Marion had misrepresented her qualifications. Since I had been the Bookkeeper for nearly 2 years and, as Systems Manager, had to review Linda's work, I found that Linda lacked sufficient banking knowledge and even basic accounting skills. She could not competently balance ledgers and share draft accounts, she also seemed unable to distinguish the difference between debits and credits, or how to designate them in the accounts.

6.      At the time of Linda's hiring, I was the Union steward and also learned that Marion had hired her daughter for more than Union scale provided.  The practice of hiring unqualified relatives and paying them more than others was a practice that Mr. Farrell had engaged in and which the Credit Union had taken steps to prevent.

7.      I complained of these matters to Marion Doucette and to the Board of Directors, and raised the issue with the Union agent. The Board appeared to do nothing.

8.      At this time, Marion Doucette began a course of retaliatory abuse and interference consisting of physical and verbal intimidation and disparagement, verbal abuse, displays of physical violence, and interference with my duties.

9.      I next discovered that Linda Doucette, who had a Credit Union account, was bouncing an excessive number of checks, and that Marion Doucette was violating practice and policy by approving their processing and payment. I reported and complained of this to Marion Doucette, who appeared to do nothing as the practice continued. As part of my duties, I continued to review the situation and when I reported the matter to Board member Brendan Hall and to the new Union steward, Linda had bounced almost 100 checks.

10.     At the same time I complained to the Board and the steward of the bounced checks, I also reported and complained of the ongoing retaliation by Marion Doucette.

11.     Defendant Donna Boggs, the Chairperson of the Board, directed me not to speak of these problems to any other Board members and to drop the matter because the Doucettes had not violated any Credit Union policy or practice. In fact, the "kiting" of checks was a prohibited practice that predated Mr. Farrell's fraud. In the process of investigating Mr. Farrell before reporting him, I researched and verified that this policy, and noted it in the books and records of the Credit Union.

12.      I insisted, both to Marion Doucette and to Donna Boggs, that the problem of Linda's fraud be dealt with or, since I was a Credit Union shareholder, I would raise the issue in a shareholder action.

13.     I later discovered a new fraud by Linda Doucette. In this case, she had manipulated the accounting system and overrode security procedures to clear her personal checks when she had insufficient funds. This was also reported to Marion Doucette, to the Board and to the Union steward but nothing appeared to be done and Marion's retaliation continued.

14.     I later discovered, and reported to Marion Doucette, yet another new fraud in which Linda manipulated ATM security procedures to wrongfully obtain funds.

15.     It was only after this latest instance of fraud was reported that the Credit Union initiated an investigation but apparently took no action to inform authorities.  Linda was allowed to resign with a fraudulent resignation letter that had no reference to her misconduct.

16.     Linda's Credit Union account was, pursuant to Board order, to be closed but Donna Boggs ordered me to keep the account open and clear checks even when there were insufficient funds. This violated not only the Board order but also policy and procedure and I reported this to the Union steward, who then notified the Board.

17.     From Defendants Francis, Boggs and Meghan I learned that the Board of Banking appeared to learn of Linda's manipulation of the ATM system from an unknown third party and the Credit Union was apparently "admonished" as a result but, although I had not been the individual who notified the Banking Commission, each of these Board members blamed me for doing so.

18.     As Linda Doucette's misconduct was continually discovered, investigated and reported over time by me, Marion Doucette's retaliation expanded and intensified.. There were weekly incidents of physical and verbal intimidation and disparagement, verbal abuse, displays of physical violence (e.g., throwing things), and interference with my duties. On occassion she ordered me not to review certain documents,

put security lockouts on information, all to prevent me reviewing files and information concerning Linda but kept me from doing my work as System Manager to review other accounts. She also refused to keep me informed as to financial and operational matters that were my responsibility, and would countermand my efforts to run various operations in the credit union. This all began after Linda started work–it had never occurred before then. No other apparent explanation for Marion's behavior existed since she and I had no problems outside of work.

