UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PAULA O'DONNELL,
  Plaintiff,

        v.                                          CIVIL ACTION NO.
                                                    05-11257-NG
DONNA BOGGS, BRENDAN HALL,
WILLIAM FRANCIS, MARY LOU MEGAN,
MARIAN DOUCETTE and THE BOSTON
GLOBE EMPLOYEES CREDIT UNION,
  Defendants.

**REPORT AND RECOMMENDATION RE:**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**(DOCKET ENTRY # 28)**

**MEMORANDUM AND ORDER RE:**
**PLAINTIFF'S MOTION TO STRIKE PORTIONS OF DEFENDANTS' NON-**
**COMPLIANT AFFIDAVITS (DOCKET ENTRY # 32); DEFENDANTS' MOTION**
**TO STRIKE PLAINTIFF'S ADDITIONAL STATEMENTS AND**
**AFFIDAVIT OF PAULA O'DONNELL**
**(DOCKET ENTRY # 38)**

**March 13, 2008**

**BOWLER, U.S.M.J.**

     Pending before this court is a motion for summary judgment
(Docket Entry # 28) filed by defendants the Boston Globe
Employees Credit Union ("the Credit Union"), Donna Boggs
("Boggs"), Brendan Hall ("Hall"), William Francis ("Francis"),
Mary Lou Megan ("Megan") and Marian Doucette ("Doucette")
(collectively:  "defendants").  After conducting a hearing, this
court took the motion (Docket Entry # 28) under advisement.


                        PROCEDURAL HISTORY

     Plaintiff Paula O'Donnell ("plaintiff") initially filed this
action on April 28, 2005, in Massachusetts Superior Court

(Suffolk County).  The original complaint alleges two counts of tortious interference with contractual relations.  Count I alleges tortious interference with contractual relations against Doucette.  Count II alleges tortious interference with contractual relations against Boggs, Hall, Francis and Megan.[1]  In June 2005, the original defendants removed this action to federal court pursuant to 28 U.S.C. §§ 1331 and 1441 on the basis that section 301 of the Labor Management Relations Act ("section 301") preempts plaintiff's state law tort claims.  29 U.S.C. § 185(a).

On December 12, 2005, plaintiff filed a separate suit against the Credit Union, Civil Action No. 05-12490-NG, alleging substantially the same facts set forth in this action.  Asserting jurisdiction under section 301,[2] the one count breach of contract claim alleged that the Credit Union violated the collective bargaining agreement between the Office and Professional Employees International Union Local 6, AFL-CIO ("Union") and the Credit Union in connection with its treatment of plaintiff.

---

[1]  The original complaint named Boggs, Hall, Francis, Megan and Doucette as defendants ("the original defendants").

[2]  Section 301 provides that "suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce may be brought in any district court of the United States having jurisdiction of the parties."  Local 791, United Food & Commercial Workers Union v. Shaw's Supermarkets, Inc., 507 F.3d 43, 44 (1st Cir. 2007) (citing 29 U.S.C. § 185(a)).

On August 3, 2005, this court conducted an initial status conference in this action. At that time, plaintiff had been deposed and wished to conduct five additional depositions. The original defendants, however, urged that a decision on section 301 preemption take place prior to conducting additional discovery.

As a result, in the fall of 2005 the original defendants filed for summary judgment and this court heard oral argument. On April 21, 2006, this court issued an opinion recommending the allowance of the summary judgment motion on the basis that section 301 preempted the two counts of tortious interference with contractual relations.

This court did not, however, recommend dismissal. Rather, because plaintiff argued that this court should consider any well pleaded claims as a section 301 claim against the employer,[3] this

---

[3] Plaintiff acknowledged that if the original defendants were correct with respect to section 301 preemption then "this case would proceed in federal court as a § 301 claim." (Docket Entry # 8, p. 6). Plaintiff maintained that in lieu of dismissal on the basis of preemption, the original complaint was "still a viable, well-pleaded § 301 claim against the employer for breach of the collective bargaining agreement." Id. Elsewhere in the filing, plaintiff urged that the claims against the individual board members survive "in federal court as pendant to a § 301 action against the employer since Plaintiff has exhausted all of her collective bargaining remedies." (Docket Entry # 8, p. 1).

Although the argument was not a model of clarity, this court construed the argument as seeking leave to amend the complaint to set forth a section 301 claim against the employer if, to use plaintiff's words, this court determined that the original defendants were correct "in their contention that Plaintiff's claims require interpretation of the collective bargaining agreement." (Docket Entry # 8, pp. 1 & 5-6). Determining that

court allowed plaintiff leave to amend the complaint within 30
days.  Because of the nascent state of discovery, this court
deliberately left open the statute of limitations issue.[4]  (Docket
Entry # 11, pp. 19-20).

On May 8, 2006, the court in Civil Action No. 05-12490-NG
allowed the parties' joint motion to consolidate the case into
this earlier filed action.  Thus, the section 301 claim against
the Credit Union became consolidated into this action involving
the individual Credit Union board members.

On May 18, 2006, the court adopted the Report and
Recommendation denying summary judgment and allowing leave to

---

defendants were, indeed, correct, this court considered the
request to amend and allowed plaintiff leave "to amend the
complaint to set forth the essential elements of a section 301
claim as elaborated in Top-Flite."  (Docket Entry # 11, p. 19).
Cf. Allis-Chambers Corporation v. Lueck, 471 U.S. 202 (1985)
(dismissing as preempted under section 301 or for failure to
exhaust grievance procedures albeit not presented with motion for
leave to amend); Magerer v. John Sexton & Co., 912 F.2d 525 (1st
Cir. 1990) (not presented with motion for leave to amend).

[4]  In particular, this court stated that, "At this time, due
to the lack of evidence currently in the record concerning the
Union's possible breach of duty and viewing the facts in the
light most favorable to plaintiff, this court declines to find
plaintiff's filing time-barred."  (Docket Entry # 11, p. 20).  As
additionally stated, the allowance of leave to amend "does not
bar [the original] defendants from seeking summary judgment at a
later date albeit subject to any case management order."  (Docket
Entry # 11, p. 19).
The law of the case doctrine therefore does not foreclose
reconsideration of the limitations issue at this juncture where,
as here, "the initial ruling was made on an inadequate record"
and/or "it was designed to be preliminary."  Ellis v. United
States, 313 F.3d 636, 647 (1st Cir. 2002).  Defendants therefore
properly raise the limitations issue again in the present summary
judgment motion.

amend.  The court additionally ordered plaintiff to include all claims against all defendants in both cases in an amended complaint on or before June 1, 2006.[5]

On May 31, 2006, plaintiff filed the amended complaint.  She brings four causes of action.  The first two counts repeat, with slight alterations, the two tortious interference with contractual relations claims brought respectively against Doucette and against Boggs, Hall, Francis and Megan.[6]  The third count is a section 301 claim against the Credit Union identical to the single claim in Civil Action No. 05-12490-NG.  Count IV alleges that defendants, including the Credit Union, violated "the Massachusetts Civil Rights Act,"[7] the federal "Constitution or laws,"[8] and "federal and state public policy, including 31 U.S.C. § 5328."  (Docket Entry # 14, ¶ 51).  Although the amended complaint alleges that the union violated the duty of fair

---

[5]  As a means to avoid untimeliness under the statute of limitations, plaintiff raises an estoppel and law of the case argument based upon the above action and a temporal agreement by the parties and the court "to file a pleading providing for 'fusion' consolidation."  (Docket Entry # 33, pp. 19-20).

[6]  Defendants logically and correctly, for reasons stated infra, argue that the law of the case and section 301 preemption mandate dismissal of these counts.

[7]  Plaintiff provides no legal citation for the statute in the complaint or in the opposition to the summary judgment motion.

[8]  Neither the amended complaint nor the opposition identify the constitutional right at issue.  The opposition does point to a number of federal regulations.

5

representation (Docket Entry # 14, ¶ 46), the pleading does not name the union as a defendant.

## STANDARD OF REVIEW

The standard of review of a summary judgment motion is well established.  "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Barbour v. Dynamics Research Corporation, 63 F.3d 32, 36-37 (1st Cir. 1995) (quoting Rule 56, Fed. R. Civ. P.).

"The moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997) (citation, internal brackets and internal quotation marks omitted).  "After such a showing, the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor."  Hinchey v. Nynex Corporation, 144 F.3d 134, 140 (1st Cir. 1998) (citation and internal quotation marks omitted).  The nonmoving party who bears the ultimate burden of proof may not rest on allegations in his briefs, Borschow

Hospital & Medical Supplies, Inc. v. Cesar Castillo, Inc., 96
F.3d 10, 14 (1st Cir. 1996), "but must affirmatively point to
specific facts that demonstrate the existence of an authentic
dispute." McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315
(1st Cir. 1995). "'[E]vidence of the nonmovant is to be believed,
and all justifiable inferences are to be drawn in his favor.'"
Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990) (citation
omitted); accord Williams v. Raytheon Company, 220 F.3d 16, 19
(1st Cir. 2000).

    Before proceeding to summarize the record, this court turns
to the motions to strike.  Both parties move to strike various
portions of the summary judgment record.

    The Credit Union's motion seeks to strike the entire
affidavit of plaintiff (Docket Entry # 34, Ex. 2) and the
statement of additional facts (Docket Entry # 34) because they
fail to identify "any genuine issues to be tried."  (Docket Entry
# 38).  To the contrary, however, the affidavit contains relevant
facts about which plaintiff has personal knowledge.  For example,
plaintiff avers that she worked as a teller and relates the
treatment she received from Doucette.  The additional statements
do not serve as admissions of matters into evidence.  See LR.
56.1.  To the extent the additional statements cite to
plaintiff's affidavit, this court considers the averments if and
only if based upon personal knowledge.

    Plaintiff seeks to strike certain portions of the affidavit

7

authored by Harvey Weiner, Esq. ("Weiner") with respect to the
membership of Boggs, Hall, Francis, Doucette and Megan on the
Board of Directors of the Credit Union.  (Docket Entry # 32, ¶
III(B), ¶¶ 7-11).  The amended complaint, as pointed out by
defendants (Docket Entry # 37), includes these facts.  (Docket
Entry # 14, ¶¶ 9, 10, 20 & 26).  In fact, the affidavit authored
by plaintiff references a number of times "Board members Francis,
Boggs, Hall and Meghan[sic]." (Docket Entry # 34, Ex. 2, ¶ 19).

    Plaintiff also challenges the fact averred by Weiner that
the Credit Union is a state chartered financial institution.
(Docket Entry # 32, ¶ III(B), ¶ 6).  Again, however, the amended
complaint states that the Credit Union is a federally insured and
state chartered entity located in Boston (Docket Entry # 14, ¶¶ 3
& 7) and plaintiff elsewhere avers that the Credit Union is
federally and state regulated as well as insured.  (Docket Entry
# 34, Ex. 2, ¶ 28).

