UNITED STATES DISTRICT COURT
THE DISTRICT OF MASSACHUSETTS

---

**Paula O'Donnell,**
 **Plaintiff**
v.

**Donna Boggs, et al.,**
 **Defendants.**

---

**Civil Action No. 05-CV-11257- NG**

**Plaintiff's Objection to Report and Recommendation**

Pursuant to Federal Rule of Civil Procedure 72(b), Plaintiff Paula O'Donnell submits these Objections to the Report and Recommendation Re: Defendants' Motion for Summary Judgment. Specifically, Plaintiff objects to the granting of summary judgment on the following matters:

**I. Introduction**

The Report recognizes that Mrs. O'Donnell was subject to wrongful intimidation and retaliation, and erroneously extinguishes all remedies. The Report acknowledges that Mrs. O'Donnell's complaints about misconduct by her superior, Boston Globe Employees Credit Union CEO Marion Doucette, and about misconduct by CEO Doucette's daughter, bookkeeper Linda Doucette, elicited retaliation "on the part of both [CEO] Doucette and the [Credit Union] board," and the retaliation "resulted in an increasingly difficult work environment." [Rpt. 14]. The Report acknowledges that CEO Doucette engaged in "weekly incidents of verbal and physical intimidation," and interfered with Mrs. O'Donnell's duties as System Manager. [Id.]. The Report acknowledges that Mrs. O'Donnell eventually experienced such debilitating physical and emotional conditions caused by the retaliation, that "[s]he began suffering 'sleepless nights, stress, panic attacks, shortness of breath, spells of nausea, vomiting and crying and general depression,'" and the Boston Globe's own medical staff recommended she take a leave of absence, which she did. [Rpt. 14-15].

Mrs. O'Donnell had complained to CEO Doucette and the Board that (i) CEO Doucette approved payment of "almost 100" bad checks written by her daughter Linda, and (ii) Linda fraudulently manipulated the ATM security system to obtain funds. [Rpt. 11-15]. As a financial officer in a banking institution, Mrs. O'Donnell had an independant duty to report financial misconduct or suspected crimes (e.g., fraud, larceny, embezzlement, etc.). *See* 12 CFR 748.0 and 748.1(c) and 209 CMR 4.03 (compliance with 12 CFR 748 deemed compliance with state regs). Failing to report such conduct could have subjected her to civil penalties. *See* 12 CFR 748.1(c)(3).

The Credit Union later maintained that CEO Doucette had not acted improperly, required Mrs. O'Donnell return to work under CEO Doucette and denied her further leave, and then terminated Mrs. O'Donnell when she did not return to work under those conditions. [Rpt. 20-23]. The Union grieved the matter but later abandoned the grievance just prior to scheduled arbitration [Rpt. 23, 25-28]. In the end, CEO Doucette's daughter voluntarily left work under a dishonest resignation letter [Rpt. 13-14] and CEO Doucette retired and took a position on the Board. Mrs. O'Donnell was the only one to suffer real consequences, losing her employment of 30 years.

## II. Tortious Interference Claim Against Marion Doucette (Count I)

A viable state law claim for tortious interference by CEO Doucette is set forth, and would be sustained even if Mrs. O'Donnell had not taken a leave of absence, and even if she had resigned rather than been terminated.[1]  Doucette's conduct was clearly not intended to further the employer's interests, but to protect Doucette and her daughter or to punish Mrs. O'Donnell, and that goal was

---

[1] *From* Gertner, J*., see* Ruffino v. State Street Bank & Trust Co., 908 F.Supp. 1019, 1050-52 (D.Mass. 1995)(stating interference need not cause termination to sustain claim of tortious interference); *See also* Boyle v. Boston Foundation, Inc., 788 F.Supp. 627, 630 (D.Mass. 1992)(stating discharge not necessary to sustain tortious interference claim when interference causes contractual performance to be more burdensome).

achieved though unprivileged and unlawful interference with Mrs. O'Donnell's employment. The resort to "verbal and physical intimidation" to achieve such illegitimate ends extinguished any ostensible supervisory privilege. Zimmerman v. Direct Federal Credit Union, 262 F.3d 70, 75-77 (C.A. 1 Mass. 2001)(involving credit union, interference motivated by malice overcame qualified supervisory privilege). The right of an employee to be free of such conduct and interference, especially from a supervisor, has been recognized by this Court (e.g., Gertner, J.).[2]

