UNITED STATES DISTRICT COURT
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PAULA O'DONNELL<br><br>　　　　Plaintiff<br><br>v.<br><br>DONNA BOGGS[*], MARIAN DOUCETTE*,<br>BRENDAN HALL, WILLIAM FRANCIS,<br>MARY LOU MEGAN*, and BOSTON<br>GLOBE EMPLOYEES CREDIT UNION<br><br>　　　　Defendants | Civil Action No. 05-11257-NG |

**BRIEF OF DEFENDANTS IN RESPONSE TO PLAINTIFF'S OBJECTIONS TO MARCH 13, 2008 REPORT & RECOMMENDATION RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 72(b), the Defendants submit this brief in response to the Plaintiff's Objections to the Report and Recommendation re: Defendants' Motion for Summary Judgment. The Defendants respectfully submit that the March 13, 2008 Report and Recommendation (the "Report") should be adopted. After a careful and exhaustive review of the summary judgment record and the related case law, the Report recommends that the Defendants' Motion for Summary Judgment should be allowed as to all of the Plaintiffs' claims in the Amended Complaint. The Report relies on well-established precedent governing Section 301

---

[*] Defendant Donna Boggs was incorrectly identified in Defendants' Notice of Removal as Donna Briggs. Plaintiff has misspelled the names of defendants Mary Lou Meighan and Marion Doucette in her Complaints. The proper spelling is used herein, as is the caption contained in Plaintiff's First Amended (Consolidated) Complaint.

claims and preemption. The Report's conclusions in support of summary judgment are summarized as follows:

- *Counts I and II: Tortious Interference with Contractual Relations:*
  Plaintiff's state law claims for tortious interference with contractual relations against Defendants Doucette, Boggs, Hall, Francis, and Meighan are preempted by Section 301 of the Labor Management Relations Act ("Section 301"). These claims are identical to the claims for tortious interference in the original Complaint, which were also held to have been preempted in a prior decision of the Court. (Report at 31-32.) Moreover, the law of the case doctrine dictates that preemption applies to these claims. (*Id.* at 32-33, referring to the prior Report and Recommendation regarding the Defendants' first motion for summary judgment, Docket Entry # 11, at 7-14.)[1]

- *Count III:  Breach of Contract by Boston Globe Employees Credit Union:*
  The Section 301 claim fails on the merits because there is no evidence that the Union breached its duty of fair representation (Report at 46-51), or that the Credit Union breached the collective bargaining agreement (*id.* at 51-55), both of which are necessary to establish liability. In addition, with regard to the statute of limitations, the Report finds that the six-month statute of limitations began to run on June 6, 2005 upon the Union's written notice to the Plaintiff of the Union's decision not to pursue the Plaintiff's grievance (Report at 33-44), and "expired just prior to the December 12, 2005 filing of the section 301 suit against the Credit Union, Civil Action No. 05-12490-NG." (*Id.* at 44.)

- *Count IV:  Various Public Policy and Rights Violations*:
  Count IV of the Amended Complaint for violation of "various public policies and rights" fails as a matter of law because the Plaintiff has not set forth a specific cause of action. (Report at 55-56.) The federal regulations cited by the Plaintiff do not provide a private right of action (Report at 56), and the federal statute cited by the Plaintiff, 31 U.S.C. § 5328, is a whistleblower statute that clearly does not apply to the Plaintiff. (*Id.* at 56-57.) The Plaintiff has not identified any evidence in the summary judgment record to support a claim under the Massachusetts Civil Rights Act (*id.* at 58), and, in any event, such a claim is preempted under Section 301. (*Id.* at 58-59.)

---

[1] For ease of reference, we refer to the prior Report and Recommendation, dated April 21, 2006, Docket Entry # 11, as "the Prior Report."

2

As discussed more fully below, there is nothing controversial about these conclusions and recommendations. The Plaintiff's objections to the Report offer nothing new, and the Defendants are entitled to summary judgment on all of the Plaintiffs' claims.