19.     The retaliation of Marion Doucette, the failure of the Board to address or correct the situation which they had known about since early on (i.e, as a result of discussions and meetings), and retaliation by the Defendant Board members Francis, Boggs, Hall and Meghan resulted in a work situation and environment that became increasingly intolerable. I suffered a physical and emotional toll, including sleepless nights, stress, panic attacks, shortness of breath, spells of nausea, vomiting and crying, and general depression.  There were no other situations in my life to which these conditions and symptoms could be attributed, and all were intimately related to my attendance or anticipation of work at the Credit Union and under Marion Doucette.

20.     Eventually, my situation was so grave and debilitating that the Boston Globe's  nurse referred me to their Employee Assistance Program, where I was strenuously advised to leave work and take a leave of absence. The Credit Union itself had no medical office or EAP facility but the practice for at least 30 years had been that Credit Union employees could take advantage of and use these resources.

21.     After leaving work I received treatment for my condition and symptoms, which could not be attributed to any situation in my life other than work, and Iwas advised that Inot return until able.

22.     The Credit Union, the Union, and Defendants Doucette, Boggs, Hall and Meghan all knew of my leave and the reasons for it, and that I could not and would not return to work with Marion Doucette as my supervisor.

23.     The Credit Union apparently took no immediate action to remove or discipline Marion Doucette, although they knew that her conduct had been a problem in this and other circumstances.

24.     Marion Doucette continued in her position and I was eventually terminated when I denied a requested leave of absence and refused to return to work under Defendant Doucette's supervision.

25.     I filed an action in state court against the named individual Defendants while my Union grieved my situation.  That grievance covered a number of issues, including my termination and circumstances prior to my termination.

26.     The state court action was removed by Defendants to federal court.

27.     Then, against my wishes and instruction, the Union officially notified the Credit Union that it was abandoning the grievance on June 14, 2004. I did not learn that it had officially done so until later. It eventually became clear the Union was abandoning me because nothing more was being done.

Miscellaneous Matters

28.     The Credit Union was subject to both state and federal regulation, which we reviewed and were educated on from time to time. Both state and federal regulators and auditors would make appearances from time to time.  We were also NCUA insured.

29.     The Credit Union, and the Union, knew that my request for leave was made because Marion Doucette's constant retaliation, attacks and interference made work unbearable and made her ill. They knew this both directly from me when I reported and discussed issues with the Union agents and Francis, Boggs, Hall and Meghan, and in my request for leave of absence.

30.     As a former Union steward and signatory to the CBA, I am familiar with its contents and there is no requirement for "medical documentation" in order to obtain leave of absence under Article XV as there is for paid sick leave under Article XII.


Signed under penalty of perjury,


2/20/2007  __/s/ Paula O'Donnell _____

**EXHIBIT 3**

John B. Hall 10-27-2006
Paula O'Donnell v. Donna Boggs, et al.

```
 1              UNITED STATES DISTRICT COURT

 2            THE DISTRICT OF MASSACHUSETTS

 3    - - - - - - - - - - - - - - x

 4    PAULA O'DONNELL,                :

 5                    Plaintiff,      : Civil Action

 6              vs.                   : No. 05-11257-NG

 7    DONNA BOGGS, et al.,            :

 8                    Defendants.     :

 9    - - - - - - - - - - - - - - x

10              DEPOSITION OF JOHN B. HALL, a witness

11    called on behalf of the Plaintiff, taken pursuant

12    to the applicable provisions of the Federal Rules

13    of Civil Procedure, before Valerie R. Johnston,

14    Registered Professional Reporter and Notary Public

15    in and for the Commonwealth of Massachusetts, at

16    the Law Offices of Scott Adams, at 92 State

17    Street, 9th Floor, Boston, Massachusetts, on

18    Friday, October 27, 2006, commencing at 2:50 p.m.

19

20

21

22

23

24
```