    "[C]lear and unambiguous" allegations from a complaint may
be used as judicial admissions in support of summary judgment.
Schott Motorcycle Supply, Inc. v. American Honda Motor Co., 976
F.2d 58, 61 (1st Cir. 1992) ("party's assertion of fact in a
pleading is a judicial admission by which it normally is bound
throughout the course of the proceeding" and finding "that
plaintiff should not be allowed to contradict its express factual
assertion in an attempt to avoid summary judgment"); see, e.g.,
Isquith v. Middle South Utilities, Inc., 847 F.2d 186, 195 (5th

Cir. 1988) (factual allegations of the complaint may be treated as admissions or stipulations for purposes of resolving a motion for summary judgment); <u>Aretakis v. General Signal, Inc.</u>, 2006 WL 1581781 at * 1 (D.Mass. June 7, 2006) ("consider[ing] as admitted the undisputed assertions in the Complaint . . . for purposes of [the summary judgment] motion").  Hence, it is not necessary to cull the foregoing facts from the foregoing portions of the Weiner affidavit that plaintiff moves to strike.

Plaintiff also seeks to strike exhibits one and two to the Weiner affidavit on the basis of inadequate authentication. These exhibits consist of the 2000 to 2002 version of the collective bargaining agreement ("the 2002 CBA") and the 2003 to 2005 version of the collective bargaining agreement ("the 2003 CBA").  Mary Mahoney ("Mahoney"), President and Business Manager of the Union, separately authenticates both the 2002 and the 2003 CBAs (Docket Entry # 31, ¶¶ 5 & 6) and attaches them to an affidavit.  Thus, this court does not rely on the copies attached to the Weiner affidavit (Docket Entry # 8, Ex. 1 & 2) thereby mooting the portion of the motion to strike that seeks to strike exhibits one and two to the Weiner affidavit (Docket Entry # 32, ¶ III(C), ¶¶ 2 & 3).

Plaintiff additionally moves to strike Weiner's affidavit because he is an attorney and because he lacks personal knowledge of facts pre-dating his involvement.  As to such facts, the affidavit amounts to hearsay, according to plaintiff.

9

Although attorney affidavits are "generally a poor source of evidence in making or opposing motions for summary judgment," they are acceptable when "a party uses them only as a vehicle through which to present admissible evidence relevant to the matter at hand." S.E.C. v. Competitive Technologies, Inc., 2006 WL 3346210 at * 1 (D.Conn. Nov. 6, 2006); accord U.S. v. Letscher, 83 F.Supp.2d 367, 381 (S.D.N.Y. 1999) (refusing to strike attorney's affidavit "submitted to put certain documents before the Court"). Like any other summary judgment affidavit, however, an attorney affidavit must comply with Rule 56(e), Fed. R. Civ. P.[9] James Wm. Moore Moore's Federal Practice § 56.14[1][c] (2007) ("Counsel may submit an affidavit in connection with a summary judgment motion so long as there is compliance with the general requirements applicable to all affidavit"); see, e.g., Letscher v. U.S., 2000 WL 1290864 at * 1 (S.D.N.Y. Sept. 11, 2000) (denying motion to strike attorney affidavit because it "complies with the general requirements applicable to attorney affidavits submitted in connection with a motion for summary judgment"). Attorney affidavits not made on personal knowledge are therefore subject to a motion to strike. See New York v. Solvent Chemical Co., Inc., 218 F.Supp.2d 319,

---

[9]  Rule 56(e) provides that, "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e).

331 (W.D.N.Y. 2002) ("if an attorney's affidavit contains factual assertions not made upon personal knowledge and/or legal arguments, such portions of the affidavit would not be considered by the court" on summary judgment).

Accordingly, the motion to strike is denied insofar as it seeks to strike Weiner's affidavit simply on the basis that he is an attorney.  To the extent the challenged averments evidence lack of personal knowledge and contain hearsay, they are addressed <u>infra</u> as are the remaining portions of both motions to strike.


## FACTUAL BACKGROUND

Plaintiff was an employee of the Credit Union from 1974 to February 13, 2004, when the Credit Union terminated her employment.  (Docket Entry # 7, Ex. 10; Docket Entry # 34, Ex. 2).  Initially, she worked as a teller until becoming head teller in 1998.  (Docket Entry # 34, Ex. 2).  As an employee of the Credit Union and a union member, plaintiff and her employment were governed by the 2002 and the 2003 CBAs between the Credit Union and the union during her employment.  (Docket Entry # 31, Ex. 1 & 2, Art. II; Docket Entry # 14, ¶ 6).

As head teller, plaintiff and another Credit Union employee began noticing that Gene Farrell ("Farrell"), then the Manager or Chief Executive Officer ("CEO"), was embezzling funds.  Plaintiff reported the fraud to the Credit Union's Board of Directors ("the

board"). The resulting investigation confirmed the misconduct and led to Farrell's termination, prosecution and sentencing. (Docket Entry # 34, Ex. 2).

Doucette replaced Farrell as Manager/CEO and plaintiff subsequently became Systems Manager. Meanwhile, Hall and two other board members expressed sympathy for Farrell and "began shunning" plaintiff. (Docket Entry # 34, Ex. 2).

In 2000, Doucette hired her daughter ("Doucette's daughter") as Bookkeeper, a position previously held by plaintiff. As Systems Manager, plaintiff's responsibilities included reviewing the bookkeeping work of Doucette's daughter. According to plaintiff, Doucette's daughter was less than proficient in balancing ledgers and distinguishing between debits and credits. (Docket Entry # 34, Ex. 2).

More notably, plaintiff, as Union Steward, learned that Doucette hired her daughter for more than the compensation level of the Bookkeeper set in Article IV of the 2002 CBA.[10] Plaintiff complained to the board which did nothing. As a result of reporting the matter to the board, however, Doucette began a series of retaliatory actions against plaintiff. In particular, Doucette began physically and verbally intimidating and

---

[10] Plaintiff's signature appears above the title of Shop Steward in the 2002 CBA. Hall and Doucette signed the document respectively as board member and Manager/CEO.

disparaging plaintiff.[11]   (Docket Entry # 34, Ex. 2).

Plaintiff next discovered that Doucette's daughter was bouncing an excessive number of personal checks drawn on her Credit Union account and that Doucette approved the processing and the payment of the checks in contravention of Credit Union policy and practice.  Doucette did nothing in response to plaintiff's complaint.  Plaintiff thereafter reported the matter to "Board member Hall" and the new Union Steward estimating the number of bounced checks as "almost 100."  Plaintiff also complained to the board about Doucette's ongoing retaliatory mistreatment.  Boggs, then Board Chairperson, directed plaintiff not to pursue the matter and that the conduct did not violate Credit Union policy.  Plaintiff disagreed and threatened to raise the issue in a shareholder action unless the matter was addressed.  (Docket Entry # 34, Ex. 2).

At an undetermined time thereafter, plaintiff uncovered another incident of misconduct on the part of Doucette's daughter.  Specifically, Doucette's daughter was obtaining funds by manipulating automatic teller machine ("ATM") security procedures.  This time when plaintiff reported the matter, the Credit Union initiated an internal investigation that led to the resignation of Doucette's daughter and a resignation letter that

---

[11]   Plaintiff identifies the physical intimidation or physical violence as "throwing things."  (Docket Entry # 34, Ex. 2).

13

failed to note the misconduct.  (Docket Entry # 34, Ex. 2).

The board additionally ordered the Credit Union account of Doucette's daughter closed.  Boggs, however, ordered plaintiff to keep the account open and clear checks notwithstanding insufficient funds.  The manipulation of the ATM system on the part of Doucette's daughter resulted in an admonishment to the Credit Union by the state banking commission ("the commission"). Although plaintiff did not report the matter to the commission, Board members Boggs, Megan and Francis all blamed plaintiff for notifying the commission.  (Docket Entry # 34, Ex. 2).

Doucette's retaliatory treatment of plaintiff increased over time.  Plaintiff began experiencing weekly incidents of verbal and physical intimidation.  A number of times, Doucette prevented plaintiff from accessing information about her daughter and performing the duties of Systems Manager by instituting security lockouts.  (Docket Entry # 34, Ex. 2).

The retaliation on the part of both Doucette and the board resulted in an increasingly difficult work environment for plaintiff.  She began suffering "sleepless nights, stress, panic attacks, shortness of breath, spells of nausea, vomiting and crying and general depression."  (Docket Entry # 34, Ex. 2).  A Boston Globe nurse referred plaintiff to the newspapers' employee assistance program where plaintiff was advised to take a leave of absence.  (Docket Entry # 34, Ex. 2).

On August 15, 2003, therefore, plaintiff took a leave of

14

absence from her employment at the Credit Union.  After leaving
the Credit Union, plaintiff received treatment for her condition
from an unknown source.  (Docket Entry # 34, Ex. 2).  In a letter
dated October 27, 2003, plaintiff's counsel noted that
plaintiff's "treating specialists" recommended that she not
return to work.[12]  Plaintiff's counsel further advised the board
about plaintiff's involuntary absence from work and her
"inability to return to such a dysfunctional environment"
particularly in light of the Credit Union's continued employment
of Doucette.  (Docket Entry # 7, Ex. 3).[13]

     In November 2003, the Credit Union retained Weiner relative
to plaintiff's complaints and her failure to return to work.  In
a November 19, 2003 letter to plaintiff's counsel, Weiner asked
plaintiff's counsel for a copy of a doctor's report if one
existed.[14]  Instead of responding to the request, plaintiff's
counsel posited the idea of the board giving plaintiff a leave of

_____

     [12]  In conjunction with the letter, plaintiff's counsel did
not identify the specialists or submit any medical records
documenting the treatment.

     [13]  Plaintiff, curiously, moves to strike this letter on the
basis of authenticity.  (Docket Entry # 32, ¶ III(D)).  Inasmuch
as Weiner is not the author or recipient, this court will exclude
it.  Hence, this court does not rely on the letter in issuing the
recommendation.  In any event, consideration of the letter would
not alter the recommendation to allow summary judgment.

     [14]  The letter, in pertinent part, reads, "It is my
understanding that there is a doctor's report, and I would
appreciate it if you would send me a copy thereof."  (Docket
Entry # 7, Ex. 4).

absence until she could decide how to proceed.

Weiner responded by letter that the board could only approve an unpaid leave of absence "upon good and sufficient reason <u>upon written request</u>." (Docket Entry # 7, Ex. 6).  The January 13, 2004 letter additionally informed plaintiff's counsel that an unpaid leave of absence could not "be longer than 6 months retroactive to December 1, 2003, which was the next working day after your client's official last day of work."[15]  (Docket Entry #

---

[15]  It is undisputed that plaintiff left work on August 15, 2003.  The 2003 CBA provided a full time Credit Union employee such as plaintiff with 15 days of paid sick leave per year.  As an employee with more than 18 years of service, plaintiff was also entitled to five weeks vacation under the 2003 CBA.  (Docket Entry # 31, Ex. 2, ¶ IX).  With the exception of one week of carry over time used by April of the year following the accrual, the 2003 CBA did not allow employees to carry over unused vacation time into the following year.  The 2002 CBA, however, allowed employees to bank "excess vacation days as of January 1, 2000" but, beginning January 1, 2000, an employee had to use accrued vacation time by December 31st of each year.  Assuming in plaintiff's favor that she had not taken vacation days or paid sick days since January 1, 2003, she would have accrued 25 days of vacation time and 15 days of sick time for the 2003 calendar year.  Accrued vacation and sick time for 2003 thus expired in the middle of October 2003.  Plaintiff would therefore need banked vacation time of approximately 14 weeks or 72 days to remain out on vacation time into early February 2004.
    Although this court strikes the averment that plaintiff's sick leave and vacation time expired on November 30, 2003 (Docket Entry # 7, ¶ 22, 2nd sent.), plaintiff did not object to the assertion in the February 2, 2004 letter that her vacation time expired more than eight weeks earlier, i.e., in late November 2003.  Similarly, the correspondence with Weiner on the part of plaintiff's counsel contains absolutely no argument that plaintiff had any accrued, unused vacation or paid sick leave that would last until the February 2004 termination.  Facing termination from a job she held for almost 30 years, the only reasonable inference is that plaintiff did not have the banked additional vacation days that would allow her not to report to work from late November to early February.