The claim for tortious interference by CEO Doucette prior to Mrs. O'Donnell's leave of absence is collateral to any claim against the Credit Union, and viable even if no claim against the Credit Union were brought or if a claim against it was dismissed or failed on the merits. The Magistrate's generalization that tortious interference claims are uniformly extinguished under section 301 preemption [Rpt. 31] is inaccurate, and would achieve an unjust result. Section 301 preemption has been applied generally only to situations other than that at issue here, such as when a supervisor was acting in that capacity as a *bona fide* agent of the employer to further the employer's interests, *see e.g.*, Magerer v John Sexton & Co., 912 F.2d 525, 530 (1st Cir. 1990), or situations involving workers compensation disputes which are, by statute, expressly subordinated to the terms of a CBA. *See e.g.*, Troconis v. Lucent Technologies, 160 F.Supp.2d. 150, 153-54 (D. Mass. 2001).

---

[2] *From* Gernter, J.: Legoff v. Trustees of Boston University, 23 F.Supp.2d. 120, 129-30 (D.Mass. 1998)(supervisor liable when acting "without right or justifiable cause;" wrongful acts such as threats and retaliation are not within scope of supervisor's duties and support prima facie case of tortious interference); Ruffino v. State Street Bank & Trust Co., 908 F.Supp.2d. 1019, 1050-51 (D.Mass. 1995)(supervisor liable when malice shown, existence of malice is question of fact).

*See also* Boyle v. Boston, 788 F.Supp 627, 630 (D.Mass. 1992)(*citing* principles that (i) "intentional acts of a supervisor which caused an employee to resign would be sufficient to state a claim of intentional interference," Anzalone v. MBTA, 403 Mass, 119 (1988), and (ii) "an officer of a corporation may be liable for interfering with an employment contract between an employee and the corporation," Steranko v. Inforex, 5. Mass.App. 253, 272-73 (1977)).

The Magistrate's alternative contention that preclusive preemption is required because interpretation of the CBA is necessary is also inapplicable. There is nothing in the CBA prescribing rights or duties related to the reporting of financial malfeasance, or to retaliation for such reporting. In contrast, as an employee of a regulated financial institution, Mrs. O'Donnell had an independent legal right and duty to report financial malfeasance she discovered, and to be free from intimidation and retaliation for making such complaints. *See* Lividas v. Bradshaw, 512 U.S. 107, 123-124 (1994)(CBA not sole source of employee rights and duties, claims based on independent rights and duties are not preclusively preempted under §301). There is no actual or potential need to interpret the CBA to address this matter, which rests on public policy meant to ensure the integrity of a regulated banking institution. Public policy requires that such disputes be resolved independently; it was clearly not legislative intent to place enforcement of public policy in the hands of unions.[3]

The Magistrate's Report acknowledged CEO Doucette engaged in weekly incidents of "verbal and physical intimidation." If a supervisor, purely as a matter of self-interest, engaged in profanity-laced insults, oral threats of violence or waved a baseball bat to intimidate, such conduct could not be legally distinguished from that of CEO Doucette, and there is no rational or just principle that would put such malfeasance beyond remedy because the victim was a union member. No interpretation of common law, the CBA at issue or section 301 preemption raises a privilege or defense for intimidation and retaliation of that nature. Common sense and the terms of the CBA do not indicate the union and management negotiated and agreed to right or regulation of such conduct.

---

[3] An enlightening analogy exposes the fundamental principle at issue. If Mrs. O'Donnell were a teacher required by law to report suspected child abuse (see G.L. c.119, sec. 51A), and she reported such abuse by the principle of the school who then engaged in "weekly incidents of verbal and physical intimidation" and interfered with Mrs. O'Donnell's duties as a teacher, there is no reasonable interpretation of section 301 that would extinguish Mrs. O'Donnell's rights to be free from retaliation and interference, and shift the duty of enforcement of those public policy rights to the union as a labor issue regulated by the CBA. The situation at issue here is no different.