## I. ARGUMENT

Throughout the Plaintiff's Objections to the Report ("Objections"), the Plaintiff misconstrues the Report's treatment of the allegations in the Amended Complaint. The Plaintiff repeatedly refers to the Report "recognizing" or "acknowledging" that the Amended Complaint's various factual allegations are in fact true.[2] This not only overstates the Report's language, it is incorrect as a matter of law. As set forth in the Report's discussion of the standard of review on a Rule 56 motion, the Report correctly states that "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." (Report at 7 (quoting *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990)). In line with that standard, the Plaintiff's factual averments must be assumed to be true, although many of them are vigorously denied by the Defendants. The Plaintiff's repeated efforts to depict assumptions as actual findings or rulings are argumentative and unfair.

---

[2] The Plaintiff uses variations on these formulations throughout her Objections. (Docket Entry # 46.) The phrase "[t]he Report acknowledges" appears three times on the first page of Plaintiff's Objections, and numerous times thereafter. The Plaintiff goes so far as to state "Again, even the Magistrate's Report acknowledges that the Credit Union's board members retaliated and made her job harder." (Objections at 6.) The Report does no such thing. The Report sets forth the "Factual Background" based on the summary judgment record, with references to the record before the Court. (Report at 11-30.) This is improper argument by the Plaintiff, and misapplies the mechanics of Rule 56.

3

### A.     Counts I and II:  The Report Correctly Concludes that the Tortious Interference Claims Are Preempted Under Section 301, as Previously Decided in this Matter.

As set forth in the Report, the "prior Report and Recommendation exhaustively and correctly discussed the preemption of counts one and two of the original complaint against the same defendants, for the same causes of action." (Report at 31 (referring to Prior Report, at 7-14)).  The Court adopted the Prior Report and Recommendation on May 18, 2006.  There has been no change in the law that would require a different result now.  Counts I and II should be dismissed.

Plaintiff continues to contend that tortious interference claims are not preempted where there is an allegation of actual malice.  (Plaintiff's Opposition Brief ("Opp. Brief") at 9; Objections at 3.)  As noted in the Report, "Plaintiff's attempt to distinguish the original from the amended claims on the basis of malice and the various forms of the tort under state law is not convincing."  (Report at 31.)  To avoid repetition, the Defendants incorporate herein their arguments set forth in their Memorandum of Law in support of summary judgment and their Reply Brief (Docket Entries # 29 and # 36, respectively).  "Federal courts in this circuit uniformly hold claims of intentional interference with contractual relations to be preempted by section 301."  (Report at 31 (quoting Prior Report at 9, and citing *Magerer v. John Sexton & Co.*, 912 F.2d 525 (1st Cir. 1990); *Troconis v. Lucent Technologies, Inc.*, 160 F. Supp. 2d 150, 153-54 (D. Mass. 2001); *Acciavatti v. Professional Services Group, Inc.*, 982 F. Supp. 69, 76 (D. Mass. 1997)).

In their Reply Brief, the Defendants have already addressed Plaintiff's misguided reliance on cases in which Section 301 preemption was not at issue or where a collective bargaining agreement did not govern the plaintiff's employment.  As discussed there and in the Prior

4

Report, *Tosti*, *Zimmerman*, *Legoff*, *Ruffino*, and *Boyle* do not apply here. (*See* Prior Report at 14-15, and n. 10 and n. 11; and Defendants' Reply Brief at 3.)

In an attempt to overcome preemption, Plaintiff continues to argue that her tortious interference claim can "stand on its own" and that it is "not inextricably intertwined with considerations of the terms of the labor contract." (Objections at 5; Opp. Brief at 10.) This argument must fail. The Plaintiff's theory seems to be that the Court need not reach the issue of preemption at all because her alleged treatment by Defendant Doucette and certain Board Members in retaliation for various complaints she made about the Credit Union is magically isolated from any interpretation or provisions of the CBA. On this premise, tortious interference claims would always be immune from preemption because they somehow stop once the CBA comes into play. This position cannot withstand review.

To support her theory, Plaintiff contends in her Objections that her claim for tortious interference against Defendant Doucette is "unrelated to the later denial of a request for additional leave and subsequent termination of Mrs. O'Donnell." (Objections at 5.) She makes the same argument as to Count II, which is the tortious interference claim against the Board Member Defendants. (*Id.* at 6, stating "The analysis of this claim . . . rests on rights collateral to the CBA.") The Plaintiff's own allegations do not support this separatist approach. One need only refer to the allegations of the Amended Complaint to see that the Plaintiff is complaining about the Individual Defendants' actions in "prevent[ing] her from fully performing her required duties for the Credit Union" and in "induc[ing] the Credit Union to terminate Plaintiff's employment relationship." (Amended Complaint, at ¶¶ 29-31, and ¶¶ 35-37 (Docket Entry # 14)). These allegations are all of a piece – *i.e.*, according to the Plaintiff, the Defendants

5

retaliated against her, caused her to be unable to perform her job, and then induced the Credit Union to terminate her. There is no separate interference claim on these allegations.