                                                                1

John B. Hall 10-27-2006
Paula O'Donnell v. Donna Boggs, et al.

| 18 | 20 |
|---|---|
| 1  looking at the future of the credit union five or | 1      MR. ADAMS:  Yeah.  If he needs to do |
| 2  10 years down the road, and we thought it was time | 2  that to recognize them or familiarize himself with |
| 3  to get -- bring somebody from the outside with | 3  them. |
| 4  broader experience in the credit union industry. | 4      BY MR. ADAMS: |
| 5      Q.  What were the factors that contributed | 5      A.  (Witness reviews document)  Okay. |
| 6  to your decision that it was time for a change? | 6      Q.  Have you seen these documents before? |
| 7      A.  Credit union business was changing.  We | 7      A.  I don't remember if I have or not. |
| 8  were thinking of expanding.  We were looking to go | 8      Q.  Do the things that they cover sound |
| 9  into on-line banking, and we just thought that we | 9  familiar to you at all? |
| 10  needed someone with broader experience in that | 10      A.  They do. |
| 11  kind of -- in those areas. | 11      Q.  So, if -- if you didn't learn about |
| 12      Q.  Did the incidents with Linda Doucette | 12  those incidents from these documents, you may have |
| 13  enter at all into your consideration that it was | 13  learned it from some other source? |
| 14  time for a change? | 14      A.  Correct. |
| 15      A.  Yes. | 15      Q.  So, in November of 2002, at least at |
| 16      Q.  At this time, were you aware that there | 16  that time, there had already been some unease in |
| 17  were complaints about Marion Doucette's conduct in | 17  the credit union, correct? |
| 18  the office? | 18      A.  Correct. |
| 19      A.  Yes. | 19      Q.  Did employees come to you with |
| 20      Q.  Did those enter into your consideration | 20  particular complaints or come to you seeking |
| 21  that it was time for a change? | 21  resolution or come to you to describe things, |
| 22      A.  We knew that there was -- there was | 22  or -- or did you just learn of it secondhand from |
| 23  unease in the credit union, and we just felt that | 23  somebody else? |
| 24  it was -- it would help to bring in somebody from | 24      MR. WEINER:  Objection. |

| 19 | 21 |
|---|---|
| 1  the outside to help with just that unease. | 1      A.  Both, I believe.  I remember having |
| 2      Q.  And this unease, how did you learn about | 2  conversations -- a conversation with Paula and |
| 3  this? | 3  Kay, and I believe I heard it from other people as |
| 4      A.  I learned it from several sources. | 4  well. |
| 5      Q.  And what sources were they? | 5      Q.  And what do -- do you recall the nature |
| 6      A.  People from the -- some employees from | 6  of the allegations? |
| 7  the credit union complained.  Some credit union | 7      A.  The one conversation I remember having |
| 8  employees had told us that they were unhappy. | 8  with Paula and Kay was that they felt that Marion |
| 9      Q.  Do you remember who that was? | 9  wasn't really up to the job, and that's the only |
| 10      A.  I know Paula had voiced that concern, | 10  specific conversation with details -- details of |
| 11  along with Kay, Kay Toland. | 11  which I remember. |
| 12      Q.  Did Marion Doucette ever indicate that | 12      Q.  I show you exhibit marked 14.  Take a |
| 13  she was going to resist being replaced? | 13  look at those two and see if they jog your memory |
| 14      A.  No. | 14  at all. |
| 15      Q.  I ask you to look at Exhibit 13, if you | 15      A.  (Witness reviews documents)  Okay. |
| 16  could.  I'm just going to ask you to review those, | 16      Q.  Do you recall these e-mails at all? |
| 17  and tell me if you recognize the incidents that | 17      A.  Having read them, yes, I do. |
| 18  are described in them. | 18      Q.  Do you recall receiving this particular |
| 19      A.  (Witness reviews documents) | 19  e-mail and sending the other one back to Paula? |
| 20      MR. ADAMS:  Could I have this marked. | 20      A.  Do I remember specifically?  No, but |
| 21      (Document marked as Exhibit 14 | 21  I -- obviously -- |
| 22      for identification) | 22      MR. WEINER:  You've answered the |
| 23      MR. WEINER:  You want him to read all | 23  question. |
| 24  the documents, as he's doing? | 24      Q.  But you believe that the date and the |

6 (Pages 18 to 21)

John B. Hall 10-27-2006
Paula O'Donnell v. Donna Boggs, et al.