7, Ex. 6).  The letter warned that unless Weiner heard from plaintiff's counsel within ten days "with a formal and documented written request for an unpaid leave of absence based on good and sufficient reason," the Credit Union would take action and consider the possibility of terminating plaintiff's employment for "gross neglect of duty."  (Docket Entry # 7, Ex. 6).

Article XV of the 2003 CBA addresses the circumstances under which a Credit Union employee such as plaintiff would be allowed an unpaid leave of absence.  Consistent with the language of Weiner's letter, it reads as follows:

> **LEAVES OF ABSENCES**
>
> Unpaid Leaves of Absence-Unpaid leaves of absence *for good and sufficient reason* in the opinion of the Employer shall be granted *upon written request* and *shall not be unreasonably denied*.  Such leaves shall not be construed to be a termination of employment so long as they last no more than 6 months and the employee does not become employed by another employer.

(Docket Entry # 31, Ex. 2) (emphasis added).  While Article XV did not expressly require a doctor's report for an unpaid leave of absence, Article XII expressly required "certification from a hospital or medical doctor" in order for an employee to obtain a prescribed limit of 15 days of paid sick leave in addition to the

---

With the Credit Union having identified an absence of evidence to support the existence of unused time, it was incumbent upon plaintiff to proffer specific facts to the contrary.  In any event, the issue is not whether she had the accrued time but whether the Credit Union's decision to terminate her breached the 2003 CBA and whether the union's review of the decision was arbitrary, discriminatory or in bad faith.

17

annually allotted 15 days paid sick leave.[16]   (Docket Entry # 31, Ex. 2).

The January 13, 2004 letter also reiterated the need for a doctor's report if plaintiff wanted to take an unpaid leave of absence for a medical reason.  Weiner thus advised plaintiff's counsel that, "If [the leave of absence] is for a medical reason, you should submit a current doctor's report explaining the medical reason and why it prevents your client from working." (Docket Entry # 7, Ex. 6).

Plaintiff's counsel responded with a written request for an unpaid leave of absence within the time frame set in the foregoing letter.[17]   He did not, however, provide a doctor's

---

[16]   In pertinent part, Article XII provides as follows:

**<u>PAID SICK LEAVE</u>**

Full time employees shall not forfeit any part of his or her pay because of an absence on account of an illness for up to fifteen (15) working days in any calendar year, or up to an additional fifteen (15) working days in any calendar year during the period of major illness . . ..

In order to qualify for a major illness allowance, an employee must be absent for five (5) working days or more or more and produce certification from a hospital or medical doctor that the illness caused the employee to be absent for this period.

(Docket Entry # 31, Ex. 2).


[17]   The January 19, 2004 letter does not assert that plaintiff had sufficient sick leave or vacation time to remain out of work.

18

report.  Instead, he outlined the following as providing the
necessary good and sufficient reason:

> (i) improper, demeaning and abusive behavior by a Credit
> Union manager and supervisor, Marion Doucette, (ii) the
> failure of the Credit Union Board and management to take
> steps to rectify the wrongful conduct of Ms. Doucette, and
> (iii) the physical emotional injury that has been caused by
> the wrongful conduct of Ms. Doucette.  On this last issue,
> my client has sought and has been treated for both physical
> and emotional injuries that she has suffered both in
> consequence of Ms. Doucette's behavior and the failure of
> the Board to rectify that situation.

(Docket Entry # 7, Ex. 7).

In the foregoing January 19, 2004 letter, plaintiff's
counsel urged the board to actively investigate Doucette's
conduct.  The letter additionally informed the board that
plaintiff was not the only employee that suffered as a result of
Doucette's misconduct.  In response, the board did not take any
immediate investigatory action.[18]

The board proceeded to review the written request for an
unpaid leave of absence.  Doucette did not participate in the
meeting or vote on the request.  After considering the request,

---

[18]  Eventually and at an undetermined time, the board
replaced Doucette with an individual outside the Credit Union.
Hall explained that the board wanted to replace Doucette to help
with the unease caused by Doucette's conduct.  He acknowledged
that plaintiff was not the only Credit Union employee complaining
about Doucette's misconduct and that the board was aware of the
additional checks issued after it ordered the closure of the
account of Doucette's daughter.  At the time the board made the
decision to terminate plaintiff, Hall noted that there were "two
factions in the [C]redit [U]nion."  (Docket Entry # 34, Ex. 3).
There were employees upset with Doucette and others who voiced
the belief that "she was a good manager."  (Docket Entry # 34,
Ex. 3).

the board unanimously denied plaintiff an unpaid leave of
absence.  (Docket Entry # 7, Ex. 8).

On behalf of the Credit Union and the board, Weiner
responded to plaintiff's counsel by letter dated February 2,
2004.  Communicating the above information, Weiner informed
plaintiff's counsel that the board "concluded that there was not
good and sufficient reason to grant [the] request."  (Docket
Entry # 7, Ex. 8).  The letter defended the board's conclusion
that Doucette did not act in an improper manner.  It also
referenced the review of the Credit Union's activities by outside
investigators.[19]  (Docket Entry # 7, Ex. 8).

In the February 2, 2004 letter, the board proffered the
following reasons for the conclusion that plaintiff had not
supplied the necessary "good and sufficient reason."  First, the
board explained that Doucette had not acted in an improper or
demeaning manner toward plaintiff which, even if true, would not
supply an adequate reason to allow the request or warrant a leave
of absence.  Second, the board noted the continued absence of the
previously requested doctor's report.  With respect to the latter
reason, the letter notes that plaintiff has not "provided any
medical basis, as requested in [the] January 13, 2004 letter to
you, for a leave of absence.  You have provided no doctor's
report explaining your client's medical condition and why this

_____

[19]  As previously indicated, plaintiff avers that the state
banking commission admonished the Credit Union.

prevents her from working at the Credit Union at this time."
(Docket Entry # 7, Ex. 8).

In a prelude to the termination, the letter required
plaintiff to either resign or return to work by February 17,
2004, and give written notice to the board of her intention to
either resign or return to work no later than February 12, 2004.
As set forth in the letter, the board reached the decision
because plaintiff had engaged in a "*gross neglect of duty* [by]
not showing up for work for over eight weeks after all her
vacation time and sick leave had expired without a word from
her." (Docket Entry # 7, Ex. 8) (emphasis added).

The 2003 CBA contains provisions governing termination and
disciplinary action in Article XX.  The Article provides as
follows:

> **DISCHARGE and DISCIPLINE ACTION**
>
> The Union and Employer agree that discipline, including
> discharge, must be administered fairly and consistently *for
> just cause*.  Discipline will typically be progressive.  The
> offense facts and circumstances will determine the level of
> discipline to be applied regardless of prior discipline, if
> any . . ..
>
> B.   Written Warnings may be issued regarding an aspect of
>      an employee's performance which could lead to
>      suspension or dismissal, if uncorrected.
>
>      A minimum of two written warnings will be issued before
>      an employee may be dismissed *except in cases of gross
>      neglect of duty or serious misconduct*.

(Docket Entry # 31, Ex. 2) (emphasis added).  Article VI of the
2003 CBA addresses management's rights and authority.  Similarly

noted therein is the provision that, "All disciplinary action undertaken by Management . . . shall be *for just cause* and will be conducted in private and in such manner as to create respect for authority and preserve individual dignity." (Docket Entry # 31, Ex. 2) (emphasis added).

The February 2, 2004 letter concluded that the board was offering plaintiff "this final chance" to return to work. (Docket Entry # 7, Ex. 8). If, however, she did not return to work on February 17, 2004, she would be "terminated from employment at the Credit Union" even though she had "almost thirty years of employment" and a "prior good employment history." (Docket Entry # 7, Ex. 8).

By letter dated February 11, 2004, plaintiff's counsel informed Weiner that plaintiff would not be returning to work. Noting that the Credit Union had not rectified Doucette's abusive behavior, the letter explained that plaintiff was "medically unable to return to work and has been advised not to do so in view of the certainty of continued harassment."[20] The letter did not provide a doctor's report to substantiate the statements. It also did not challenge or disagree with the assertion that plaintiff had not appeared for work for more than eight weeks

---

[20] As indicated in the February 2, 2004 letter, Doucette was still working at the Credit Union at that time. Plaintiff's February 11, 2004 letter made it apparent to the Credit Union that plaintiff would not return to work unless and until Doucette's "abusive behavior" ended. (Docket Entry # 7, Ex. 9).

after the expiration of her vacation and sick leave.[21]  (Docket Entry # 7, Ex. 9).

On February 13, 2004, Weiner responded by letter advising plaintiff's counsel of the board's decision to terminate plaintiff's employment "for gross neglect of duty, as indicated in [the] February 2, 2004 letter."  (Docket Entry # 31, Ex. 11). The February 13, 2004 letter additionally noted the continued failure to provide a doctor's report to support plaintiff's alleged inability to return to work for medical reasons.  (Docket Entry # 31, Ex. 11).

On February 25, 2004, the union filed a grievance on plaintiff's behalf seeking "reinstatement and to be made whole." (Docket Entry # 31, Ex. 3).  The grievance alleged that the Credit Union "unjustly terminated" plaintiff in violation of "Articles I, VI, XV, XX and any other relevant articles of the collective bargaining agreement." (Docket Entry # 31, Ex. 3; Docket Entry ## 30 & 34, ¶¶ 23).  The grievance covered not only the termination but also the circumstances involving Doucette that took place prior to the discharge.  (Docket Entry # 34, Ex. 2, ¶ 25).[22]

---

[21]  In the motion to strike, plaintiff maintains that Weiner does not have the necessary personal knowledge to aver that her vacation time expired on or about November 30, 2003.  (Docket Entry # 32, ¶ III(B)).  This court agrees.

[22]  The Credit Union moves to strike this paragraph of plaintiff's affidavit as well as the corresponding statement in plaintiff's additional statement of material fact (Docket Entry #

The 2003 CBA sets out a multi-step grievance process including requiring a meeting between the union and the Credit Union President and Treasurer. (Docket Entry # 31, Ex. 2, Art. XIX(3)). A grievance hearing or meeting took place on March 19, 2004. On March 25, 2004, the Credit Union reaffirmed the denial of the grievance.