The claim for tortious interference by CEO Doucette prior to Mrs. O'Donnell's initial leave of absence is not subject to 301 preemption since it can "stand on [its] own" and is not inextricably intertwined with consideration of the terms of the labor contract." Cullen v. E.H. Friedrich Co., Inc., 910 F.Supp. 815, 821 (D.Mass. 1995)(quoting Allis-Chalmers, 471 U.S. 202, 213 (1985). This claim is unrelated to the later denial of a request for additional leave, and subsequent termination of Mrs. O'Donnell. Nevertheless, the Magistrate's Report concludes that section 301 preclusion will extinguish the claim. That holding and recommendation should not be adopted because it leads to an unjust and unreasonable result, and reliance on law of the case doctrine [Rpt. 32] cannot save it. See Flibotte v. Pennsylvania Truck Lines, Inc., 131 F.3d 21, 25 (1st Cir. 1997)("not improper for a court to depart from a prior holding if convinced that it is clearly erroneous and would work a manifest injustice"). Rather, summary judgment could issue in Plaintiffs' favor.[4]

**III.    Tortious Interference Claim Against Board Defendants** (Count II)

Tortious interference claims against the Board Defendants should also survive, based on the Report's acknowledgment that retaliation "on the part of both Doucette and the [Credit Union] board" had "resulted in an increasingly difficult work environment" [Rpt. 14] prior to the initial leave of absence. As the Report notes, Mrs. O'Donnell discovered and reported malfeasance by two successive CEO's, and by the second CEO's daughter. After Mrs. O'Donnell reported the first CEO (i.e., Gene Farrell), he was terminated, prosecuted and sentenced for embezzling funds. [Rpt 11-12]. Surprisingly, some of the Credit Union's board members, including Defendant Hall, sympathized with Farrell and began shunning Mrs. O'Donnell. [Rpt 12]. The Report notes that, with regard to

---

[4] Even if summary judgment were not granted in Plaintiff's favor, there is a right to a jury determination regarding Doucette's motive and means. *From* Gertner, J.: *see* North Shore Pharmacy Services, Inc. v. Breslin Associates Consulting, 491 F.Supp.2d. 111, 128-29 ((D.Mass. 2007).

5

CEO Doucette's daughter Linda, who fraudulently obtained funds by manipulating ATM security procedures [Rpt. 13-14], the Credit Union was admonished by the state banking commission and Defendants Boggs, Megan and Francis blamed Mrs. O'Donnell for reporting the matter to the commission [Rpt. 14] even though she had not done so. Again, even the Magistrate's Report acknowledges that the Credit Union's board members retaliated and made her job harder.

The Report does not hold that there is no merit in this cause of action for this interference prior to the initial leave of absence. The Magistrate held only that it is preclusively preempted and extinguished under section 301. The analysis of this claim, like that of the tortious interference claim against CEO Doucette, rests on rights collateral to the CBA. and on motive and means that were not privileged or are subject to dispute. The Magistrate's erroneous reliance on 301 preemption and law of the case requires denial of summary judgment.

### IV.    Section 301 Claim (Count III)

The section 301 claim should also survive summary judgment. As noted in the Report, "weekly incidents of verbal and physical intimidation" by CEO Doucette led the Boston Globe's own medical staff to recommend Mrs. O'Donnell take a leave of absence. [Rpt. 14-15]. The section 301 claim rests not on that intimidation and retaliation, but on the Credit Union's later insistence that Mrs. O'Donnell return to work under CEO Doucette and refusal to allow her additional leave of absence as required. This conduct by the Credit Union violated the CBA, and the Union's failure to carry out the scheduled grievance of this matter violated its duty to Mrs. O'Donnell.

The Report actually recognizes that the plain language of Article XV (Leave of Absence) required only a written request–not a doctor's certification–to obtain leave of absence for "good and

sufficient reason."[5] [Rpt. 17]. The Report's recognition of the verbal and physical intimidation and retaliation by CEO Doucette resulting in debilitating emotional and physical injury clearly sustain "good and sufficient reason" for both the initial and a continuing leave of absence, and a reasonable basis for Mrs. O'Donnell not to return to work under CEO Doucette. The Credit Union's conclusory declaration, without investigation, that "Doucette did not act in an improper manner" [Rpt. 19-20] does not overcome the evidence of retaliation and intimidation, or overcome a reasonable conclusion or a dispute that a contractually sufficient request for leave was "unreasonably denied."