This theory is in fact no different than the argument presented in the Plaintiff's brief in opposition to summary judgment, where she argued that "retaliatory conduct is not privileged and rights under the CBA are not at issue because the right to be protected from such conduct is clearly collateral to and independant [sic] of any CBA." (Opp. Brief at 10.) However, as already discussed in the Prior Report, "[t]ortious interference with contractual relations claims depend on an interpretation of the CBA where, as here, the CBA establishes the rights and duties of the parties." (Prior Report at 14 (citing *Magerer*, 912 F.2d 525)).

In this case, the CBA sets forth "the duties of defendants as well as the standards guiding leaves of absence, discharge, and arbitration procedures." *Id.* An interpretation of the CBA is required to resolve the question of whether the Defendants' conduct toward the Plaintiff derogated from the CBA with regard to disciplinary action (Article VI of the CBA), denial of the unpaid leave of absence (Article XV), or her termination (Article XX). (Prior Report at 12-13.) The CBA also addresses management's rights and authority and provides that:

> All management rights, powers, authority and functions, whether heretofore or hereafter exercised, and regardless of frequency or infrequency of their exercise, shall remain vested exclusively in the Credit Union, and the Credit Union shall have the sole and exclusive right to manage its business in every respect and to take any other action which the Credit Union deems desirable to the conduct of its business.
> . . .
> All disciplinary action undertaken by Management against a member of the Bargaining Unit shall be for just cause and will be conducted in private and in such manner as to create respect for authority and preserve individual dignity. . . . (Article VI of the 2003 CBA and Report at 21.)

There is only one employment relationship which the Plaintiff claims the Defendants interfered with – her position at the Credit Union. The Plaintiff alleges that the Individual

6

Defendants retaliated against her, prevented her from being able to do her job, and that these alleged retaliatory acts caused her to be terminated because she refused to return to work at the Credit Union. After the Plaintiff's paid vacation and sick leave expired, the Credit Union terminated the Plaintiff for gross neglect of duty when she refused to provide adequate evidence to support her request for an unpaid leave of absence. All of the steps taken by the Defendants with regard to these events are governed by provisions of the CBA.[3]

    Even if one were to accept Plaintiff's premise that the alleged retaliatory conduct by management and certain Board members against her prior to August 14, 2003 constituted wrongful interference with contractual relations, any such actions were taken on behalf of the Credit Union. *See Magerer*, 912 F.2d at 530 (citing *Kneeland v. Pepsi Cola Metropolitan Co., Inc.*, 605 F. Supp. 137, 139 (D. Mass. 1985) (claims against supervisory employees for malicious interference with contractual relations were preempted, because supervisors were acting as agents for employer whose conduct was governed by a collective bargaining agreement)). Determining whether the Defendants improperly interfered with the Plaintiff's employment contract "requires an examination of the rights of plaintiff and [the employer] under the collective bargaining agreement." *Id.* at 530-31. The Plaintiff admits that she brought her complaints to the attention of the "Defendant Board Members Boggs, Hall, Francis and Megan directly by me and separately through union grievance procedures." (Docket Entry # 8, Affidavit

---

[3] Plaintiff's reliance on *North Shore Pharmacy Servs., Inc. v. Breslin Assocs. Consulting*, 491 F. Supp. 2d 111 (D. Mass. 2007), is misplaced. *North Shore Pharmacy* does not involve a collective bargaining agreement, or the issue of Section 301 preemption. It does not hold, as Plaintiff suggests, that "there is a right to a jury determination" regarding a defendant's "motive and means." (Objections at 5, n. 4.) Rather, this Court held that, based on the specific summary judgment record in that case, there was sufficient evidence in the record to preclude summary judgment for a pharmaceutical supplier on a tortious interference claim. *North Shore Pharmacy*, 491 F. Supp. 2d at 129-30.