50

1  write off the cash shortage" is, I guess, how the
2  credit union decided to resolve the issue?
3          MR. WEINER:  Objection.
4      A.  It wasn't unusual to write off amounts
5  of money.
6      Q.  But that's, certainly, not a situation
7  that you would want to be in, correct?
8          MR. WEINER:  Objection.
9      A.  I saw it as a bookkeeping transaction.
10     Q.  But it also could represent the loss of
11  $10,000, couldn't it?
12     A.  Possibly, but primarily I saw it as a --
13  the credit union from time to time wrote off
14  balances, and it was the course of doing business.
15     Q.  So not a big problem?
16         MR. WEINER:  Objection.
17     A.  My feeling is that by writing things
18  off, you cannot say at some later time you could
19  you -- you could get it back.  I believe it's a --
20  it's a bookkeeping way of just getting things off
21  the book, whether temporarily or long term.
22     Q.  I show you Exhibit No. 7.  Just review
23  that.
24     A.  (Witness reviews document) Okay:

51

1      Q.  Are you familiar with this issue?
2      A.  Yes.
3      Q.  And how did it come to your attention?
4      A.  I can't recall.
5      Q.  Was it addressed at a board meeting?
6      A.  I believe so.
7      Q.  Was there a decision of the -- by the
8  Board to close Linda's account?
9      A.  Yes.
10     Q.  Was that taken as a Board action?
11     A.  I believe so.
12     Q.  And the reason for closing -- what was
13  the reason for closing Linda's account?
14     A.  Well, because of all the -- the stuff
15  that had been going on, bouncing checks and things
16  like that.
17     Q.  It was brought to your attention that,
18  after it was ordered closed, additional checks had
19  been put through her account, correct?
20     A.  Correct.
21         MR. WEINER:  Objection.
22     A.  Correct.
23     Q.  Do you know how you learned about that?
24         MR. WEINER:  Learned about what?

52

1      Q.  That additional checks had been put
2  through her account after it was supposedly
3  closed.
4      A.  I remember that coming up at a board
5  meeting.
6      Q.  And do you know how that was addressed?
7      A.  I believe we said, Let's get this
8  account closed, or something to that effect.
9  Excuse me.
10     Q.  Do you know anything about Donna Boggs'
11  involvement in this situation?
12     A.  Other than her being the chairman of the
13  board at that time, no.
14     Q.  Do you know that she directed credit
15  union employees to process the checks in any
16  event?
17     A.  No, I did not.
18     Q.  Do you know why she might have ordered
19  that to be done?
20     A.  No.
21     Q.  I show you Exhibit No. 10.
22     A.  (Witness reviews document) Okay.
23     Q.  Were you aware of problems involving
24  disputes between Marion and other employees as

53

1  early as May of 2002?
2      A.  I remember there being disputes, but the
3  date I can't recall.
4      Q.  Do you know anything about the issue of
5  one of Marion's daughters applying a loan, and two
6  of the loan officers refused to sign off on the
7  loan.  Do you recall that incident?
8      A.  I don't recall the specifics.  I
9  remember there being an issue with people signing
10  off on loans and who should and who shouldn't.  I
11  don't remember who that was for, but I remember
12  that being an issue.
13     Q.  Do you recall how that issue was
14  resolved?
15     A.  No.
16     Q.  Do you recall that Marion had written
17  two, I guess, disciplinarian letters or complaints
18  against loan officers for refusing to sign off on
19  the loan?
20     A.  I remember that, yes.
21     Q.  Did that come to the attention of the
22  Board?
23     A.  Yes.
24     Q.  Do you remember how it did?