The 2003 CBA provides that if the matter is not settled in the foregoing manner, "the Union shall submit the grievance to arbitration . . . within ten (10) working days of the President's decision." If "there is [sic] no specific provisions set forth in [the 2003 CBA], expectations to the above time limits shall be only upon the mutual agreement of the Parties." (Docket Entry # 31, Ex. 2, Art. XIX).

By letter dated September 7, 2004, the union wrote to Peter M. Vinci ("Vinci"), Manager/CEO of the Credit Union, stating that the union was submitting the claim to arbitration. In a September 13, 2004 reply letter, Vinci maintained that the submission was untimely because the parties did not have a written mutual agreement to extend the ten day time period in Article XIX. According to Vinci, the union thereby forfeited any right to arbitration. (Docket Entry # 31, Ex. 7). After additional correspondence, however, the Credit Union agreed to arbitrate the matter and designated an arbitrator in a letter

---

34, ¶ 2-25). The motion as it pertains to this paragraph is denied.

dated September 21, 2004.[23]   (Docket Entry # 31, Ex. 9; Docket
Entry ## 30 & 34, ¶¶ 25).

    In a letter dated June 6, 2005, the union's General Counsel
wrote to plaintiff's counsel.   The letter states that, "the Union
has decided not to proceed to arbitration" on behalf of plaintiff
and that the union was "withdrawing the case."   (Docket Entry #
31, Ex. 10).[24]   The union's letterhead appears on the letter and
on the accompanying facsimile transmission cover sheet dated June
6, 2005.[25]   Plaintiff's counsel cannot recall a telephone
conversation between himself and the union's General Counsel on
June 6, 2005.   (Docket Entry # 34, Ex. 1).

    The June 6, 2005 letter additionally explains the reason why

---

[23]   Although agreeing to arbitration, the Credit Union
reserved its position that the time for arbitration had expired.

[24]   The parties strongly dispute whether plaintiff had
notice of the union's decision not to pursue arbitration.   This
court considers the letter not for the truth of the matter
asserted but for the purpose of showing notice or knowledge on
the part of plaintiff's counsel of the union's decision not to
proceed with arbitration.   See fn. 26.

[25]   Plaintiff does not challenge Mahoney's averment that,
"Local 6 withdrew the grievance just prior to the scheduled
arbitration.   The grievance was formally withdrawn on June 6,
2005."   (Docket Entry # 32, ¶ IV(A), "Mahoney may testify as to
the Union's withdrawal of the grievance").   Plaintiff does move
to strike (Docket Entry # 32, ¶ IV(A); accord Docket Entry # 34,
¶ 26) the averment on the part of Mahoney that the foregoing "was
communicated to Plaintiff's counsel by telephone on June 6, 2005
and by facsimile letter received by Plaintiff's counsel on June
6, 2005."   (Docket Entry # 31, ¶ 15).   The basis for moving to
strike the averment by Mahoney is because it consists of
"[s]peculation, [o]pinion and [c]ontradiction."   (Docket Entry #
32, ¶ IV(A).   The next footnote addresses the argument.

the union withdrew the grievance from arbitration.  Although
cryptic, the letter states that, "Our investigation and analysis
of the matter has led us to believe that the grievance is not
sufficiently meritorious to win at arbitration."[26]  (Docket Entry

_____

        [26]  The letter, which contains factual information, is not
speculative.  The contradiction, discussed infra, between the
letter and Weiner's September 2005 affidavit (Docket Entry # 7, ¶
31) does not mandate the letter's exclusion from the summary
judgment record.  This court considers the letter for the purpose
of evaluating the basis for the union's decision and both the
letter and the facsimile cover sheet for the purpose of showing
notice.  As such, the letter and facsimile cover sheet are not
hearsay.  See Wolff v. Brown, 128 F.3d 682, 685 (8th Cir. 1997)
(internal document relied on by employer in employment
discrimination case in making employment decision admissible to
explain employer's conduct as opposed for truth of matter
asserted); Morgan v. Massachusetts General Hospital, 901 F.2d
186, 190 (1st Cir. 1990) (agreeing with "district court's
decision permitting the introduction of the documents, on the
ground that they were admitted, not for proving the truth of
their contents, but to prove what steps were taken to investigate
the circumstances surrounding the assault"); Crimm v. Missouri
Pacific Railroad Company, 750 F.2d 703, 709 (8th Cir. 1984)
(employment discrimination case where notes and report offered
"to disclose information that [employer] had relied on in making
its decision" were not offered for truth of matter asserted and
thus were not hearsay); see also United States v. Goodchild, 25
F.3d 55, 61 (1st Cir. 1994) (lower court properly admitted
statement "not for the truth of the statement made, but to
explain what Discover did in response to it").  As aptly
explained by the First Circuit in Morgan, an affidavit, which
recited statements made to supervisor during his investigation of
a fight, "was not offered to prove any particular version of the
fight" but "was offered only to demonstrate what steps [the
supervisor] took, and what information he received during his
investigation."  Morgan v. Massachusetts General Hospital, 901
F.2d at 191.  As evidenced by the facsimile cover sheet, which
plaintiff does not challenge on the basis of authenticity,
plaintiff's counsel received the letter on June 6, 2005.
        The motion to strike, however, is allowed insofar as it
seeks to strike Mahoney's averment that the withdrawal of the
grievance "was communicated to Plaintiff's counsel by telephone
on June 6, 2005 and by facsimile letter received by Plaintiff's
counsel on June 6, 2005."  (Docket Entry # 31, ¶ 15).  There is

# 31, Ex. 10).

The union withdrew the grievance because it believed that the grievance did not have sufficient merit to win at arbitration.  (Docket Entry # 31, ¶ 16).[27]  The union ascertained that the Credit Union had "good and sufficient reason" under Article XV of the 2003 CBA for denying the grievance because plaintiff did not supply the requested medical documentation to support an unpaid leave of absence.  (Docket Entry # 31, ¶ 17).[28]

---

no indication that Mahoney has personal knowledge of the stated fact, to wit, that the withdrawal was communicated to plaintiff's counsel by telephone and by facsimile on June 6, 2005.

[27]  Plaintiff moves to strike this averment by Mahoney on the basis of hearsay and "[i]nadmissible representation[]." (Docket Entry # 32, ¶IV(C)).  Because this court considers the averment for purposes of showing why the union withdrew from arbitration, see fn. 26, it is neither hearsay nor an inadmissable representation.  Alternatively, as President of the union, Mahoney has sufficient personal knowledge to testify about the union's reasoning.

[28]  Plaintiff also moves to strike this averment by Mahoney on the basis of hearsay and "[i]nadmissible representation[]." (Docket Entry # 32, ¶ IV(C)).  Again, the averment by Mahoney is not considered for the truth of the matter asserted but, instead, for the information the union relied upon "in making its decision."  See United States v. Goodchild, 25 F.3d at 61. Footnote 26 sets forth the relevant case law.  Alternatively, as President of the union, Mahoney has sufficient personal knowledge to testify about the union's reasoning.
    The same reasoning applies to plaintiff's motion to strike paragraph 20 of the Mahoney affidavit on the basis of hearsay and "[i]nadmissible [r]epresentation."  (Docket Entry # 32, ¶ IV(C)). Finding it not necessary to consider the first sentence, this court turns to the second sentence which reads, "As a result, the Union determined that it would not be possible for the arbitrator to remedy the grievance."  (Docket Entry # 31, ¶ 20).  This court considers the statement solely for purposes of ascertaining the reason for the union's decision as opposed to the averred fact that the arbitrator would not be able to remedy the grievance.

27

The union decided that plaintiff's refusal to return to work made it impossible for the arbitrator to remedy the grievance. (Docket Entry # 31, ¶ 21, 3rd sent.).[29]

As set forth in a September 14, 2005 letter, the union based its decision not to pursue the grievance because it "ultimately concluded . . . that the employer was within its rights to deny the unpaid leave of absence, and that she was required to obey and grieve." (Docket Entry # 31, Ex. 13). In addition, the union learned from plaintiff "that she did not want to return to work for the credit union." (Docket Entry # 31, ¶ 23 & Ex. 13). Plaintiff avers that she could not return to work with Doucette as her supervisor. The union also rejected the grievance because it learned that plaintiff rejected a monetary settlement and wanted the union to pursue the case to arbitration even though "she did not want to return to work." (Docket Entry # 31, Ex. 13).

Plaintiff was not the only employee to complain about Doucette's conduct. (Docket Entry # 34, Ex. 2, ¶ 22).[30] The

---

[29] As to paragraph 21 of the Mahoney affidavit (Docket Entry # 31, ¶ 21), which plaintiff also moves to strike (Docket Entry # 32, ¶ IV(C)), it does not constitute evidence of a settlement for the purpose of proving liability or the amount of a claim under Rule 408, F.R.E. This court considers the averment for the non-hearsay purpose of the reason for the union's decision to terminate the grievance.

[29] See fn. 28.

[30] The Credit Union moves to strike this paragraph of plaintiff's affidavit as well as the corresponding statement of

board was aware of other complaints and that additional checks were processed after it ordered the closure of Doucette's daughter's account.  On the other hand, Hall was aware that other employees thought that Doucette was a good manager.[31]  (Docket Entry # 34, Ex. 3).  The board also knew that plaintiff's return to work was unlikely if Doucette remained her supervisor.

On August 22, 2005, plaintiff filed a charge against the union with the National Labor Relations Board ("NLRB").  She complained that the union discriminated against her "based on her mental handicap" thereby violating "its duty of fair representation when it chose not to take her grievance to arbitration."  (Docket Entry # 31, Ex. 12).[32]  The union explained

---

additional material fact (Docket Entry # 34, ¶¶ 2-22).  The motion as it pertains to this paragraph is denied.

[31]  This court considers the above statement for the purpose of showing a board member's knowledge as opposed to for the truth of the matter asserted, i.e., that Doucette was a good manager.

[32]  Plaintiff moves to strike these and other NLRB documents and the accompanying paragraphs of Mahoney's affidavit (Docket Entry # 31, ¶¶ 22-25) due to lack of foundation, hearsay, "conclusory statements" and "[i]mpermissible [o]pinion."  (Docket Entry # 32).  Mahoney attests that the NLRB documents are true and accurate copies.  The Credit Union asserts that the documents are either business records under Rule 803(6), F.R.E. ("Rule 803(6)"), or public records under Rule 803(8), F.R.E. ("Rule 803(8)").  Mahoney's averment that the records are "true and accurate" copies provides little, if any, information that the documents were made and kept in the ordinary course of a regularly conducted business activity.  Wallace Motor Sales, Inc. v. American Motors Sales Corp., 780 F.2d 1049, 1060 (1st Cir. 1985).  Rule 803(8), however, excludes from the reach of the hearsay rule certain public records.  The factual findings made by the NLRB's Regional Director in the October 19, 2005 letter (Docket Entry # 31, Ex. 14, 3rd ¶) are therefore not hearsay.

the basis for its decision in the September 14, 2005 letter summarized above.