Article XV does not require a medical condition in order to obtain leave, but the Board's initial informal request for a doctor's note [see Rpt. 15 n.14] escalated into a demand to provide one even though Mrs. O'Donnell, on a number of occasions provided a documented, sufficient written request that Article XV required (e.g., Letter 10/27/03 - Docket Entry #34, Ex. 2; Letter 01/19/04 - Docket Entry #7, Ex. 7; Letter 02/11/04 - Docket Entry #7, Ex. 9). The Magistrate improperly read a requirement for a doctor's note into the CBA merely on the Magistrate's belief that requesting one was "reasonable and prudent." [Rpt. 53]. The Magistrate concluded that Mrs. O'Donnell "failure to produce [a doctor's note] likely suffice[s] to establish that the Credit Union did not breach" the CBA. [Rpt 54; emphasis added]. The Magistrate's use of the term "likely" discloses the application of an improper standard (i.e., "likelihood of prevailing on the merits") to resolve a factual dispute through summary judgment. The facts set forth in the Report are sufficient to show that the written requests for leave set forth good and sufficient reason that was unreasonably denied, or a factual dispute exists, and summary judgment was improperly granted.

---

[5] The Report examined CBA Article XII (Paid Sick Leave), which reasonably requires medical certification of illness in order to obtain leave for a medical condition. [Rpt. 17-18]. Mrs. O'Donnell was not requesting paid sick leave and that article does not apply to this action. It appears that the Magistrate improperly exported these express terms into Article XV as implied terms.

Turning to the Union's breach of duty, the issue is whether the Union's failure to arbitrate the valid grievance of the refusal to grant the leave of absence was arbitrary, capricious, in bad faith or taken absent countervailing interests. *See eg.* Miller v. U.S. Postal Service, 985 F.2d 9 (C.A. 1 1993). There is no allegation by the Union that Mrs. O'Donnell's grievance had not been investigated and had no merit when, over considerable resistance, the Union obtained the Credit Union's agreement to arbitration of the matter. [Rpt. 24-25]. The merits of the grievance regarding the refusal to grant additional leave obviously did not change prior to the scheduled arbitration.

The Magistrate granted summary judgment based on the unsustainable conclusion that the Credit Union made a "reasonable finding there was a 'gross neglect of duty' because of the plaintiff's failure to provide medical documentation for the extended leave of absence." [Rpt. 49]. It has already been noted that Article XV does not require medical documentation and, in fact, does not even require that leave is based on a medical condition. Surprisingly, the Magistrate also holds that "even if [CEO] Doucette acted improperly," the Credit Union's failure to grant leave and its requirement that she return to work under Doucette, "are adequate under the circumstances for [the Union] to conclude" that the Credit Union was "unlikely" to have violated the CBA. [Rpt. 51]. Again, the wrong standard (i.e., "unlikely") has been applied to sustain summary judgment.

The Union's belated assertion that the grievance did not have merit because Mrs' O'Donnell failed to provide a doctor's note that was not contractually required cannot be sustained as "reasonable," and its assertion that the arbitrator could not remedy the situation is clearly pure speculation and unreasonable. [Rpt. 26-28]. Alone, the Union's change in position at the last minute presents a disputed question of fact as to motive, and would defeat summary judgment.[6] The

---

[6] Factual finding regarding motive must be resolved by a jury. *From* Gertner, J.: *see e.g* North Shore Pharmacy Services, Inc., 491 F.Supp.2d. at 128-29 ((D.Mass. 2007).

Union's reference to Mrs. O'Donnell's rejection of a settlement offer also does not represent a diminution of the merits of her grievance, and it would not have precluded the arbitrator from fashioning a remedy. The proffered reasons for the Union's failure to arbitrate a valid grievance do not preclude its breach of duty, and do set forth a factual dispute to defeat summary judgment.

On the issue of limitation period, the Defendant Credit Union asserted that the original April 28, 2005 complaint stated a section 301 claim.[7] Plaintiff filed a second federal action on December 12, 2005 which restated the section 301 claim that Defendant recognized in the first complaint. In conference with Judge Gertner, the parties agreed to "fusion" consolidation of both matters and an agreement to that effect was filed. (see Case 1:05-cv-12490-NG Document 7 Filed 04/26/2006).