of Paula O'Donnell ("O'Donnell Aff."), at ¶ 7.) It is clear that any complaint that Plaintiff had about Doucette's treatment of her was subject to the grievance process under the CBA. As such, this alleged conduct was not only previously addressed through the CBA's grievance procedure, it cannot now be outside of the CBA. It is also clear that this occurred prior to August 15, 2003 when the Plaintiff stopped showing up for work. (*See* O'Donnell Aff. at ¶¶ 6-8; and Docket Entry # 7, Affidavit of Harvey Weiner, Esq., at Exhibit 3 (correspondence dated October 27, 2003 from Plaintiff's counsel Scott Adams to Donna Boggs, referring on page 2 to Ms. Doucette's conduct and to Ms. O'Donnell's "efforts to resolve the problem and associated matters through the grievance procedure.")) All of this happened prior to the Credit Union's termination of the Plaintiff in 2004 and the grievance at issue in this matter regarding the Plaintiff's termination. The Plaintiff's own conduct in pursuing her complaints about Ms. Doucette and the Board Members through the Union grievance procedure establishes she does not have a "tortious interference" claim that stands on its own.

Under Massachusetts law, to establish a claim of tortious interference with contractual relations, a plaintiff must show, among other elements, that she "had a contract with a third party [and] the defendant knowingly induced the third party to break that contract." *Id.* at 531 (quoting *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 551 N.E.2d 20, 21 (1990)). There is no third party here. There is only the Plaintiff's employment relationship with the Credit Union. The determination of whether the Defendants wrongfully interfered with the CBA requires an interpretation of the CBA. Accordingly, the tortious interference claims depend on an interpretation of the CBA, their resolution is inextricably intertwined with the CBA, and they are preempted under Section 301. (Prior Report at 13-14; Report at 32; and *Magerer*, 912 F.2d at 531.)

For the reasons set forth in the Report at 32-33, the law of the case doctrine also calls for this result. The law on preemption is well established. This issue has now been briefed several[4] times by the parties, and has been considered in two thoughtful Reports by the Magistrate in this case. The Prior Report has been adopted by the Court on the preemption issue. The Defendants respectfully request that the Court adopt the Report's recommendation for judgment as a matter of law for the Defendants on Counts I and II.

    **B.    Count III: The Report Correctly Concludes that the Plaintiff Cannot Establish Breach by the Credit Union or the Labor Union Under Section 301.**

The Report canvasses the Rule 56 record and concludes that the Plaintiff cannot establish a Section 301 claim. Plaintiff offers no new arguments to overcome this conclusion.[5]

To prove a hybrid Section 301 claim, the Plaintiff must show that the Credit Union breached the CBA and that the Union breached its duty of fair representation. *DelCostello v. Int'l Bhd. of Teamsters,* 462 U.S. 151, 164-65 (1983); *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 20-21 (1st Cir. 2003) (plaintiff must provide "sufficient evidence from which a reasonable factfinder can conclude not only that the discharge was improper but also that the union's breach

---

[4] The Defendants have filed two motions for summary judgment, plus two reply briefs (Docket Entries ## 5, 9, 29, 36), plus briefs in response to the Prior Report (Docket Entry # 12), and the new Report.

[5] The Report also includes a meticulous examination of the statute of limitations issue with regard to the Section 301 claim. (Report at 33-46.) Plaintiff's Objections add nothing new to the discussion. (Objections at 9-10.) To avoid unnecessary re-argument of the statute of limitations issue here, the Defendants incorporate by reference their arguments in their moving papers (Docket Entry # 29, at 12-14; and Docket Entry # 36, at 8-14), and urge the conclusion that the Section 301 claim is time barred. The Report reaches this conclusion as well (Report at 44), but does not explicitly recommend dismissal on this procedural ground, and thus also considers the Section 301 claim on the merits.

undermined the grievance process and thereby contributed to the error"). She cannot prove either of these elements.

### 1.    The Union's Conduct

With regard to the Union, the Report offers a thorough review of the Union's reasons for its decision not to pursue the Plaintiff's grievance. (Report at 47-51.) As set forth more fully in the Defendant's summary judgment brief (Docket Entry # 29, at 8-10), the summary judgment record establishes that the Union investigated the Credit Union's conduct and determined that the Union was unlikely to be able to show a breach of the CBA by the Credit Union. The Union is not required to take further steps. (Report at 49-50 ("union is required to investigate an employee's grievance only to the extent necessary to uncover the merits of the employee's case") (citation omitted)). Here, the Union concluded that it was unlikely to prevail at arbitration because the Credit Union did not act unreasonably in requiring medical documentation to substantiate Plaintiff's request for a medical leave of absence. The Union did not act in an arbitrary or capricious manner; indeed, the Report concludes that the "grievance had little merit." (Report at 51.)