14 (Pages 50 to 53)

John B. Hall 10-27-2006
Paula O'Donnell v. Donna Boggs, et al.

54

1    A.  I just remember it being discussed at a
2    board meeting.  How it -- how it got there I can't
3    recall.
4       Q.  Do you know whether or not the
5    application for the loan was -- whether it should
6    or should not have been approved?
7            MR. WEINER:  Objection.
8       A.  No.
9       Q.  Would it have -- was it appropriate for
10   Ms. Doucette to order the officers to approve the
11   loan that they felt they shouldn't have approved?
12           MR. WEINER:  Objection.
13      A.  If that's what happened, yes.
14      Q.  So it was appropriate for her to order
15   them to do it, even though they thought they
16   shouldn't?
17      A.  No.  That's not what I said.  I believe
18   I said, if that's what she did, that probably was
19   not appropriate.
20      Q.  Okay.  Sorry.  I misunderstood.
21          And there, certainly, would have been a
22   conflict of interest in that situation with Marion
23   Doucette; is that correct?
24           MR. WEINER:  Objection.

55

1          You may answer.
2       A.  It probably would not have been
3    appropriate.  I'm not sure what you mean by a
4    conflict of interest.
5       Q.  Well, on the one hand, she's a
6    representative of the credit union.
7       A.  Uh-huh.
8       Q.  She has a duty to the credit union.  On
9    the other hand, she has a personal relationship
10   with the person who's applying for the loan, and
11   there are different duties or different interests
12   in effect, and they can conflict.  They might not
13   be the same, correct?
14           MR. WEINER:  Objection.
15          You may answer.
16      Q.  Do you understand that principle --
17      A.  Yes.
18      Q.  -- that you may have different masters
19   to serve essentially?
20           MR. WEINER:  Objection.
21      A.  Yes.
22      Q.  And a serving one you may doing wrong to
23   the other, correct?
24           MR. WEINER:  Objection.

56

1       A.  In theory, yes.
2       Q.  Were you ever a union steward?
3       A.  No.
4       Q.  But by "conflict of interest"
5    essentially that's what I mean.  You've got two
6    separate masters or two separate interests, and
7    there may be a problem.  They both don't want to
8    go in the same direction.  So you've got a
9    conflict there.
10          There would have been a conflict for
11   Marion between what she should or might be able to
12   do as an officer of the credit union and what she
13   might be able or should be able to do for her
14   daughter, correct?
15           MR. WEINER:  Objection.
16      A.  It could be a conflict.
17      Q.  Okay.  Is there any policy at the credit
18   union for handling conflicts of interest like
19   that?
20      A.  Not that I know of.
21      Q.  Did you know at the time that Marion had
22   taken disciplinarian action against the two loan
23   officers?
24      A.  All I remember is the letters of

57

1    reprimand or letters were being put in their
2    files.
3       Q.  Do you think that -- would that -- do
4    you think that could be fairly classified as
5    retaliation?
6            MR. WEINER:  Objection.
7       A.  No.
8       Q.  Why not?
9       A.  Because there were times, I believe, if
10   I remember correctly, where Marion asked people to
11   do things, and they refused them, and I felt that,
12   as the CEO of a credit union, if -- and I don't
13   have exact recollections of what the situation
14   was, but if -- if people were asked to do
15   something, they should do it.
16      Q.  Even if it might be improper under
17   credit union policy procedure?
18           MR. WEINER:  Objection.
19      A.  If it was under those circumstances, no.
20      Q.  So, under circumstances where it might
21   be against credit union policy, should the
22   employee follow the manager's directions in any
23   event?
24      A.  No.