On October 19, 2005, the union's Regional Director dismissed the charge after conducting an investigation. She found that there was "no evidence that the Union processed [the] grievance in an unfair or discriminatory manner." (Docket Entry # 31, Ex. 14). In particular, "The Union's decision not to take the case to arbitration was made after analysis of the grievance showed that it would not be possible for an arbitrator to remedy the grievance, thereby rendering the arbitration process moot." (Docket Entry # 31, Ex. 14). On December 9, 2005, the NLRB's Director of Office of Appeals denied plaintiff's appeal "substantially for the reasons set forth" in the October 19, 2005 letter. The NLRB's Director of Office of Appeals additionally noted that plaintiff "either refused reinstatement or a negotiated settlement." (Docket Entry # 31, Ex. 15).

## DISCUSSION

### I.  Counts I and II

------

See F.R.E. 803(8)(C). Although plaintiff challenges the foundation of the document as well as the other NLRB documents, Mahoney's averment is sufficient. See F.R.E. 901(b)(1) & 902(7); F.D.I.C. v. Houde, 90 F.3d 600, 606 (1st Cir. 1996) ("public records are admissible as an exception to the hearsay rule and generally self-authenticating"); U.S. v. Doyle, 130 F.3d 523, 546 (2nd Cir. 1997) ("803(8) does not require any foundational testimony"). The motion to strike insofar as it seeks to strike the NLRB letters (Docket Entry # 32, ¶ IV(B)) is denied.

Plaintiff brings this case against her employer, the Credit Union, and certain individual former or current Credit Union board members. Defendants initially move for summary judgment on counts one and two which consist of the state law claims for tortious interference with contractual relations brought against Doucette, Boggs, Hall, Francis and Megan. Defendants maintain that the law of the case doctrine precludes this court from revisiting the prior recommendation finding the claims preempted. Defendants additionally posit that section 301 preempts the claims. Defendants are correct.

As pointed out in the prior Report and Recommendation:

> Federal courts in this circuit uniformly hold claims of intentional interference with contractual relations to be preempted by section 301. <u>Magerer v. John Sexton & Co.</u>, 912 F.2d 525 (1st Cir. 1990); <u>Troconis v. Lucent Technologies, Inc.</u>, 160 F.Supp.2d 150, 153-154 (D.Mass. 2001); <u>Acciavatti v. Professional Services Group, Inc. et al.</u>, 982 F.Supp. 69, 76 (D.Mass. 1997).

(Docket Entry # 11). The prior Report and Recommendation exhaustively and correctly discussed the preemption of counts one and two of the original complaint against the same defendants, Doucette, Boggs, Hall, Francis and Megan, for the same causes of action, tortious interference with contractual relations.

Plaintiff's attempt to distinguish the original from the amended claims on the basis of malice and the various forms of the tort under state law is not convincing. Plaintiff raised and this court rejected the same argument regarding malice as an element of the tort in the brief opposing the initial summary

judgment motion.  (Docket Entry # 8; "[f]ederal preemption of tortious interference claim did not exist where underlying tort liability was based on actual malice").  The "new" claims of tortious interference with contractual relations, just like the old claims of tortious interference with contractual relations, depend upon the interpretation of the 2002 and 2003 CBAs.  In light of the law set forth in the prior opinion (Docket Entry # 11, pp. 7-14), the "new" claims are preempted.

In the alternative, the law of the case doctrine dictates that this court adhere to the prior recommendation.  In addition to promoting efficiency, the doctrine, which has two branches, "affords litigants a high degree of certainty" and "furthers the abiding interest shared by both litigants and the public in finality and repose."  Ellis v. United States, 313 F.3d 636, 647 (1st Cir. 2002).  This case implicates the more flexible branch applicable to reconsidering orders entered in the same proceeding at the same district court level.  Id. at 646.  Under this branch, "a legal decision made at one stage of a civil or criminal case constitutes the law of the case throughout the pendency of the litigation."  Id.

Reconsideration is nevertheless permissible "if the initial ruling was made on an inadequate record or was designed to be preliminary or tentative[,] . . . . there has been a material change in controlling law [or] . . . . newly discovered evidence bears on the question.  Id. at 647-648.  It is also "not improper

32

for a court to depart from a prior holding if convinced that it is clearly erroneous and would work a manifest injustice." Flibotte v. Pennsylvania Truck Lines, Inc., 131 F.3d 21, 25 (1st Cir. 1997); accord Ellis v. United States, 313 F.3d at 648 (avoidance of manifest injustice may provide basis for reconsideration). Nonetheless, "neither doubt about the correctness" of the first ruling "nor a belief that the litigant may be able to make a more convincing argument the second time around will suffice to justify reconsideration." Ellis v. United States, 313 F.3d at 648. (further noting that "there is a meaningful difference between an arguably erroneous ruling . . . and an unreasonable ruling that paves the way for a manifestly unjust result").

There is no basis for finding a manifest injustice. To the contrary, the prior recommendation with respect to section 301 preemption was entirely correct. The state law regarding a tortious interference with contractual relations claim has not materially changed since the time of the April 2006 recommendation. Although the ruling on the limitations issue was decidedly preliminary and made upon an inadequate record,[33] the ruling on the preemption issue was not. Counts I and II are therefore subject to dismissal.

II.  Count III

A.  Statute of Limitations

----

[33]  See fn. 4.

33

In Count III, plaintiff brings a section 301 claim against her employer as opposed to her employer and the union. She complains about her treatment on the job at the hands of Doucette and her discharge. The amended complaint further alleges that the union breached the duty of fair representation.

The prior opinion recommended giving plaintiff leave to amend the complaint to allege a hybrid section 301 and breach of fair representation claim. Here, as in Cabarga Cruz v. Fundacion Educativa Ana G. Mendez, Inc., 822 F.2d 188 (1st Cir. 1987), the choice of whether to apply the state statute of limitations or the federal limitations statute in section 10(b) of the National Labor Relations Act ("NLRA"), "turns upon whether" the claim in Count III "is a hybrid claim or a straight breach of contract claim" grounded upon the Credit Union's breach of the 2003 CBA. Id. at 191. In fairness to plaintiff, this court examines whether the claim in Count III is in reality a hybrid section 301 claim or a straight forward breach of contract claim because the issue bears upon what statute of limitations to apply.

In hybrid section 301 and breach of fair representation cases, the six month statute of limitations borrowed from section 10(b) of the National Labor Relations Act ("NLRA") applies. See DelCostello v. International Brotherhood of Teamsters, 462 U.S. 151, 163 (1983) (applying six month period in section 10(b) of

NLRA to hybrid section 301 and fair representation suit).[34] Hybrid cases require the plaintiff employee to establish both a breach of the collective bargaining agreement on the part of the employer and a breach of the duty of fair representation on the part of the union.[35] <u>Mulvihill v. Top-Flite Golf Co.</u>, 335 F.3d 15, 18-20 (1st Cir. 2003).  Moreover, "The six month statute of limitations applies to such a hybrid suit whether the employee sues the employer, the union, or both." <u>Cabarga Cruz v. Fundacion Educativa Ana G. Mendez, Inc.</u>, 822 F.2d at 191.  Consequently, the fact that the plaintiff does not name the union as a party to a section 301 suit does not foreclose the existence of a hybrid action.  <u>See</u>, <u>e.g.</u>, <u>Cabarga Cruz v. Fundacion Educativa Ana G. Mendez</u>, 822 F.2d at 191 (employee sued employer under section 301 for breach of collective bargaining agreement yet court nonetheless examined whether suit was hybrid or straight breach of

---

[34] "<u>DelCostello</u> involved . . . a hybrid § 301/fair representation suit." <u>Communications Workers of America, AFL-CIO v. Western Electric Co., Inc.</u>, 860 F.2d 1137, 1139 (1st Cir. 1988).

[35] As reasoned by the Court in <u>DelCostello</u>, an employee can sue the employer for breach of a CBA but must exhaust a CBA's grievance or arbitration remedies. <u>DelCostello v. International Brotherhood of Teamsters</u>, 462 U.S. at 163-164.  Where a union breaches the duty of fair representation with respect to the grievance process an injustice arises because the employee will be bound by the result and "[s]ubject to very limited judicial review." <u>Id</u>. at 164.  To avoid that injustice, the employee can bring a hybrid action "notwithstanding the outcome or finality of the grievance or arbitration proceeding." <u>Id</u>.  To succeed, however, the employee must establish the union's breach of the duty of fair representation in addition to establishing the breach of the CBA by the employer. <u>Id</u>.

contract); <u>Molina v. Sea-Land Services, Inc.</u>, 2 F.Supp.2d 180
(D.P.R. 1997) (applying six month federal period to claim for sick
leave and overtime pay brought by employee against employer
interpreted as section 301 hybrid claim even though union did not
join); <u>see</u> <u>generally</u> <u>McKee v. Transco Products, Inc.</u>, 874 F.2d 83,
86 (2nd Cir. 1989) (reasoning that a plaintiff "cannot circumvent
the six-month limitations period for hybrid actions by choosing to
sue only [her] employer").

        In contrast, when the case presents a "straight breach of
contract" claim against the employer as opposed to a hybrid claim
implicating a union's breach of the duty of representation, a
"state statute of limitations remains applicable." <u>Farr v. H.K.
Porter Co., Inc.</u>, 727 F.2d 502, 505 (11th Cir. 1984); <u>see</u> <u>Auto
Workers v. Hoosier Cardinal Corporation</u>, 383 U.S. 696, 704-705
(1966) ("presented with "straightforward suit under § 301 . . .
for breach of a collective bargaining agreement by an employer,"
Court borrowed the breach of contract limitations period
applicable under state law).  Thus, the First Circuit in <u>Cabarga
Cruz</u> "applied Puerto Rico's contract statute of limitations to a
wrongful discharge suit that was 'in essence, purely a breach of
contract action against the employer'" grounded upon a CBA.
<u>Communications Workers of America, AFL-CIO v. Western Elec. Co.,
Inc.</u>, 860 F.2d 1137, 1139 (1st Cir. 1988) (quoting <u>Cabarga Cruz v.
Fundacion Educativa Ana G. Mendez</u>, 822 F.2d 188 (1st Cir. 1987)).

        This case alleges a breach of the terms of the 2003 CBA

applicable to unpaid leaves of absence as well as the existence of
"just cause" and "gross neglect of duty" for the discharge.  It
also presents a situation in which the union abandoned the
grievance mid-stream which, plaintiff submits, amounts to a breach
of the duty of fair representation.  The section 301 claim in
Count III thus appears to mandate the application of the six month
limitation period in section 10(b).  The more detailed analysis
below confirms this conclusion.

   Section 301 does not contain a statute of limitations.
Posadas de Puerto Rico Associates, Inc. v. Asociacion de Empleados
de Casino de Puerto Rico, 873 F.2d 479, 480 (1st Cir. 1989)
("section 301 extends federal jurisdiction to '[s]uits for
violation of contracts between an employer and a labor
organization,' 29 U.S.C. § 185(a), but establishes no time
limits").  Where, as here, "Congress fails to furnish an express
statute of limitations in connection with enforcement of a federal
right, a court's initial look must be to state law to isolate the
most closely analogous rule of timeliness."  Posadas de Puerto
Rico Associates, Inc. v. Asociacion de Empleados de Casino de
Puerto Rico, 873 F.2d at 480.  State law may nonetheless give way
to a "significantly more appropriate federal law" that "provides a
closer analogy than available state statutes" when "the federal
policies at stake and the practicalities of litigation make that
rule a significantly more appropriate vehicle for interstitial
lawmaking."  Rossiter v. Potter, 357 F.3d 26, 33 (1st Cir. 2004).