In the prior summary judgment motion, Defendant set forth a material fact, in an attorney's affidavit of personal knowledge, that the Union withdrew the grievance on June 14, 2005. (Docket Entry #6, p.5 ¶26). Now, Defendant has directly contradicted that prior factual assertion and changed the date of withdrawal to June 6 (Docket Entry #30, p.6 ¶26). The supporting affidavits sustain the express contradiction as to the date of withdrawal.[8] At a minimum, if Defendant is not judicially estopped from asserting the later contradictory factual statement, there is a disputed question of fact established by Defendant's own affidavits as to when the Union withdrew the grievance, and this would suffice to preclude summary judgment. *See* <u>Scaglione v. Commuications</u>

---

[7] "For purposes of §301 claims (and state law claims preempted by §301), [supervisory employees] are the employer, since the employer is liable for their conduct." (Docket Entry #5, p.12 - Defendants' Memorandum in Support of Motion for Summary Judgment).

[8] In Attorney Weiner's affidavit of Sep. 2005 (Docket Entry #7, p. __, ¶31):
    "31.    Local 6 abandoned the grievance just prior to a scheduled arbitration. **The grievance was formally withdrawn on June 14, 2005**. ..."
In Mary Mohoney's affidavit of Jan. 2007 (Docket Entry #31, p.3, ¶15):
    " 15.    Local 6 withdrew the grievance just prior to the scheduled arbitration. **The grievance was formally withdrawn on June 6, 2005.** ..."

Workers of America, Local 1395, et al., 586 F.Supp. 1018, 1021 (D. Mass. 1983) (Zobel, J.)(denying summary judgment where disputed question of fact regarding limitation period).

Furthermore, as the Magistrate notes, "Section 301 does not contain a statue of limitations .... a court's initial look must be to state law to isolate the most closely analogous rule of timeliness." [Rpt. 37, cites omitted]. Massachusetts has refused to recognize the principle of "anticipatory breach" and even communicated intent not to perform will not trigger a breach of duty upon which a cause of action accrues. *See* Petrangelo v. Pollard, 356 Mass 696, 702 (1970)(noting that recovery for anticipatory breach would be denied under the rule of Daniels v. Newton, 114 Mass. 530."). Under these circumstances, Mrs. O'Donnell had no viable claim for breach of duty by the Union until the time set for arbitration passed or, under a broad interpretation of the principle, when the Union disabled its ability to perform either by notifying the arbitrator that the arbitration was cancelled or by notifying the Credit Union, in a manner sufficient for the Credit Union to reasonably rely, that it was withdrawing the grievance. That date–at its earliest–was June 14 when, as Credit Union attorney Harvey Weiner stated, of personal knowledge in his affidavit, he received official notice from the Union that it was withdrawing its grievance. The Union would not have breach at an earlier date by mere notification to Mrs. O'Donnell that the Union intended not to proceed, as it was not too late for Mrs. O'Donnell to persuade the Union to perform on the date set for arbitration.[9]

The section 301 claim presents sufficient disputes of fact on the various issues of breach by the Credit Union, the Union, and the limitations period, to preclude summary judgment.

---

[9] The Magistrate's reliance on Tuggle v. Greektown Casino, LLC., 2007 WL 674462 at *4-5 (E.D. Mich. Feb. 28, 2007)(limitation period begins when union sent letter notifying employee it would not proceed with greivance) is unavailing since Michigan actually does recognize and apply the principle of anticipatory breach. *See* Stoddard v. Mftrs. Natl. Bank, 234 Mich.App.140, 163; 593 NW2d 630 (1999); Paul v. Bogle, 193 Mich.App. 479, 493; 484 NW2d. 728 (1992).

**V. Conclusion**

       The Magistrate's Report should not be adopted on the issues and for the reasons noted above, and this Court should deny Defendant's request for summary judgment.


Submitted for
Plaintiff, by her attorney,

\_\_\_/s/ Scott Adams_____        \_\_\_3/24/2008_____
Scott Adams (BBO# 639166)              date
34 Ridgemont St.
Allston, MA 02134
Tel: (617) 694-1332


Certificate of Service: I, Scott Adams, hereby certify that on this date of 3/24/2008 I served a copy of this document on Defendants' counsel of record by electronic service.

\_\_\_/s/ Scott Adams_____        \_\_\_3/24/2008_____
Scott Adams (BBO# 639166)              date