Plaintiff now speculates that the Union's motives were suspect, but she cannot point to any evidence to support this. There is none. It is simply insufficient for the Plaintiff to argue that "the Union's change in position at the last minute presents a disputed question of fact as to motive, and would defeat summary judgment." (Objections at 8.) There is no question of fact as to the Union's reasoning or its "motives." Instead, the evidence in the summary judgment record is that the Union investigated the grievance, determined that the Credit Union did not violate the CBA, and decided not to pursue the grievance further because it was not likely to succeed at arbitration. (*See* Docket Entry # 31, Affidavit of Mary Mahoney, ¶¶ 16-19.) Furthermore, because the Plaintiff did not want to return to work at the Credit Union, the Union found there

was no viable remedy for the grievance.[6] *Id.,* ¶ 20. "Courts may not substitute their own views for those of the union." *Miller v. United States Postal Service*, 985 F.2d 9, 12 (1st Cir. 1993). This evidence is uncontradicted. The Plaintiff deposed the president of the Union, Mary Mahoney. She had every opportunity to establish a record on this issue. There is no countervailing evidence to provide.

Accordingly, the Court should adopt the Report's recommendation that the Plaintiff cannot establish a breach of the Union's duty of fair representation.

### 2. The Credit Union's Conduct

With regard to the Credit Union's conduct, this too is well-trod ground. To prevail on the Section 301 claim, the Plaintiff must establish that the Credit Union's "discharge was improper." (Report at 51 (quoting *Mulvihill*, 335 F.3d at 20)). As set forth more fully in the Defendants' summary judgment briefs and the related exhibits, counsel for the Credit Union "asked plaintiff a number of times for medical documentation in the form of a doctor's report to support the request" for an unpaid medical leave of absence. (*Id.* at 49 (referring to Docket Entry # 7, Exs. 4, 6, and 8)). "When plaintiff failed to produce the requested material, the Credit Union found 'just cause' for a termination and the existence of a 'gross neglect of duty' because of her extended absence for more than eight weeks." *Id.* There is nothing unreasonable about the Credit Union's decision to terminate the Plaintiff. The Report observes that it was "prudent" for the Credit Union to request a doctor's report, and that although the Plaintiff "complained about emotional and physical abuse on the part of Doucette, plaintiff did not support the mental and physical injuries with the requested medical documentation." *Id.* at 52-53.

---

[6] By the time the Union withdrew the grievance on June 6, 2005, Ms. Doucette no longer worked at the Credit Union. She retired the previous year, on July 2, 2004. (*See* Docket Entry # 30, Defendants' Statement of Undisputed Material Facts, ¶ 7.)

To bypass the ample and undisputed documentary evidence supporting the Credit Union's decision, the Plaintiff contends that the Report misreads the CBA's provision governing requests for unpaid leaves of absence: "The Magistrate granted summary judgment based on the unsustainable conclusion that the Credit Union made a 'reasonable finding there was a 'gross neglect of duty' because of the plaintiff's failure to provide medical documentation for the extended leave of absence." (Objections at 8 (quoting Report at 49)). Plaintiff's objection here is that the CBA "does not require medical documentation and, in fact, does not even require that leave is based on a medical condition." *Id.* This misses the point. The Report does not conflate the CBA's provision for unpaid leaves of absence (Article XV) with its provision for paid sick leave (Article XII). There is no confusion on this issue. The Report merely observes that under Article XII medical documentation is expressly required for an employee to obtain 15 days of paid sick leave in addition to the annually allotted 15 days paid sick leave. (Report at 17-18, and n. 16.) This is undisputed. The Report also observes that "unpaid leaves of absence for good and sufficient reason in the opinion of the Employer shall be granted upon written request and shall not be unreasonably denied." (Report at 17 (quoting Article XV)). This is also undisputed.