15 (Pages 54 to 57)

John B. Hall 10-27-2006
Paula O'Donnell v. Donna Boggs, et al.

---

**78**

1    Q.  On Exhibit No. 1, the bottom right-hand
2 page, there's a CU 184.  If you could go to that
3 page of Exhibit 1.  If you could just review that.
4    A.  (Witness reviews document) Okay.
5    Q.  This describes the -- Ms. O'Donnell's
6 request for leave of absence, one of the reasons
7 being improper, demeaning and abusive behavior by
8 Marion Doucette.  This was -- this came to the --
9 this letter came to the Board's attention I
10 presume sometime in January of 2004, and prior to
11 this date, you had actual knowledge that there
12 were complaints about improper, demeaning and
13 abusive behavior by Marion Doucette, correct?
14    A.  I had complaints from Paula.
15    Q.  But there were also some complaints from
16 other employees, correct?
17    A.  Not that I'm aware of.
18    Q.  Hadn't Kay complained about --
19    A.  Yes.
20    Q.  And I believe Christine Nickerson had
21 also made some complaints.
22    A.  Kay had, yes.
23    Q.  Linda also had made some complaints at
24 some point?

---

**79**

1    A.  Linda who?
2    Q.  Karen.  Sorry.  Do you know Karen?
3    A.  I do.  I don't recall Karen making
4 complaints.
5    Q.  You certainly were aware that there were
6 some complaints about Ms. Doucette.
7    A.  Yes.
8    Q.  And you were aware that Linda Doucette,
9 her daughter, had been engaged in improper conduct
10 involving, you know, accounts at the credit union?
11    A.  Correct.
12        MR. WEINER:  Objection.
13    A.  Correct.
14    Q.  You had actually asked for a
15 resignation?
16    A.  Correct.
17    Q.  And you knew that Marion Doucette was
18 upset about this, correct?
19    A.  Correct.
20    Q.  And you -- you knew that, in prior
21 instances when Marion had been upset about
22 something, she had actually taken action against
23 employees?  I'm referring to the refusal of the
24 loan officers to sign off on the loan, and that

---

**80**

1 she wrote letters of complaints against them,
2 correct?
3    A.  Correct.
4    Q.  So, at this point, you had knowledge
5 that at least there was a chance that there was a
6 real problem, correct?
7        MR. WEINER:  Objection.
8    A.  Correct.
9    Q.  That it wasn't a figment of Paula's
10 imagination?
11        MR. WEINER:  Objection.
12    A.  I was aware of the allegations.
13    Q.  Well, certainly, that -- that Ms.
14 Doucette's writeup of the two loan officers wasn't
15 a figment of Paula's imagination?
16    A.  Correct.
17    Q.  And Linda Doucette's conduct wasn't
18 imagined by Paula, was it?
19    A.  Correct.
20    Q.  Why did you believe that or -- what
21 about this information that you have at this time
22 is insufficient for you to reach a conclusion as
23 to Marion's conduct?  What else do you need to
24 know about Marion's conduct?

---

**81**

1        MR. WEINER:  Objection.
2    A.  At that time, there were -- I would
3 describe it as two factions in the credit union.
4 There were those employees who were very upset
5 with Marion and that didn't like -- basically
6 didn't like her, and there were other employees
7 that said that she was a good manager.
8    Q.  So you just didn't know what side to
9 take?
10        MR. WEINER:  Objection.
11    A.  I felt at the time that -- that's a fair
12 statement.
13    Q.  Okay.  Why did you take Marion's side in
14 the end?
15        MR. WEINER:  Objection.
16    A.  I believed her, along with what she said
17 and with what the other employees said.
18    Q.  Why did -- why is it that you believed
19 Marion?
20    A.  I just -- I believed her.
21    Q.  Was it based on any evidence that you
22 had?
23        MR. WEINER:  Objection.
24    A.  When you add it up, everything -- no.  I

---

21 (Pages 78 to 81)