In other words, a borrowed federal limitations period "may be applied if two preconditions are met:  (1) some federal rule of limitations provides a closer analogy than state alternatives, and (2) the federal policies at stake and the practicalities of litigation render the federal rule more suitable."  <u>Posadas de Puerto Rico Associates, Inc. v. Asociacion de Empleados de Casino de Puerto Rico</u>, 873 F.2d at 480-481 (internal quotation marks omitted).

Examining state law, this court finds that the applicable six year limitation period for breach of contract claims, Mass. Gen. L. ch. 260, § 2, presents the "most closely analogous rule of timeliness" under state law.  <u>See</u> <u>Posadas de Puerto Rico Associates, Inc. v. Asociacion de Empleados de Casino de Puerto Rico</u>, 873 F.2d at 480.

Turning to the federal policies at stake, "federal labor law is chiefly designed to promote the formation of the collective agreement and the private settlement of disputes under it." <u>Mulvihill v. Top-Flite Golf Co.</u>, 335 F.3d at 24 (citing <u>Auto Workers v. Hoosier Cardinal Corporation</u>, 383 U.S. at 702).  This case implicates those strong federal goals inasmuch as the parties formed a collective bargaining agreement and Article XIX of the 2003 CBA provides the means to accomplish an efficient and private settlement through the internal grievance process leading to arbitration.  <u>See</u> <u>United Auto. Aerospace and Agriculture Implement Workers of America, Local 33, v. R.E. Dietz Co.</u>, 996 F.2d 592, 596

38

(2nd Cir. 1993) ("mere presence of an arbitration clause is
sufficient to render an employee's claim a hybrid claim and
subject it to the six-month statute of limitations" inasmuch as
"the federal policy in favor of private dispute resolution is so
strong").  Arbitration clauses in a collective bargaining
agreement such as the one in the 2003 CBA "implicate important
federal interests not present in ordinary *ex contractu*
litigation."[36]  Communications Workers of America, AFL-CIO v.
Western Elec. Co., Inc., 860 F.2d at 1141.

In addition, the "relatively rapid final resolution of labor
disputes favored by federal law" is not favored by applying the
significantly longer period under the state statute.  DelCostello
v. International Brotherhood of Teamsters, 462 U.S. at 168.  "A
long period of controversy and conflict can be a serious burden,
both for the grievant and for the management, and can poison the
relationship between the contracting parties that the contract was

---

[36]  Thus, in a suit brought by the union to compel
arbitration, the First Circuit in Western applied the six month
federal statute.  In so doing, the court distinguished a section
301 suit by a union to compel arbitration from a garden variety
breach of contract suit in part because of the important federal
interests presented by "arbitration clauses in collective
bargaining agreements."  Communications Workers of America,
AFL-CIO v. Western Elec. Co., Inc., 860 F.2d at 1141.  In
comparison, the First Circuit in Posadas applied a 30 day
limitation period under local Puerto Rico law in a suit to vacate
an arbitration award.  Posadas de Puerto Rico Associates, Inc. v.
Asociacion de Empleados de Casino de Puerto Rico, 873 F.2d at
486; accord Local 2322, International Brothers of Electrical
Workers v. Verizon New England, Inc., 464 F.3d 93 (1st Cir. 2006)
(applying Massachusetts 30 day period to union suit under section
301 to compel arbitration by employer).

designed to establish and preserve." Communications Workers of
America v. Western Electric Co., 860 F.2d at 1142; accord
Montplaisir v. Leighton, 875 F.2d 1, 6 (1st Cir. 1989) (quoting
Western). Accordingly, although ordinarily the analogous state
law statute of limitations applies, the six month period in
section 10(b) of the NLRA "clearly provides a closer analogy than"
the six year period under state law and "the federal policies at
stake" as well as "the practicalities of litigation make" the
federal "rule a significantly more appropriate vehicle."[37]
DelCostello v. International Brotherhood of Teamsters, 462 U.S. at
171-172.

     The issue therefore devolves into when the six month period
began to run. "A cause of action in a hybrid Section 301/fair
representation suit arises when the plaintiff knows, or reasonably
should know, of the acts constituting the union's alleged
wrongdoing." Arriaga-Zayas v. International Ladies' Garment
Workers' Union-Puerto Rico Council, 835 F.2d 11, 13 (1st Cir.
1987); accord Adorno v. Crowley Towing And Transportation Co., 443
F.3d 122, 126 (1st Cir. 2006) (in hybrid actions, "the clock
started ticking when the prospective plaintiffs knew, or
reasonably should have known, of the alleged wrongful acts"). The
limitations clock is therefore "activated by knowledge, actual or

---

     [37] Alternatively, rather than urge the application of the
state statute, plaintiff only posits that the present suit is
timely under the six month federal period. Hence, plaintiff
waived the argument.

constructive," and "begins to tick when the challenged conduct comes to light."  Arriaga-Zayas v. International Ladies' Garment Workers' Union-Puerto Rico Council, 835 F.2d at 13.

The wrongful conduct consists of the Credit Union's discharge of plaintiff in February 2004, including its failure to address and investigate Doucette's maltreatment of plaintiff, and the union's subsequent failure "to take Plaintiff's grievance to arbitration" in June 2005.  (Docket Entry # 14, ¶ 46).  Turning to the later of the two events, see Hazard v. Southern Union Co., 275 F.Supp.2d 214, 223 (D.R.I. 2003) (section 301 hybrid "cause of action accrues when plaintiff received 'notice of the alleged union wrongdoing'"), a failure to process a grievance or processing a grievance in a perfunctory way may constitute a breach of the duty of fair representation.  Scaglione v. Communications Workers of America, Local 1395, 586 F.Supp. 1018, 1021 (D.Mass. 1983) (citing Vaca v. Sipes, 386 U.S. 171 (1967)).  An egregious disregard of a union member's rights by a failure to conduct at least a minimal investigation of the merits of the grievance may also breach the duty of fair representation.  Emmanuel v. International Brothers of Teamsters, Local Union No. 25, 426 F.3d 416, 420 (1st Cir. 2005).  Thus, "[o]nce plaintiff had notice that the [union's] processing of [her] grievance was perfunctory or done in bad faith, the necessary elements of [her] cause of action had accrued."  Scaglione v. Communications Workers of America, Local 1395, 586 F.Supp. at 1021.

41

This took place no later than the unequivocal letter of June
6, 2005, wherein the union's General Counsel informed plaintiff's
counsel that, "[T]he Union has decided not to proceed to
arbitration in Ms. O'Donnell's grievance."  (Docket Entry # 31,
Ex. 10).  The knowledge imbued upon plaintiff's counsel is imputed
to plaintiff, his client.  <u>Levin v. Berley</u>, 728 F.2d 551, 553 (1st
Cir. 1984) (noting, in context of statute of limitations argument,
that "Levin denies knowledge of this letter, but a client is
charged with the knowledge of his attorney"); <u>One-O-Six Realty,
Inc. v. Quinn</u>, 845 N.E.2d 1182, 1186 (Mass.App.Ct. 2006) ("[t]he
defendant's attorney's knowledge of the Tremblay deed and its
contents is properly imputed to the defendant").

Plaintiff's attempt to create a genuine issue of material
fact regarding notice is misguided.  The fact that plaintiff's
counsel does not remember a telephone conversation on June 6, 2005
(Docket Entry # 34, Ex. 1) does not detract from knowledge, actual
or constructive, of the letter and the union's unequivocal
decision not to pursue the grievance communicated in that June 6,
2004 letter.  Plaintiff's averment that she did not learn that the
union "had officially" abandoned the grievance until after the
June 14, 2004 letter gives rise, at best, to a genuine issue about
actual knowledge on her part alone.  Plaintiff's counsel had
actual or constructive knowledge and plaintiff at a minimum had
constructive knowledge by virtue of the facsimile transmission of

42

the letter on June 6, 2004.[38]

The existence of the June 14, 2005 letter to Weiner confirming the union's withdrawal and the earlier averment on the part of Weiner based upon that letter that the "grievance was formally withdrawn on June 14, 2005" does not create a genuine issue of material fact. The record is undisputed that on June 6, 2005, the union's General Counsel made a facsimile transmission to plaintiff's counsel communicating, in no uncertain terms, that the union was withdrawing from the case and would not proceed to arbitration. See Tuggle v. Greektown Casino, LLC, 2007 WL 674462 at * 4-5 (E.D.Mich. Feb. 28, 2007) (limitations period for hybrid section 301 claim began when union sent the plaintiff letter "explicitly stat[ing] 'please be advised that the [u]nion will not pursue the grievance further through the grievance procedure'"); see also Cook v. Columbian Chems. Co., 997 F.2d 1239, 1241 (8th Cir. 1993) (agreeing with trial court that six month limitation period in hybrid section 301 claim "began to run on October 27, 1991 (the last day the union could have sought arbitration) rather than February 1, 1992 (the day appellant received written notice that the time to request arbitration had expired)").

Plaintiff's argument based upon this court's prior recommendation is also misplaced. The April 21, 2006 finding by

---

[38] Put another way, there is an absence of evidence to refute the cover sheet dating the facsimile transmission on June 6, 2005.

this court in the context of making a recommendation on the prior summary judgment motion explicitly referenced the June 14, 2005 letter for the statement that, "On June 14, 2005, however, the union withdrew its grievance prior to arbitration." (Docket Entry # 11, p. 6).[39]  Furthermore, with respect to the statute of limitations issue, this court carefully and expressly did not make a definitive ruling because of "the lack of evidence in the record."[40]  (Docket Entry # 11, p. 20).  Whereas the prior summary judgment record did not contain the June 6, 2005 letter, the current record does.

The six month limitation period thus began to run on June 6, 2005, expiring just prior to the December 12, 2005 filing of the section 301 suit against the Credit Union, Civil Action No. 05-12490-NG.

Plaintiff next maintains that the "claims relate back to the original state court filing date" in light of the May 8, 2006 consolidation of Civil Action No. 05-12490-NG into this action or the subsequent May 31, 2006 amendment of the original complaint to include the section 301 claim against the Credit Union.  The Credit Union, in turn, argues that the relation provisions of Rule 15(c), Fed. R. Civ. P. ("Rule 15(c)"), do not apply.  (Docket

---

[39]  The opinion cites to a paragraph of the Credit Union's LR. 54.1 statement of material facts which, in turn, cites to the applicable paragraph of the Weiner affidavit and the June 14, 2005 letter attached thereto.

[40]  See fn. 4.

Entry # 36).

Turning to the first argument, consolidation does not
transform an untimely action into a timely action.