The Plaintiff takes issue with the Report's conclusions that it was not unreasonable for the Credit Union to request medical documentation to support the Plaintiff's request for a medical leave of absence, and that "the Credit Union did not 'unreasonably deny' the leave within the meaning of Article XV given the undisputed absence of the requested doctor's report." (Report at 52-53.) As the Report correctly points out, by the time the Plaintiff submitted a written request for a leave, she had exhausted all of her sick leave and vacation time, had taken an extended leave of absence without approval, and had not shown up for work since

12

the expiry of any sick or vacation days eight weeks earlier.[7] (Report at 52.) She claimed that she was unable to return to work for medical reasons but declined to substantiate this with a doctor's report. (*Id.*) The Report therefore concludes that "the board's decision to require medical documentation to continue an unpaid leave of absence does not breach the terms of the 2003 CBA." (*Id.* at 53.) "It was both reasonable and prudent for the Credit Union to require medical documentation for an unpaid leave of absence based on alleged mental and physical abuse." (*Id.* at 53-54.) There is no violation of the CBA by the Credit Union.

The Plaintiff has not proffered sufficient facts to show a genuine issue of material fact on the Credit Union's breach of the CBA. For all of these reasons, the Court should adopt the Recommendation for entry of summary judgment on Count III on substantive grounds.

    **C.    Count IV: The Report Correctly Concludes that the Plaintiff Has Failed to Articulate Any Federal or State Civil Rights Claims or Public Policy Claims.**

The Amended Complaint includes a vague amalgam of assertions in Count IV, which purport to set forth claims for violations of federal and state civil rights, and of public policy. The Report concludes that none of the allegations withstand scrutiny under Rule 56. "With Defendants having identified the deficiencies of Count IV, it was incumbent upon plaintiff to set forth a cause of action. She fails in this task." (Report at 56.) In her Objections, the Plaintiff makes no argument against the Recommendation for dismissal of Count IV. She cites in passing the same federal and state regulations (12 CFR 748.0 and 748.1; and 209 CMR 4.03), but does

---

[7] The Plaintiff does not contest the fact that when she stopped coming to work after August 14, 2003, her sick leave and vacation time expired on November 30, 2003. Plaintiff has not contested this issue at any time in her correspondence with the Credit Union regarding her request for an unpaid leave of absence, and does not do so here. (*See* discussion of this issue in the Report at 16, n. 15.) The Report correctly concludes that "the only reasonable inference is that plaintiff did not have the banked additional vacation days that would allow her not to report to work from late November to early February." (*Id.*)

not identify a specific cause of action.  (Objections at 2.)   Plaintiff appears to have waived any objection to this portion of the Report.  (*See* Report at 55-60.)

Accordingly, the Defendants request that the Court adopt the Recommendation for entry of judgment for the Defendants on Count IV.

## **CONCLUSION**

For all of the foregoing reasons, and those set forth in the Defendants' Memorandum of Law and Reply Brief, the Defendants are entitled to summary judgment on all claims against them.  The Defendants respectfully request that the Court adopt the March 13, 2008 Report and Recommendation, allow the Defendants' Motion for Summary Judgment, and enter judgment in the Defendants' favor on all counts of the Amended Complaint.

Respectfully submitted,

Defendants

DONNA BOGGS, MARIAN DOUCETTE, BRENDAN HALL, WILLIAM FRANCIS, MARY LOU MEGAN, and BOSTON GLOBE EMPLOYEES CREDIT UNION

By their attorneys,

*/s/ Elizabeth A. Houlding*
Harvey Weiner, BBO# 519840
Elizabeth A. Houlding, BBO# 645981
PEABODY & ARNOLD LLP
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA  02210

April 3, 2008                                      (617) 951-2100

**CERTIFICATE OF SERVICE**

      I, Elizabeth A. Houlding, counsel for the defendants, do hereby certify, that I have this 3rd day of April, 2008 served the *Brief of Defendants in Response to Plaintiff's Objections to March 13, 2008 Report & Recommendation Re: Defendants' Motion for Summary Judgment*, by causing a copy thereof, to be sent electronically to the registered participants in this case, if any, as identified on the Notice of Electronic Filing (NEF) and paper copies mailed, first class mail, postage prepaid to any non registered participants in this case.

                                                         */s/Elizabeth A. Houlding*
                                                         Elizabeth A. Houlding

679804_1
193-90324