> A consolidation order does not merge two cases into a single
> claim, nor does it change or expand the parties' rights.  It
> does not expand this Court's jurisdiction, which is narrowly
> defined and statutorily prescribed by Congress.  Our
> jurisdiction cannot be enlarged by rule. Consolidation with
> the timely-filed SoCal case simply cannot rescue Mr. Parsky.

<u>Southern California Federal Savings & Loan Association v. U.S.</u>, 51
Fed.Cl. 676, 678 (Fed.Cl. 2002).

This court declines to address the second argument because
the absence of a genuine issue of material fact regarding the
union's breach of the duty of fair representation and the Credit
Union's breach of the CBAs foreclose relief even if the action
related back to the filing date of the original complaint or the
filing date of Civil Action 05-12490-NG.

This court notes, however, that additional facts occurring
after the April 2005 filing of the original complaint, i.e., the
union's refusal to proceed with the grievance, implicate the
strictures of Rule 15(d), Fed. R. Civ. P. ("Rule 15(d)").[41]  Rule
15(d) "permits supplemental amendments to cover events happening
after suit and it follows, of course, that persons participating
in these new events may be added if necessary."  <u>Griffin v. County
School Bd. of Prince Edward County</u>, 377 U.S. 218, 227 (1964).

---

[41]  Neither party cited or presented an argument relative to
Rule 15(d).

Although a number of courts apply the strictures of Rule 15(c),

Fed. R. Civ. P.,[42] to supplemental pleadings, <u>see</u> <u>FDIC v.</u>

<u>Knostman</u>, 966 F.2d 1133, 1138-1139 (7th Cir. 1992); <u>Davis v. Piper</u>

<u>Aircraft Corporation</u>, 615 F.2d 606, 609 n. 3 (4th Cir. 1980);

<u>Bromley v. Michigan Education Association</u>, 178 F.R.D. 148, 155-156

(E.D.Mich. 1998), the position of the First Circuit is unclear.

<u>See</u> <u>U.S. v. Russell</u>, 241 F.2d 879, 882 (1st Cir. 1957).

B.  <u>Merits of Section 301 Claim</u>

      The Credit Union argues that the hybrid section 301 claim

fails on the merits.  Specifically, it contends that plaintiff

cannot establish that the union breached its duty of fair

representation or that the Credit Union breached the 2003 CBA.

      In order to succeed in a hybrid section 301 claim, the

---

      [42]  Rule 15(c) customarily contains three requirements:  (1)
the claim "in the amended pleading arose out of the conduct,
transaction, or occurrence set forth or attempted to be set forth
in the original pleading," Fed. R. Civ. P. 15(c)(2); (2) the
newly named defendant "received such notice" within the time
period provided in Rule 4(m), Fed. R. Civ. P., such that the
defendant will not be prejudiced in maintaining a defense on the
merits; and (3) that "but for a mistake concerning the identity
of the proper party," the plaintiff would have named the
defendant in the original complaint.  Rule 15(c), Fed. R. Civ.
P.; <u>see</u> <u>Leonard v. Parry</u>, 219 F.3d 25, 28 (1st Cir. 2000);
<u>Figueroa v. J.C. Penney Puerto Rico, Inc.</u>, 2007 WL 4327929 at * 4
(D.P.R. Nov. 5, 2007); <u>cf.</u> <u>Young v. Lepone</u>, 305 F.3d 1, 14 (1st
Cir. 2002) (setting forth slightly different requirements in
context of changing identity of a plaintiff); <u>see generally</u>
<u>Wilson v. U.S. Government</u>, 23 F.3d 559, 563 (1st Cir. 1994)
(finding no mistake inasmuch as "Wilson fully intended to sue
GEGS, he did so, and GEGS turned out to be the wrong party");
<u>Torres Ramirez v. Bermudez Garcia</u>, 898 F.2d 224, 229 (1st Cir.
1990) (refusing to allow relation back).

plaintiff "must prove an erroneous discharge, a breach of duty on the union's part, and a causal nexus between the two, that is, that [the] union's breach of its duty 'seriously undermine[d] the integrity of the [grievance] process.'" Mulvihill v. Top-Flite Golf Co., 335 F.3d at 20; see DelCostello v. International Brothers of Teamsters, 462 U.S. at 165 (the plaintiff "must not only show that [her] discharge was contrary to the contract but must also carry the burden of demonstrating a breach of duty by the Union") (internal quotation marks omitted); Miller v. U.S. Postal Service, 985 F.2d 9, 11 (1st Cir. 1993) ("[t]o succeed in a hybrid breach of contract and fair representation claim, appellant must establish not only that the employer breached the contract, but also that his union breached its duty of fair representation").  The plaintiff must therefore show not only that "the discharge was improper but also that the union's breach undermined the grievance process and thereby contributed to the error." Mulvihill v. Top-Flite Golf Co., 335 F.3d at 20.  The burden is "heavy" inasmuch as the plaintiff cannot relitigate the issue by proffering new evidence.  Id.

    1.  Union's Breach of Duty of Fair Representation

    The union has a statutory duty to represent all employees in the enforcement of a collective bargaining agreement. Vaca v. Sipes, 386 U.S. 171, 177 (1967).  It has a duty to avoid arbitrary conduct and to exercise its discretion in good faith.  Id. at 910.  In light of this latitude, a union's breach of the statutory duty

47

of fair representation takes place "only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." Id. at 190.  Arbitrary conduct on the part of the union occurs "only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." Air Line Pilots Association International v. O'Neill, 499 U.S. 65, 67 (1991); accord Miller v. U.S. Postal Service, 985 F.2d at 12 (same; quoting Air Line Pilots, 499 U.S. at 67).

A union may breach that duty not only by a refusal to pursue a grievance entirely but also by "a wrongful failure to pursue a grievance to arbitration." DelCostello v. International Brotherhood of Teamsters, 462 U.S. at 166 n. 16.  A failure to conduct at least a minimal investigation into the merits of the grievance may likewise constitute a breach of the duty of fair representation. Emmanuel v. International Broth. of Teamsters, Local Union No. 25, 426 F.3d at 420 ("'egregious disregard for union members' rights constitutes a breach of the union's duty' to investigate"); see Robert A. Gorman & Matthew W. Finkin, Basic Text on Labor Law:  Unionization and Collective Bargaining, § 30.8, pp. 1003-1004 (2nd ed. 2004) (discussing investigation of grievance as breach of duty of fair representation).  This case falls under the latter two categories.

It is also true that a union's negligence does not suffice to

avoid summary judgment.  See Miller v. U.S. Postal Service, 985
F.2d at 12.  Thus, "a union's mere negligence or erroneous
judgment will not constitute a breach of the duty of fair
representation."  Id. (citing Condon v. United Steelworkers Local
2944, 683 F.2d 590, 594 (1st Cir. 1982)).  Moreover, a union
receives "great latitude in determining the merits of an
employee's grievance and the level of effort it will expend to
pursue it."  Miller v. U.S. Postal Service, 985 F.2d at 12.

     Viewing the facts under this legal framework, the union did
not act in an arbitrary, discriminatory or bad faith manner in
refusing to pursue the matter to arbitration.  The Credit Union
made the reasonable finding that there was a "gross neglect of
duty" because of plaintiff's failure to provide medical
documentation for the extended leave of absence.  The 2003 CBA
requires "good and sufficient reason" for extended unpaid leaves
of absence.  The Credit Union's attorney asked plaintiff a number
of times for medical documentation in the form of a doctor's
report to support the request.  (Docket Entry # 7, Ex. 4, 6 & 8).
When plaintiff failed to produce the requested material, the
Credit Union found "just cause" for a termination and the
existence of a "gross neglect of duty" because of her extended
absence of more than eight weeks.

     Given such facts, the union's investigation need only be
minimal.  See Robert A. Gorman and Matthew W. Finkin Basic Text on
Labor Law:  Unionization and Collective Bargaining § 30.8 ("as one

court put it, '[a] union is required to investigate an employee's
grievance only to the extent necessary to uncover the merits of
the employee's case'"). Moroever, the board's decision to require
such documentation, the reason for the concomitant finding of a
gross neglect of duty is readily apparent in the correspondence
between the Credit Union's counsel and plaintiff's counsel.

During the union's investigation, the union discovered that
plaintiff did not want to return to work even though the grievance
sought the remedy of "Reinstatement and to be made whole."
(Docket Entry # 31, Ex. 3). The union additionally found out
that, after rejecting a monetary settlement, plaintiff insisted
that the union pursue the case to arbitration even though she did
not want to return to work.[43]

The union did not ignore plaintiff's assertion of misconduct
on the part of Doucette as constituting "good and sufficient
reason." To the contrary, the union acknowledged the assertion in
the September 14, 2005 letter explaining the basis for the union's
decision. (Docket Entry # 31, Ex. 13, 2nd ¶). It was not an
"egregious disregard" of plaintiff's right to ultimately conclude
that the Credit Union was within its rights. See generally
Emmanuel v. International Broth. of Teamsters, Local Union No. 25,
426 F.3d at 420. The investigation uncovered the failure to

_____

[43] Again, this court considers the foregoing for the
purpose of determining the union's reasons for terminating the
grievance as opposed to for the truth of the matter asserted.

50

provide medical documentation as well as the refusal to return to work.  Hence, even if Doucette acted improperly, the union's investigation was adequate under the circumstances for it to conclude that the existence of a breach of the 2003 CBA on the part of the Credit Union "was unlikely."  (Docket Entry # 31, Ex. 13).

Likewise, the union did not ignore a meritorious grievance or process it in a perfunctory manner.  See generally Vaca v. Sipes, 386 U.S. at 191 ("a union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion").[44]  The grievance had little merit.  At best, the union may not have examined, to the degree desired by plaintiff, the Credit Union's decision not to further investigate Doucette's conduct at and around the time of plaintiff's termination.  Plaintiff's failure to raise a genuine issue of fact as to the union's breach of the duty of fair representation warrants issuance of summary judgment in the Credit Union's favor.

2.  Credit Union's Breach

In order to succeed with the hybrid section 301 claim, the plaintiff must establish that the Credit Union's "discharge was improper."  Mulvihill v. Top-Flite Golf Co., 335 F.3d at 20.  In seeking summary judgment, the Credit Union points to the absence

_____

[44]  The Court in Vaca also recognized that an employee does not have an "absolute right to have his grievance taken to arbitration."  Id.

51

of evidence to support this essential element of an erroneous discharge.

Plaintiff maintains that the Credit Union "unreasonably denied" the unpaid leave of absence in violation of Article XV. (Docket Entry # 33, 2nd ¶).  She submits that she provided "good and sufficient reason" for an unpaid leave of absence in light of the intimidating, weekly physical and verbal abuse she experienced from Doucette.  Plaintiff additionally asserts that the Credit Union never addressed the improper treatment by Doucette prior to the February 2004 termination.

Article XV of the 2003 CBA requires "good and sufficient reason in the opinion of" the Credit Union to allow an unpaid leave of absence as well as a "written request."  (Docket Entry # 31, Ex. 2).  It also mandates that unpaid leaves "shall not be unreasonably denied."

By the time plaintiff submitted the written request, she had exhausted her 2003 sick leave and vacation time as well as her banked vacation time.  She had taken an extended leave of absence without approval and without sufficient sick leave or vacation time.  The Credit Union therefore required a doctor's report to support the request and gave her the opportunity to provide it.  Although plaintiff complained about emotional and physical abuse on the part of Doucette, plaintiff did not support the mental and physical injuries with the requested medical documentation.  The request for a doctor's report was not unreasonable.  To the

52

contrary, it was a prudent response to an already lengthy leave of absence. Accordingly, the Credit Union did not "unreasonably den[y]" the leave within the meaning of Article XV given the undisputed absence of the requested doctor's report. Hence, the Credit Union did not breach the terms of Article XV.

The 2003 CBA additionally allows the Credit Union to terminate an employee for "just cause." Requiring a doctor's report to support a continued unpaid leave of absence for alleged emotional and physical abuse is reasonable. Not appearing for work for an extended period of time justifies a finding that there was a "gross neglect of duty." The Credit Union's attorney asked plaintiff a number of times for medical documentation in the form of a doctor's report to support the request. (Docket Entry # 7, Ex. 4, 6 & 8). When plaintiff failed to produce the material, the Credit Union found "just cause" for a termination and the existence of a "gross neglect of duty" because of the medically unsupported, extended leave of absence of more than eight weeks. The findings and decisions of the Credit Union did not breach the 2003 CBA.

Even though the 2003 CBA requires "certification from a hospital or doctor" to recover paid sick leave, the board's decision to require medical documentation to continue an unpaid leave of absence does not breach the terms of the 2003 CBA. Rather, it is both reasonable and prudent for the Credit Union to require medical documentation for an unpaid leave of absence based

53

upon alleged mental and physical abuse.  The board's decision to require the documentation and plaintiff's failure to produce it likely suffice to establish that the Credit Union did not breach Article XX's requirement to administer discipline, including discharge, "fairly and consistently for just cause."

The Credit Union's decision that Doucette did not act in an improper manner and that, if true, the conduct would not constitute "good and sufficient cause" likewise did not breach Article XV as a matter of law.  The article requires "good and sufficient reason in the opinion of" the Credit Union to allow an unpaid leave of absence.  (Docket Entry # 31, Ex. 2).  In the Credit Union's opinion, Doucette did not act in an improper, demeaning or abrasive manner.  The decision was reasonable given the knowledge that a number of employees considered Doucette a good manager.  The board had, in its opinion, rectified the past misconduct brought to its attention by the commission.  It had terminated Doucette's daughter and ordered the closure of her account.  The commission's investigation caused an admonishment but did not require Doucette's termination.  In light of the review and investigation in the near past, the Credit Union's failure to further investigate the conduct at or around the time of the termination did not breach the 2003 CBA.

Simply put, plaintiff failed to provide medical documentation, after a number of requests, to support the written request for a leave of absence.  Although she complained about

54

emotional and physical abuse on the part of Doucette, plaintiff did not support the mental and physical injuries with the requested documentation. She took an extended leave of absence without sufficient banked vacation time. The board was within its rights to require the documentation and thereafter terminate her employment for just cause and gross neglect of duty. There was no erroneous discharge. Plaintiff fails to proffer sufficient facts to evidence a genuine issue of fact on the material element of the Credit Union's breach of the CBAs.

In sum, Count III is subject to summary judgment on two alternative grounds, i.e., the failure of plaintiff to set forth a genuine issue of material fact as to the union's breach of the duty of fair representation and as to the Credit Union's breach of the CBAs.

III.  Count IV

Count IV of the amended complaint alleges a violation of "Public Policy and Rights Violations" and asserts that defendants interfered with or attempted to interfere with plaintiff's rights under the Constitution or laws of the United States. Plaintiff does not identify the constitutional right at issue or the "laws of the United States" defendants purportedly violated.

In opposition to summary judgment, however, plaintiff explains that defendants retaliated against her for "engaging in protected activities." (Docket Entry # 33, ¶ III(C)). Presumably, she refers to the retaliation she experienced at the

55

hands of Doucette for reporting the improprieties of Doucette and Doucette's daughter to the board.

Defendants move for summary judgment in part because plaintiff fails to identify a specific cause of action. With defendants having identified the deficiencies of Count IV, it was incumbent upon plaintiff to set forth a cause of action. She fails this task.

None of the federal regulations plaintiff cites endow her with a private right of action. Pointing out that she works "in a federally regulated and state chartered credit union," plaintiff cites the following federal regulations: 12 C.F.R. §§ 748.0, 748.1(c) and 748.1(c)(3). (Docket Entry # 33, ¶ III(C)). Part 748 of Title 12 of the Code of Federal Regulations concerns the duties of federally insured credit unions "to develop a written security program" and to file suspicious activity reports related to "money laundering activity or a violation of the Bank Secrecy Act." 12 C.F.R. §§ 748.0 & 748.1(c). Plaintiff's additional citation to 209 C.M.R. § 4.03 simply provides that compliance with 12 C.F.R. § 748 meets state requirements.

Plaintiff additionally cites 31 U.S.C. § 5328 ("section 5328") in the amended complaint. Section 5328 prohibits discrimination against whistle blowers but requires the employee to provide the "information to the Secretary of the Treasury, the Attorney General, or any Federal supervisory agency regarding [the] possible violation." 31 U.S.C. § 5328. Defendants

56

therefore argue that any section 5328 claim is flawed or patently insufficient.

The language of section 5328 is clear.[45]  "If the plaintiff did not report the relevant information, himself or through a conduit, to a federal banking agency, the Attorney General, the Secretary of the Treasury, or any federal supervisory agency, before being discharged or otherwise discriminated against . . ., then the plaintiff is not protected by these whistle-blower protection laws."  <u>Hill v. Mr. Money Finance Co.</u>, 491 F.Supp.2d 725, 735-736 (N.D.Ohio 2007) (citing 12 U.S.C. § 1831j and 31 U.S.C. § 5328(a)).

---

[45]  In pertinent part, the statute reads as follows:

(a) Prohibition against discrimination.  No financial institution or nonfinancial trade or business may discharge or otherwise discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to the request of the employee) provided information to the Secretary of the Treasury, the Attorney General, or any Federal supervisory agency regarding a possible violation of any provision of this subchapter or section 1956, 1957, or 1960 of title 18, or any regulation under any such provision, by the financial institution or nonfinancial trade or business or any director, officer, or employee of the financial institution or nonfinancial trade or business.

(b) Enforcement.  Any employee or former employee who believes that such employee has been discharged or discriminated against in violation of subsection (a) may file a civil action in the appropriate United States district court before the end of the 2-year period beginning on the date of such discharge or discrimination.

31 U.S.C.A. § 5328.

Plaintiff's reliance on "the Massachusetts Civil Rights Act," also cited in the amended complaint but not addressed in response to defendants' summary judgment argument, does not salvage Count IV.  Section 11I of the Massachusetts Civil Rights Act ("MCRA") "provides a remedy for the interference 'by threat, intimidation, or coercion' with an individual's 'exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth.'" Tamburello v. Comm-Tract Corp., 67 F.3d 973, 980 (1st Cir. 1995). Defendants argue that there is no evidence to support the assumed violation or retaliation against plaintiff's exercise of her free speech or any other unidentified constitutional right.  Plaintiff fails to address this substantive attack on the claim by pointing to evidence in the record.  Consequently, she fails in her summary judgment burden.

Defendants additionally maintain that section 301 preempts the MCRA claim as well as any other claim in Count IV.  Again, plaintiff does not address this argument.  Defendants are correct.

As previously explained (Docket Entry # 11), section 301 preempts state law claims that depend on the interpretation of a CBA.  Lingle v. Norge Division of Magic Chef, Inc., 486 U.S. 399 (1988); Allis-Chalmers v. Lueck, 471 U.S. 202, 209 & 220 (1985) (explaining that Congress passed section 301 so that CBAs would be interpreted under a uniform federal labor law).  "[W]hen resolution of a state-law claim is substantially dependent upon

analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim or dismissed as pre-empted by federal labor contract law." Nuzzo v. Northwest Airlines, Inc., 887 F.Supp. 28, 31 (D.Mass. 1995).

State law claims may depend on an interpretation of a CBA where the conduct at issue allegedly breached duties established by the CBA or violates rights created by the CBA. Fant v. New England Power Service Co., 239 F.3d 8, 15 (1st Cir. 2001). Rights existing independently of a CBA under state and federal law, however, are not preempted. Lividas v. Bradshaw, 512 U.S. 107, 123-124 (1994); Ralph v. Lucent Technologies, Inc., 135 F.3d 166, 171 (1st Cir. 1998). Furthermore, disputes requiring mere reference to terms of a CBA are not preempted. Lingle, 486 U.S. at 413 n. 12.

Presumably, an MCRA claim would depend upon the threats, intimidation and coercion lodged by Doucette against plaintiff. Plaintiff submitted a written request for unpaid leave to the board and argued that the "improper, demeaning and abusive behavior" by Doucette constituted "good and sufficient reason" within the meaning of Article XV. (Docket Entry # 7, Ex. 7). The Credit Union denied the request which led to plaintiff's discharge for "just cause" and "gross neglect of duty" under Article XX of the 2003 CBA. In essence, plaintiff maintains that Doucette's mistreatment constitutes "good and sufficient reason" for the

extended leave of absence and that the Credit Union "unreasonably" denied the leave in violation of Article XV of the 2003 CBA. (Docket Entry # 33).

Hence, any MCRA claim would require a determination as to whether plaintiff had "good and sufficient reason" for the unpaid leave, whether the Credit Union "unreasonably" denied the leave and whether plaintiff's conduct rose to the level of "just cause" and a "gross neglect of duty" warranting the dismissal. Given the inevitable interpretation of these terms in the 2003 CBA, section 301 preempts any MCRA claim in Count IV. See Nuzzo v. Northwest Airlines, Inc., 887 F.Supp. at 31-32 (the plaintiff's claim of retaliatory discharge was "substantially dependent on the terms of the Last Chance and collective bargaining agreement" and therefore preempted by section 301); see also Tamburello v. Comm-Tract Corp., 67 F.3d at 980-981 (NLRA preempts employee's MCRA claim based upon retaliation by employer for employee's union activities); Hart v. Verizon Communication, Inc., 2004 WL 438786 at * 2 (D.Mass. March 9, 2004) (section 301 preempts employee's breach of contract claim based upon selective enforcement of company rules which required interpretation of a CBA). Likewise, section 301 preempts any other state law claims raised in Count IV based upon a public policy violation.


## CONCLUSION

For the foregoing reasons, this court **RECOMMENDS**[46] that defendants' motion for summary judgment (Docket Entry # 28) be **ALLOWED** as to counts I, II, III and IV.  The motions to strike (Docket Entry ## 32 & 38) are **ALLOWED** in part and **DENIED** in part as set forth in the body of the opinion.


                              /s/  Marianne B. Bowler
                         **MARIANNE B. BOWLER**
                         United States Magistrate Judge

---

[46] Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten days of receipt of the Report and Recommendation to which objection is made and the basis for such objection.  Any party may respond to another party's objections within ten days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.  United States v. Escoboza Vega, 678 F.2d 376, 378-379 (1st Cir. 1982); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).